UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


UNITED STATES OF AMERICA,   )    CASE NO:  4:18-MJ-01203
                      )
          Plaintiff,   )      CRIMINAL
                      )
    vs.              )     Houston, Texas
                      )
JOSE MANUEL TESTINO,     )    Friday, September 21, 2018
                      )    (10:27 a.m. to 12:32 p.m.)
          Defendant.   )    (12:44 p.m. to  2:10 p.m.)


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE PETER BRAY,
UNITED STATES MAGISTRATE JUDGE


Appearances:         See next page


Court Recorder [ECRO]:  Shoshana Arnow / Jennifer Olson

Clerk:             Jason Marchand

Transcribed By:        Exceptional Reporting Services, Inc.
                      P.O. Box 18668
                      Corpus Christi, Texas  78480-8668
                      361-949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES FOR:


Plaintiff:                      SARAH EDWARDS, ESQ.
                                JOHN PEARSON, ESQ.
                                ROBERT JOHNSON, ESQ.
                                U.S. Attorney's Office
                                1000 Louisiana, Suite 2300
                                Houston, TX 77002

Defendant:                      EDWARD R. SHOHAT, ESQ.
                                MONIQUE GARCIA, ESQ.
                                Jones Walker
                                201 S. Biscayne Blvd., Suite 2600
                                Miami, FL 33131

                                JAMES M. ARDOIN, III, ESQ.
                                Jones Walker
                                811 Main St., Suite 2900
                                Houston, TX 77002

1                          INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CORBIN WICKMAN | 6 | 55/77/105 | 111 | -- |

DEFENDANT'S WITNESSES

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARIA DIAZ | 119 | 126 | | |
| WALTER TESTINO | 130 | 139 | 141 | -- |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 1, 2 | 28 |
| 3, 4 | 41 |

| DEFENDANT'S EXHIBITS | RECEIVED |
|---|---|
| 3, 4 | 150 |

1      <u>**Houston, Texas; Friday, September 21, 2018; 10:27 a.m.**</u>

2                          **(Call to Order)**

3          **THE COURT:**  Jose Manuel Testino.

4          So why don't we -- you know, maybe the Government

5   lawyers over here, and the Defense lawyers over there?  And

6   let's all announce our presence.  And let me write down who all

7   is here.

8          **MR. SHOHAT:**  Should we switch tables?

9          **THE COURT:**  I don't care about that.  I just want to

10  know who's who.

11         **MR. PEARSON:**  We're happy to enter appearances, Your

12  Honor.  John Pearson on behalf of United States, along with

13  Sarah Edwards and Robert Johnson.

14         **THE COURT:**  Hold on a minute.  Okay.  All right, and

15  for --

16         **MR. SHOHAT:**  Good morning, Your Honor.  My name is Ed

17  Shohat.

18         **THE COURT:**  Good morning.

19         **MR. SHOHAT:**  I'm with Jones Walker LLP in Miami.  We

20  have filed a permanent full appearance.

21         **THE COURT:**  Got it.

22         **MR. SHOHAT:**  In the case with me in court today is

23  Monique Garcia of my office in Miami and Jimmy Ardoin of our

24  Houston office.

25         **THE COURT:**  Okay, is that all the lawyers?

1          **MR. SHOHAT:** That's the lawyers that will be

2   participating, Judge.

3          **THE COURT:** Okay.

4          Sir, what's your name?

5          **THE DEFENDANT:** Jose Manuel Gonzalez-Testino.

6          **THE COURT:** All right.

7          Let me just ask the lawyers, because I know that

8   there's a lot that's happened here; he's made an initial

9   appearance, correct, and been advised --

10         **MR. SHOHAT:** Correct.

11         **THE COURT:** -- of all of his rights over in Miami?

12         **MR. SHOHAT:** And here, a week ago today.

13         **THE COURT:** And here already, okay. Sorry, there's a

14   lot going -- there's --

15         **MR. SHOHAT:** Yeah.

16         **THE COURT:** -- sort of two docket sheets. So all we

17   really need to do this morning then is the preliminary and

18   detention hearing, correct?

19         **MR. SHOHAT:** Correct.

20         **MS. EDWARDS:** That's correct, Your Honor.

21         **THE COURT:** Okay. I don't need to talk to him about

22   the charges; that's already been done?

23         **MR. SHOHAT:** It's all done.

24         **THE COURT:** Okay. Well, then call your first

25   witness.

1       **MS. EDWARDS:**  Thank you, Your Honor.  The Government

2  will call Special Agent Corbin Wickman.

3       **THE CLERK:**  Corbin Wickman?  Face me.  Raise your

4  right hand.

5            **CORBIN WICKMAN, GOVERNMENT'S WITNESS, SWORN**

6       **THE COURT:**  And if you speak up, you don't have to

7  stick your face right in that microphone.  Yeah, just --

8  exactly, just speak up, and that'll pick everything up.

9                        **DIRECT EXAMINATION**

10 **BY MS. EDWARDS:**

11 Q    Agent Wickman, could you please introduce yourself to the

12 Court and spell your last name for the record?

13 A    Yes.  My name is Corbin Wickman; that's W-I-C-K-M-A-N.

14 And I'm a special agent with the Department of Homeland

15 Security, Homeland Security Investigations.

16 Q    And how long have you been a special agent?

17 A    Since 2005.

18 Q    Have you been working in Houston that entire time?

19 A    I have.

20 Q    And which groups within Homeland Security Investigations

21 are you a part of?

22 A    Yes, I spent about 10 years in our commercial fraud group,

23 investigating importation of counterfeit computer parts and

24 other counterfeit goods.

25            In the last three years, I've been assigned to the

1   financial fraud group, investigating various financial crimes,

2   including money laundering and violations of the Foreign

3   Corrupt Practices Act.

4   Q    Are you familiar with an investigation of an individual

5   known as Jose Manuel Gonzalez-Testino?

6   A    Yes.

7   Q    How are you familiar with that investigation?

8   A    That is an investigation being conducted by my group.

9   Q    Are you the primary case agent on that investigation?

10  A    No.

11  Q    And is that investigation part of a larger group of FPCA

12  cases being handled by group?

13  A    Yes.

14  Q    What have you done to prepare for your testimony here

15  today, Mr. Wickman?

16  A    I reviewed numerous reports of investigation, agent

17  interview notes, travel records for Mr. Gonzalez, and spoken

18  with other agents familiar with the investigation.

19  Q    What is the crime that Mr. Gonzalez is being investigated

20  for?

21  A    It's foreign public corruption, more specifically bribes

22  paid to foreign government officials in exchange for something

23  of value.

24  Q    And is Mr. Gonzalez-Testino the bribe payor, the bribe

25  recipient; what's his role in this scheme?

1  A    He would be a bribe payor.

2  Q    And who is the person or persons he's bribing?

3  A    Various officials with the Venezuelan state-owned oil and

4  gas company known as Petroleos de Venezuela or PDVSA and/or its

5  wholly-owned subsidiaries Citgo or Bariven.

6  Q    All right.  Can you tell me a bit about those

7  subsidiaries?  What does Bariven do?

8  A    Bariven is the procurement arm of PDVSA.

9  Q    So they buy things for the full operation?

10  A    Yes.

11  Q    Okay.  How about Citgo?

12  A    Citgo is a company based in Houston, Texas.  And they also

13  procure things that PDVSA needs in the oil and gas industry.

14  Q    Okay.  So Citgo is a wholly-owned subsidiary of PDVSA; is

15  that correct?

16  A    Yes.

17  Q    And --

18        THE COURT:  How do you spell that company name that

19  you're referring to

20        MS. EDWARDS:  The acronym, Your Honor, is PDVSA.

21        THE COURT:  No, the one that you just said?

22        MS. EDWARDS:  Sorry, Citgo, C-I-T-G-O.

23        THE COURT:  Okay.  I just --

24        THE WITNESS:  Gas station --

25        THE COURT:  Got it.

1          **THE WITNESS:**  -- Citgo gas station.

2          **THE COURT:**  I thought it was.  I just wanted to make

3     sure I knew what you were talking about.

4     **BY MS. EDWARDS:**

5     Q    So is it actually possible then for a Venezuelan official

6     working for the state-owned enterprise to be living and working

7     here in Houston?

8     A    Yes.

9     Q    Okay.  So that's the big picture.  Let's step back and

10    talk about part of the investigation specifically dealing with

11    Mr. Gonzalez for a minute.

12         For the rest of the hearing, I'm going to refer to

13    PDVSA and the subsidiaries that you've mentioned just generally

14    as PDVSA.  And I'm going to refer to the Defendant as Gonzalez-

15    Testino.

16         How did the investigation with respect to

17    Mr. Gonzalez begin?

18    A    Our group was conducting an investigation of other

19    individuals, specifically Mr. Roberto Rincon (phonetic) and

20    Abraham Shiera (phonetic).  And that investigation lasted for

21    several years and resulted in the arrest and eventual guilty

22    plea entered into by Mr. Roberto Rincon and Mr. Shiera.  They

23    were also individuals who were paying bribes to PDVSA officials

24    in order to obtain PDVSA contracts and other things of value.

25         **THE COURT:**  So spell -- Rincon is as it sounds.  But

1   Shiera, how do you spell that?

2           **THE WITNESS:**  I believe it's S-H-I-E-R-A.

3           **THE COURT:**  Okay, go ahead.

4   **BY MS. EDWARDS:**

5   Q    And in what year did Mr. Rincon and Mr. Shiera plead

6   guilty?

7   A    In 2016.

8   Q    After they were convicted, did they provide you with any

9   additional information about bribery at PDVSA?

10  A    Yes.  They described the -- kind of the management

11  structure of PDVSA.  And they identified several higher-level

12  PDVSA officials who had all received bribe payments.  These are

13  people that they, in particular, paid bribes to at PDVSA in

14  order to obtain contracts.

15  Q    And these higher-level officials, did they have a name for

16  this group of people?

17  A    Yes, they referred to them as the management team.

18  Q    Was this management team charged?

19  A    Yes, several individuals, five to be specific.  Four of

20  the people have been arrested in Spain.  And of those four

21  individuals arrested in Spain, two have since been extradited

22  to the United States.  And one of the five still remains a

23  fugitive.

24  Q    Have either of the individuals who have been extradited to

25  the United States pled guilty?

1    A    Yes.  One individual in particular by the name of Cezar

2    (phonetic) Rincon; no relation to Roberto Rincon, but same last

3    name.

4    Q    And has Mr. Cezar Rincon provided Homeland Security

5    Investigations with any information regarding the Defendant?

6    A    Yes, he has.  Cezar Rincon has stated that he knows

7    Mr. Gonzalez from many years ago when they worked together at

8    PDVSA.  During that time, they were close friends.  And

9    Mr. Cezar Rincon said that they, you know, had lunch together

10   two to three times a week during that time period.

11   Q    And did they stay in touch afterwards as well?

12   A    Yes.

13   Q    What was Mr. Cezar Rincon's position in PDVSA during the

14   timeframe described in the complaint?

15   A    Yes.  He was the general manager of Bariven.  Again,

16   that's the procurement arm of PDVSA.

17   Q    And in that role, what sort of help was Mr. Cezar Rincon

18   in a position to give the Defendant?

19   A    He had a role in the awarding of contracts to vendors,

20   such as companies owned by Mr. Gonzalez.  So broadly, he helped

21   Mr. Gonzalez obtain PDVSA contracts.  He also aided

22   Mr. Gonzalez in getting paid after completion of those

23   contracts.  And thirdly, he helped to ensure that Mr. Gonzalez

24   would be paid in United States dollars for those contracts

25   instead of the Venezuelan bolivar.

1   Q    And why was it advantageous for Mr. Gonzalez to be paid in

2   dollars instead of bolivars?

3   A    At that time, the Venezuelan currency, the bolivar, was

4   declining in value rapidly.

5   Q    Let's talk about the mechanics of how these bribes were

6   paid.  What did your investigation reveal about the accounts

7   into which Cezar Rincon received his bribe payments?

8   A    The accounts that Mister -- that Cezar Rincon received

9   these payments; there was two bank accounts.  Both bank

10  accounts were in the same corporate name, so they were

11  corporate accounts as opposed to an individual account.

12          One of the bank accounts was in Houston.  And one was

13  in Miami.  So again, these bank accounts are in corporate --

14  corporation names.  The company in particular was Inversiones

15  JKL.  And those companies were actually registered, I believe

16  in Panama, and -- or owned by relatives of Cezar Rincon, not

17  owned by him directly.

18  Q    And is it possible that Inversiones JKL was actually a

19  Florida-based company?

20  A    Yes.  I apologize.

21      **MR. SHOHAT:**  I'm sorry, I didn't hear that question,

22  Ms. Edwards.  Could you repeat it, please?

23      **MS. EDWARDS:**  Certainly.  I asked the agent if it was

24  possible that Inversiones JKL was actually a Florida-based

25  company.

1        **MR. SHOHAT:**  Oh, okay.

2   **BY MS. EDWARDS:**

3   Q    There are two bank accounts identified in the complaint,

4   Agent Wickman.  And you just described a Houston and Miami bank

5   account.  Can you tell us which is bank account one and two in

6   the complaint, and which banks that they come from?

7   A    Yes.  Bank account one was -- again, it's a corporate

8   account in the name of Inversiones JKL.  And it's at Bank of

9   Houston here in Houston, Texas.  And bank account number two --

10  again, same corporate name, Inversiones JKL, that was at a

11  bank, a BB&T based in Miami.

12  Q    And these accounts were not personal accounts in Mr. Cezar

13  Rincon's name?

14  A    No.

15  Q    So how did Mr. Gonzalez know to direct the payments to

16  those two accounts?

17  A    Mr. Cezar Rincon and Mr. Gonzalez met in person.  And at

18  that time, Cezar Rincon provided Mr. Gonzalez with the banking

19  information of these accounts in which the funds were to be

20  paid.

21  Q    And you've described conversations with Mr. Cezar Rincon

22  in which he's provided this information.  Do you have

23  additional evidence related to these two bank accounts?

24  A    Yes.  Documents were obtained from the U.S. banks in

25  Houston and Miami.  Those banking records showed the deposits,

1   which are, I believe listed in the criminal complaint, and also

2   show the listed -- the signators of those bank accounts,

3   confirming that those accounts are held in other individuals'

4   names.  And those individuals are relatives of Cezar Rincon.

5   Q    And what is the total amount of bribe payments alleged in

6   the complaint?

7   A    Approximately $630,000.

8   Q    So those are the accounts that received the bribes.  What

9   has your investigation revealed about the accounts through

10  which the Defendant paid the bribes?

11  A    So the sending banks, it was banks in Switzerland, so

12  these are Swiss accounts.  And the accounts are again held in

13  corporate -- by a corporation.

14         Again, they're not personal bank accounts in

15  Switzerland, but corporate accounts.  The -- there were three

16  separate company names that these accounts were listed in.  One

17  company name was Ameri-traders (phonetic).  Another was RH

18  International (phonetic).  And another was Henri Pittier

19  (phonetic).  So they're all three Swiss accounts.  Each of

20  those three --

21         THE COURT:  What was the last one?

22         THE WITNESS:  Henri Pittier, P-I-T-T-I-E-R.  So we

23  have three Swiss bank accounts that initiated the -- that sent

24  those funds.  Those three companies are actually all registered

25  in Panama.

1   **BY MS. EDWARDS:**

2   Q     And just for everyone's reference, can you tell us which

3   of those three accounts are companies A, B, and C in the

4   complaint?

5   A     Yes.  Company A is Ameri-traders.  Company B is RH

6   International.  And company C is Henri Pittier.

7   Q     In his business and this bribery scheme, are you aware of

8   any business partners or coconspirators of the Defendant?

9   A     Yes, several.

10  Q     And in particular, who is the Coconspirator One in the

11  complaint?

12  A     Yes.  An individual by the name Gonzalo Jose Jorge

13  Morales-Divo (phonetic).

14  Q     We'll call him Mr. Morales.

15  A     Mr. Morales.

16  Q     Has one person had the opportunity to speak with

17  Mr. Morales?

18  A     Yes.

19  Q     And what did you learn about the briberies when you spoke

20  with Mr. Morales?

21  A     Mr. Morales was a business partner with Mr. Gonzalez.  He

22  provided startup capital.  And their partnership and the

23  startup capital would enable them to bid on and obtain PDVSA

24  contracts.  And Mr. Morales stated that at the time that he

25  entered into this partnership he was aware the bribes were

1   being paid and going to be paid to PDVSA officials in order to

2   obtain these contracts.

3   Q    And did Mr. Cezar Rincon have any knowledge of

4   Mr. Morales' involvement in this scheme?

5   A    Yes.  Although, we don't believe Cezar Rincon ever met or

6   dealt directly with Mr. Morales, there were instances where

7   Cezar Rincon was meeting with Mr. Gonzalez, and Mr. Gonzalez

8   would pick up the phone and call Mr. Morales to discuss certain

9   aspects of the partnership and the business.

10  Q    Did Mr. Morales and Mr. Gonzalez ever share an office at

11  any point during their business partnership?

12  A    Yes, they did.  The office was located at 848 Brickell

13  Avenue in Miami, Florida.

14  Q    And did Homeland Security also have the opportunity to

15  discuss Mr. Gonzalez's assets with Mr. Morales?

16  A    Yes.  Mr. Morales stated that Mr. Gonzalez controlled many

17  assets, companies, bank accounts, and had numerous assets in

18  the form of condominiums in the Miami area, a house in the

19  Miami area, apartments in Switzerland and in Spain, a private

20  plane.  And I think the interesting thing that Mr. Morales

21  stated is that Mr. Gonzalez was not the listed owner of any of

22  these companies or assets, that all these companies and assets

23  were -- the assets were in the names of companies for other

24  individuals.

25  Q    But did Mr. Morales understand that Mr. Gonzalez still

1   exercised control over these companies and assets?

2   A    Yes.

3   Q    In addition to your conversation with Mr. Morales, has

4   your investigation yielded other evidence of Mr. Gonzalez's

5   corporate structure?

6   A    Yes, it has.  Roberto Rincon, again, a defendant who was

7   previously investigated by our group and who pled guilty and

8   cooperated with our investigation, provided a document.  It's a

9   document that he stated actually originated at PDVSA.  And as a

10  result of Mr. Rincon's bribe payments to various PDVSA

11  officials, he obtained this PDVSA document.  This document

12  shows an elaborate list of companies controlled by Mr. Gonzalez

13  in the United States, in Panama, in Switzerland, and in Spain,

14  and in other countries.

15  Q    Okay.  And so this is an internal PDVSA document that

16  you've reviewed?

17  A    Yes.

18          MS. EDWARDS:  May I approach, Your Honor?

19          THE COURT:  Sure.

20  BY MS. EDWARDS:

21  Q    Agent Wickman, I'm showing you what I've marked for

22  identification as Government's Exhibit 1.  Is this the document

23  that you are referring to?

24  A    Yes.

25          THE COURT:  Do you have another one of those?

1          **MS. EDWARDS:** (Indiscernible)

2          **THE COURT:** Okay, sure. Does he need it to testify?

3          **MS. EDWARDS:** (Indiscernible)

4    **BY MS. EDWARDS:**

5    Q    Agent Wicker, do you --

6          **THE COURT:** Can I just look at this for a second

7    while you're -- just give me one second. You all have been

8    doing this for a while.

9          **MS. EDWARDS:** Of course.

10         **THE COURT:** All right, go ahead.

11   **BY MS. EDWARDS:**

12   Q    Agent Wickman, you stated that you received this document

13   from Roberto Rincon. What is it exactly?

14   A    It looks like it's part of a, maybe a PowerPoint

15   presentation. But it's -- the title at the top is kind of the

16   empire of Mr. Jose Manuel Gonzalez. And it lists, again,

17   numerous companies that are believed to be controlled by

18   Mr. Gonzalez in a number of countries.

19   Q    And based on your investigation to date, do you believe

20   that this is a complete list of the companies controlled by

21   Mr. Gonzalez?

22   A    No.

23         **MR. SHOHAT:** Objection. What he believes is not

24   relevant. What he has information on is relevant.

25         **MS. EDWARDS:** I'll rephrase --

1          **THE COURT:**  Well, just ask --

2          **MS. EDWARDS:**  -- Your Honor.

3          **THE COURT:**  -- it that way then.

4    **BY MS. EDWARDS:**

5    Q    Agent Wickman, based on the evidence you've gathered to

6    date, do you believe this is a complete list of the companies

7    controlled by Mr. Gonzalez?

8    A    No, there are other companies that we believe Mr. Gonzalez

9    control that do not appear on that list.

10         **THE COURT:**  Well, can I ask you, so does -- did

11   Mr. Rincon, Roberto, tell you he has knowledge of this, or is

12   this -- who has knowledge of this, this document?  Who made

13   this?

14         **THE WITNESS:**  Presumably --

15         **THE COURT:**  Well, no --

16         **THE WITNESS:**  -- he --

17         **THE COURT:**  -- do you know who made it?

18         **THE WITNESS:**  According to Mr. Rincon, somebody at

19   PDVSA made it, because he obtained from PDVSA.

20         **THE COURT:**  But does Mr. Rincon have knowledge of the

21   matters that are set forth in this document?  Does Mr. Rincon

22   know this document to be true?  Does he say this is -- this

23   reflects my understanding?

24         **THE WITNESS:**  I don't know of Mr. Rincon's knowledge

25   on that matter.

1          THE COURT:  Do you have information that corroborates

2   this?

3          THE WITNESS:  Yes, sir; yes, Your Honor.

4          THE COURT:  Are you going to talk about that or --

5   because I mean this --

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  -- by itself is a document that was made

8   by somebody we don't know.

9          THE WITNESS:  Other witnesses that we've spoken to

10  have confirmed the various companies on that list are in fact

11  companies controlled by Mr. Gonzalez.  So it's been

12  corroborated by other witnesses.

13         THE COURT:  So are you offering this?

14         MS. EDWARDS:  Yes, Your Honor.

15         THE COURT:  Are you objecting to it?

16         MR. SHOHAT:  No, sir.

17         THE COURT:  Okay.  Go ahead then.

18         MS. EDWARDS:  So I think you led me to my next

19  question, Your Honor.

20  BY MS. EDWARDS:

21  Q    Agent Wickman, have you talked to other witnesses who have

22  corroborated the bribery scheme?

23  A    Yes.

24  Q    Who are these additional witnesses, some of them?

25  A    So we have spoken with a former employee of Mr. Gonzalez

1   and also an employee of a Houston company who has received

2   bribes directly from Mr. Gonzalez.

3           **MR. SHOHAT:**  I'm sorry, I didn't hear that whole --

4   an employee of what company?

5           **THE WITNESS:**  Of a Houston area company.

6   **BY MS. EDWARDS:**

7   Q    And sorry, Agent Wickman; I'm going to go back to what you

8   learned from Mr. Morales for just a second.  I skipped

9   something.

10          In addition to Mr. Morales describing the way in

11  which Mr. Gonzalez controls these assets, did he describe any

12  specific assets for you?

13  A    Yes.  Mr. Morales indicated that Mr. Gonzalez had condos

14  in the Miami area, a house in the Miami area in Miramar, also

15  apartments in Switzerland and in Spain, and a private plane.

16  Q    And you said you had also spoken to a former employee of

17  Mr. Gonzalez's; who's that?

18  A    Yes, a woman by the name of Johana Haddad (phonetic).  She

19  -- in addition --

20          **THE COURT:**  You need to spell these names, just so we

21  get it right.

22          **THE WITNESS:**  Yes.  I believe it's J-O-H-A-N-A; last

23  name H-A-D-D-A-D.

24  **BY MS. EDWARDS:**

25  Q    And what was Ms. Haddad's role in Mr. Gonzalez's business?

1   A    So in addition to being an employee with some other

2   responsibilities, she was also the frontperson or the listed

3   owner of one company in particular.  I'm blanking on the

4   company; I can't -- Petroleum Logistics (phonetic), I believe.

5   So she was the listed owner of that company, although she

6   didn't actually have direct control of that company.

7            But as part of her duties, she prepared and

8   maintained a spreadsheet.  And this spreadsheet detailed

9   contracts which had been awarded from PDVSA and PDVSA

10  subsidiaries, and listed the bribe percentages that would be

11  owed to various officials related, you know, to obtaining those

12  contracts.  So she was tasked with preparing and maintaining

13  this spreadsheet.

14  Q    And are those spreadsheets in the possession of law

15  enforcement?

16  A    Yes.

17  Q    Do they detail bribes that are related to a specific PDVSA

18  subsidiary?

19  A    Yes, Citgo.

20  Q    You said that Cezar Rincon was the general manager of

21  Bariven.  Does he appear on the spreadsheet?

22  A    No.

23  Q    Did Ms. Haddad work in the same office as Mr. Gonzalez and

24  Mr. Morales?

25  A    Yes, she worked out of the 848 Brickell Avenue office in

1   Miami.

2   Q    And did Ms. Haddad actually oversee specific aspects of

3   the bribery scheme?

4   A    Yes, she assisted in payments of bribes to various

5   government officials.

6   Q    Did you discuss Mr. Gonzalez's assets with Ms. Haddad?

7   A    Yes.  Ms. Haddad also provided information that

8   Mr. Gonzalez has, again, condos in Miami, house in Miramar.

9   She also described a condo at the Cosmopolitan here in Houston.

10  She also said that he had various residential properties in

11  Atlanta that were used as rental income.  And she also

12  mentioned luxury vehicles, including a Ferrari, two Range

13  Rovers, a Cadillac Escalade, and also a private plane.

14        Specific to the private plane, she was able to recall

15  a partial tail number being 820.  She wasn't sure if that was

16  the beginning or the end, but it was a partial tail number that

17  she recalled as being a plane owned by Mr. Gonzalez.

18  Q    Does she know what type of aircraft that was the tail

19  number for?

20  A    Yes, a Hawker.

21        **THE COURT:**  How does she know that all of these

22  things are owned by Mr. Gonzalez?

23        **THE WITNESS:**  Mr. Gonzalez told her these things.

24        **THE COURT:**  And can I just -- I'm sorry; so

25  Mr. Gonzalez, according to your -- what you're saying, has been

1    working out of this office where?

2              **THE WITNESS:**  848 Brickell Avenue in Miami.

3              **THE COURT:**  And he's been working out of there for

4    how long?

5              **THE WITNESS:**  I don't know a starting date for that.

6              **THE COURT:**  I mean do you --

7              **THE WITNESS:**  Several years.  It would be at least --

8    multiple years.

9              **THE COURT:**  Okay.

10             Go ahead.

11   **BY MS. EDWARDS:**

12   Q    Aside from Ms. Haddad and Mr. Morales's statements, have

13   you collected any additional evidence regarding Mr. Gonzalez's

14   assets in your investigation?

15   A    Yes.  So there's a document that we recovered back in

16   January of this year.  Upon his arrival in the United States at

17   a private airport in Miami, agents conducted a border search of

18   Mr. Gonzalez's electronic devices, being a laptop and three

19   cellphones.

20   Q    When you say conducted a border search, what happened to

21   those devices?

22   A    So whenever someone crosses the United States border,

23   customs officers have the authority to detain electronic

24   devices and conduct a search of those devices for evidence --

25   evidence and involving merchandise.  And so those devices were

1   detained, imaged, and then the devices I believe were

2   ultimately returned to Mr. Gonzalez.

3   Q    I'm sorry to interrupt you.  So you're talking about a

4   document found on which of these devices?

5   A    On the laptop computer.  So there's a document from a

6   Swiss bank --

7            **MR. SHOHAT:**  Excuse me, Judge.  I know that it's

8   admissible for purposes -- I just want to interpose an

9   objection, so I don't waive any issue as binding to search.

10           **THE COURT:**  You don't waive 4th Amendment issues --

11           **MR. SHOHAT:**  Yeah.

12           **THE COURT:**  -- in this hearing --

13           **MR. SHOHAT:**  I just want to make sure.

14           **THE COURT:**  -- for any purpose whatsoever.  You

15  don't --

16           **MR. SHOHAT:**  Thank you.

17           **THE COURT:**  -- and so that's running.  Okay?

18           **MR. SHOHAT:**  Thank you.

19           **THE COURT:**  Yeah.

20           **THE WITNESS:**  So the document is from a Swiss bank.

21  And the document specifically references a company.  And

22  Aziolarefin is the name of the company.  So the document

23  states --

24           **THE COURT:**  You need to spell these --

25           **THE WITNESS:**  I'm going to do my best on this one.

1          **MS. EDWARDS:**  For the spelling, may I, Your Honor --

2          **THE COURT:**  Sure.

3          **THE WITNESS:**  A --

4          **THE COURT:**  I mean I just, you know, you're kind of

5     going fast, and you've got a lot of company names and named

6     names in your head.  But for those of us who have not been

7     investigating this case for a while, I don't know the names,

8     and neither does the court reporter.

9          **THE WITNESS:**  Okay.  Aziolarefin is

10    A-Z-I-O-L-A-R-E-F-I-N.

11         **THE COURT:**   Thank you.

12         **THE WITNESS:**  So this letter states that Aziolarefin,

13    that there's a family of bank accounts at this bank that have

14    in excess of $50 million.

15         **THE COURT:**  $15 million or --

16         **THE WITNESS:**  Five-zero; $50 million as of August

17    2016.

18    **BY MS. EDWARDS:**

19    Q    And what is the Swiss bank for Aziolarefin?

20    A    It is Gonet Cie; it's G-O-N-E-T, and, the ampersand sign,

21    C-I-E; Gonet & Cie.

22    Q    Has this bank come up in other parts of your

23    investigation?

24    A    Yes.  The accounts A, B, and C that were used by

25    Mr. Gonzalez to pay Cezar Rincon, those three accounts were

1   also with the same Gonet & Cie Bank in Switzerland.

2   Q    And do you have the records from the Swiss bank Gonet &

3   Cie?

4   A    No, those records -- a request has been made to obtain

5   those records from Switzerland, but those records have not yet

6   been received.

7   Q    Aside from finding this letter on Mr. Gonzalez's laptop,

8   do you have other evidence that Aziolarefin is a company under

9   his control?

10  A    Yes.  The document provided to us by Roberto Rincon that

11  we entered as Exhibit 1, this Aziolarefin is actually listed as

12  being the same name with slight -- different illegal entities,

13  but are listed in I believe Spain and Panama -- or maybe it's

14  Switzerland and Panama; but this name, Aziolarefin, appears on

15  that document.

16  Q    Do you have any additional evidence that --

17       MR. SHOHAT:  Can you hold on a second?  I don't see

18  the name on the document.

19       THE COURT:  It's in the first column and the second

20  column, third from the bottom, second from the bottom,

21  respectively.

22  BY MS. EDWARDS:

23  Q    Do you have any additional evidence that Aziolarefin is a

24  corporate entity under Mr. Gonzalez's control?

25  A    Yes.  Ms. Haddad also told us that that was a company

 1  controlled by Mr. Gonzalez.

 2          **MS. EDWARDS:**  Your Honor, we'd like to offer

 3  Government's Exhibit 2.

 4          **MR. SHOHAT:**  No objection.

 5          **THE COURT:**  Then it's admitted for this hearing only;

 6  and so is Exhibit 1, for this hearing only.

 7      **(Government's Exhibits Numbers 1 and 2 were received in**

 8  **evidence for this hearing only)**

 9          **MR. SHOHAT:**  This is Exhibit 2, this one.

10          **THE COURT:**  So is somebody going to, just for

11  completeness, do an exhibit list that we can --

12          **MS. EDWARDS:**  Sure.  I'll be --

13          **THE COURT:**  -- attach these to?

14          **MS. EDWARDS:**  -- happy to, Your Honor.

15          **THE COURT:**  All right.  We might even have one.  Do

16  we have a blank exhibit list form?

17          **THE CLERK:**  I can get one, sir.

18          **MR. SHOHAT:**  We would like a blank exhibit list, too,

19  if we could have one.

20          **THE COURT:**  You could do a combined exhibit list.

21  And you can --

22          **MR. SHOHAT:**  That's fine.

23          **THE COURT:**  -- just put D -- you know --

24          **MR. SHOHAT:**  Yeah.

25          **THE COURT:**  -- G1 --

1           **MR. SHOHAT:**  We -- I think we got --

2           **THE COURT:**  -- G2 --

3           **MR. SHOHAT:**  -- two exhibit stickers --

4           **THE COURT:**  -- D1, D2.

5           **MR. SHOHAT:**  -- but we're going to need more than

6    that.

7           **THE COURT:**  Keep going.

8    **BY MS. EDWARDS:**

9    Q    In addition to your conversations with Ms. Haddad about

10   the Defendant's corporate structure and bribery scheme, did you

11   discuss other topics with her?

12   A    Yes.  She indicated that on at least two occasions,

13   Mr. Gonzalez instructed her to destroy evidence.

14   Q    (Indiscernible)

15          **MR. SHOHAT:**  I'm sorry, I didn't -- I apologize, I

16   didn't hear the question or the answer.

17          **MS. EDWARDS:**  I asked Agent Wickman if he had

18   discussed additional topics with Ms. Haddad in addition to the

19   Defendant's corporate structure and bribery scheme versus

20   just --

21          **MR. SHOHAT:**  Okay.

22          **MS. EDWARDS:**  -- discuss the assets.

23   **BY MS. EDWARDS:**

24   Q    So you said there were two occasions on which the

25   Defendant had requested that she destroy evidence?

1  A    Yes.

2  Q    All right, let's start with the first one; when was that?

3  A    So in January of this year, shortly after the border

4  search where customs officers detained Mr. Gonzalez's laptop

5  and cellphones, Mr. Gonzalez contacted Ms. Haddad and stated

6  that his devices had been taken by the government so he did

7  not --

8           THE COURT:  What was the date of his border search?

9  Sorry to keep interrupting.

10          THE WITNESS:  I don't know the exact date.  I believe

11  possibly January the 9th, somewhere -- I don't know the exact

12  date to be sure.

13          THE COURT:  Of this year?

14          THE WITNESS:  Of this year.

15          THE COURT:  And he was on a plane coming --

16          THE WITNESS:  Private --

17          THE COURT:  -- in to where?

18          THE WITNESS:  To Miami.

19          THE COURT:  From where?

20          THE WITNESS:  From Venezuela.

21          THE COURT:  Okay, thank you.

22  BY MS. EDWARDS:

23  Q    This conversation between Ms. Haddad and the Defendant,

24  was it in person, over the phone?  How did this happen?

25  A    I believe it was over the phone.  So Mr. Gonzalez called

1  Ms. Haddad and explained that his electronic devices had been

2  taken by the government.  Mr. Gonzalez instructed Ms. Haddad to

3  access one of his email accounts.  And he provided --

4  Mr. Gonzalez provided Ms. Haddad with the password to that

5  email account and instructed her to delete emails related to

6  the bribe scheme.

7  Q    Did she do that?

8  A    Yes, she did.

9  Q    When was the second time that the Defendant asked

10  Ms. Haddad to destroy evidence?

11  A    So on July 26th of this year, Mr. Gonzalez called

12  Ms. Haddad and said that he needed to speak with her urgently.

13  She was not available at that moment.  She said that she was at

14  a hospital actually caring for her son.  Mr. Gonzalez actually

15  went to the hospital where she was in order to speak with her

16  in person because it was --

17  Q    The meeting took place at the hospital?

18  A    Yes, it did.

19  Q    Okay.  And during this meeting, what did Ms. Haddad and

20  the Defendant discuss?

21       **MR. SHOHAT:**  Excuse me.  I was talking to my client.

22  I apologize about the prior question.  Would you have him

23  repeat -- could you read back the last -- we don't have that

24  ability, right?

25       **THE COURT:**  And let me just say, you're permitted at

1    any time to speak to your client for as long and about --

2              **MR. SHOHAT:**  Right --

3              **THE COURT:**  -- whatever you want.

4              **MR. SHOHAT:**  -- but I didn't hear the last question

5    and answer.

6              **THE COURT:**  So what I'm trying to tell you is, just

7    -- we can pause.

8              **MR. SHOHAT:**  Oh, okay.

9              **THE COURT:**  You can just say, "Can I have a minute?";

10   we can pause.  It's fine.

11             **MR. SHOHAT:**  Thank you.

12             **THE COURT:**  So go back a couple questions or so and

13   just start over.

14   **BY MS. EDWARDS:**

15   Q    So Agent Wickman, I believe you were speaking about the

16   second time the Defendant asked Ms. Haddad to destroy evidence.

17   I don't know if you can remember where I stopped.  Okay.  And

18   you were telling us how that meeting came about.  Can you

19   repeat your answer?

20   A    Yes.  On July the 26th of this year, Mr. Gonzalez

21   telephoned Ms. Haddad and said that he needed to speak with her

22   urgently.  She explained to him that she was at a hospital

23   caring for her son, or her son was being cared for.

24   Mr. Gonzalez drove to that hospital so that they could have a

25   discussion in person.

1   Q    So this meeting took place at the hospital?

2   A    Yes.

3   Q    And what did Ms. Haddad and the Defendant discuss during

4   this meeting?

5   A    So one thing is that Mr. Gonzalez stated that he believed

6   that the government was getting close to him and that he was

7   going to be departing the United States and going to Venezuela.

8   That was one thing that he mentioned.

9   Q    Let me stop you right there.  Did he tell Ms. Haddad that

10  he was leaving for Venezuela?  Did he actually tell her that he

11  was leaving?

12  A    I don't recall if he said specifically that he was -- gave

13  her a destination or that just indicated the fact that he was

14  leaving.

15  Q    Sorry, I interrupted you.  So in addition to the fact that

16  he thought the government was getting close, what else did they

17  discuss?

18  A    Yes.  He also said that he believed that the government

19  knew about the spreadsheet and the nicknames on the

20  spreadsheet.  The nicknames would again allow the government to

21  know which Citgo officials were receiving bribes.

22  Q    I'm not sure that we went into detail on this earlier.  So

23  the spreadsheet that Ms. Haddad maintained, you said it

24  contained the names of Citgo officials that were being paid

25  bribes; is that right?

1   A    Yes.

2   Q    Did it contain the, like, real given legal names of these

3   officials?

4   A    No, it had nicknames which corresponded to real, you know,

5   the real given names of Citgo employees.  And also,

6   Mr. Gonzalez instructed Ms. Haddad to destroy files, emails,

7   discs, and backups related -- that would be related to the

8   bribe scheme.

9   Q    Did the Defendant give Ms. Haddad any instructions about

10  her work laptop?

11  A    Yes.  So after being instructed to destroy these things,

12  Ms. Haddad reminded Mr. Gonzalez that she had already taken the

13  work laptop and mailed that down to Panama, in accordance with

14  a previous instruction that Mr. Gonzalez had given to her.

15  Q    On this occasion, the July 26th meeting, after being

16  instructed by the Defendant to destroy these various types of

17  evidence, did Ms. Haddad destroy that evidence?

18  A    No.

19  Q    When was approximately the first time the government spoke

20  with Ms. Haddad?

21  A    I believe in mid-July.

22  Q    So this meeting was on July 26th?

23  A    Yes.  The first time they spoke with her, I believe it was

24  mid-July.  The second meeting was July 26th.

25  Q    And after her July 26th meeting with the Defendant, what

1    did Ms. Haddad do?

2    A    She -- are you talking about the -- did you ask about the

3    second meeting?

4    Q    Uh-huh, the July 26th.

5    A    Yes.  She contacted her attorney who contacted our office.

6    Q    We'll come back to that.

7              THE COURT:  When did she do that?

8              THE WITNESS:  This would've been --

9              THE COURT:  On that 7/26 date?

10             THE WITNESS:  On or after.

11             THE COURT:  Pretty close?

12             THE WITNESS:  It would've been pretty close.

13   BY MS. EDWARDS:

14   Q    When was --

15   A    I believe.

16   Q    -- was the complaint sworn out, if you remember?

17   A    July 27th.

18   Q    Thank you.  All right.  Are you aware of the Defendant

19   asking anyone else to destroy evidence?

20   A    Yes.  There is an employee at Citgo.  This employee

21   received bribe payments from Mr. Gonzalez.  And Mr. Gonzalez

22   kind of indicated similar things to this employee, that the

23   government was aware of the spreadsheet, and instructed this

24   employee to delete emails related to the bribe scheme.

25   Q    Okay.  Has the government spoken with this employee?

1    A    Yes.

2    Q    And do you know approximately when the conversation

3    between Mr. Gonzalez and this employee about destroying the

4    emails took place?

5    A    I believe that was on July 27th of this year.

6    Q    Was it July 27th or was it earlier in the month?

7    A    Well, I believe there was two instances.  One was in mid-

8    July; I don't have the exact date of that, and then there was a

9    second conversation on July 27th.

10   Q    Okay, we'll talk about the July 27th conversation in a

11   minute.  This conversation between Mr. Gonzalez and this Citgo

12   employee who was instructed to destroy evidence, was that over

13   the phone, again in person?  How did that meeting take place?

14   A    I believe that meeting was in person, here in Houston.

15   Q    And then you stated that there was a second conversation

16   between Mr. Gonzalez and this employee that was relevant to

17   your investigation.  That was on July 27th?

18   A    Yes.

19   Q    And is that a phone conversation or an in-person meeting?

20   A    That was also in person.  Mr. Gonzalez had traveled to

21   Houston on that day.

22   Q    And what was discussed in the second meeting, the July

23   27th meeting?

24   A    Mr. Gonzalez told this employee that he believed that he

25   was in trouble and was going to depart the United States and go

1   to Venezuela.

2   Q    After Mr. Gonzalez instructed this employee to destroy

3   emails, did the employee do so?

4   A    Yes.

5   Q    Let's go back to the information that Ms. Haddad called

6   the government with on July 26th.  In response to this

7   information, what actions, if any, did Homeland Security

8   Investigations take?

9   A    Upon learning that Mr. Gonzalez had, you know, at least

10  indicated that he was potentially going to depart the United

11  States, we conducted queries in various databases that we have.

12  And we found Mr. Gonzalez had a booked flight for Monday, July

13  the 30th, departing Miami and with an intended destination of

14  being Caracas, Venezuela.

15  Q    Does Venezuela extradite to the United States?

16  A    No.

17  Q    What happened on July 30th?

18       THE COURT:  Can I -- sorry.  Do you know when he

19  booked that flight?

20       THE WITNESS:  I do not.  I believe we saw the flight

21  on Friday the 27th.  So I think it would have had to have been

22  on or before --

23       THE COURT:  Well, if you --

24       THE WITNESS:  -- on or before that date.  I don't

25  know how much in advance --

1          **THE COURT:**  Well, I mean did he --

2          **THE WITNESS:**  -- he had that flight booked.

3          **THE COURT:**  -- book the flight in, you know, May or

4    something?

5          **THE WITNESS:**  I don't know.

6          **THE COURT:**  Okay.

7    **BY MS. EDWARDS:**

8    Q    Agent Wickman, what happened on July 30th?

9    A    So agents, after obtaining the arrest warrant for

10   Mr. Gonzalez, were at the airport in Miami on Monday the 30th.

11   Mr. Gonzalez did not appear for the -- that flight on that

12   date.

13   Q    What happened next?

14   A    Shortly after his scheduled departure time, additional

15   queries of the travel database showed that Mr. Gonzalez

16   rebooked a similar flight for the following day, Tuesday, July

17   31st.

18   Q    And what happened on Tuesday, July 31st?

19   A    Mr. Gonzalez, and ex-wife, and daughter arrived at the

20   airport.  And Mr. Gonzalez entered the airport terminal and was

21   taken into custody by HSI agents.

22   Q    Turning to Mr. Gonzalez's travel pattern, did you have the

23   opportunity to research Mr. Gonzalez's border crossings in and

24   out of the United States?

25   A    Yes.

1  Q    What did you learn?

2  A    Since 2015, just in the last three years, Mr. Gonzalez has

3  crossed in and out of the -- from the United States

4  approximately 150 times.

5  Q    And how many of those crossings were in 2018 up to the

6  date of the arrest?

7  A    Twenty-eight.

8  Q    Does Mr. Gonzalez always fly commercial?

9  A    No, he flies commercial and also via private aircraft.

10 Q    And how many of his 2018 crossings involved private

11 aircraft?

12 A    I believe there were seven private air -- three different

13 private aircraft on seven different crossings in 2018 alone.

14 Q    Are any of those three private aircraft, the Hawker,

15 described by Ms. Haddad as being the Defendant's plane?

16 A    Yes.  One of the three aircraft, the tail number is

17 N820JS.  And that aircraft is registered to a company called

18 Agroven Agriculture (phonetic).  And the listed address for

19 that company is the 848 Brickell Avenue in Miami, Florida,

20 where Mr. Gonzalez maintained an office.

21 Q    And do you have additional evidence that Agroven

22 Agriculture is a company under Mr. Gonzalez's control?

23         **MS. EDWARDS:**  Sorry, did we spell Agroven?

24         **THE COURT:**  No.

25         **MS. EDWARDS:**  Okay.

1          **THE COURT:**  Maybe you did, but I don't remember.

2          **THE WITNESS:**  A-G-R-O-V-E-N; Agroven Agriculture.

3          **THE COURT:**  Same number at Brickell as the --

4          **THE WITNESS:**  848 --

5          **THE COURT:**  -- office?

6          **THE WITNESS:**  -- Brickell Avenue, yes.  Yes -- do you

7    want to ask the question again?

8    **BY MS. EDWARDS:**

9    Q    Right.  In -- so in addition to the address, do you have

10   other evidence that Agroven Agriculture is a corporate entity

11   under Mr. Gonzalez's control?

12   A    Yes.  Documents obtained from Mr. Gonzalez's laptop, again

13   these documents obtained pursuant to the border search in

14   January of this year, there were documents on that laptop

15   showing Mr. Gonzalez's control of Agroven.

16   Q    And have any of the witnesses that you've spoken with

17   mentioned Agroven Agriculture?

18   A    Yes, Ms. Haddad also mentioned that that is a company

19   controlled by Mr. Gonzalez.

20   Q    What about the ownership of the other two planes?

21   A    The other two planes are owned by various trust companies

22   in other states.

23   Q    So you have not been able to determine the owner, the

24   ultimate owner of those other two private aircraft?

25   A    No.

1   Q    But Mr. Gonzalez has used all three this year?

2   A    Yes.

3   Q    Going back to his arrest, was Mr. Gonzalez carrying any

4   passports at the time of his arrest?

5   A    Yes.  He had one United States passport and one Venezuelan

6   passport in his possession.

7   Q    Is Mr. Gonzalez a dual citizen?

8   A    Yes, he is.

9        **MS. EDWARDS:**  Your Honor, we have previously provided

10  the Defense full copies of these passports.

11  **BY MS. EDWARDS:**

12  Q    Agent Wickman, are these the two passports that were

13  recovered from the Defendant on the date of his arrest?

14  A    Yes.

15       **MS. EDWARDS:**  Your Honor, we'd like to offer these as

16  Government Exhibits 3 and 4.

17       **MR. SHOHAT:**  No objection.

18       **THE COURT:**  Then they're admitted.

19       **(Government's Exhibits Numbers 3 and 4 were received in**

20  **evidence)**

21       **THE COURT:**   Here, can you hand them up?  Can I look,

22  please?  Thank you.

23  **BY MS. EDWARDS:**

24  Q    Agent Wickman, did you notice anything unusual about these

25  passports?

1        **THE COURT:**  Could I just look at them just real

2    quick, and then you ask the questions?

3        **MS. EDWARDS:**  Sure.

4        **THE COURT:**  Just -- I'm sorry.  Again, you all have

5    done the work and I haven't.

6        There's no argument that these are not his, is --

7        **MR. SHOHAT:**  No, no, those are his passports, Judge.

8        **THE COURT:**  Okay, go ahead.  Sorry.

9        **MR. SHOHAT:**  Could we have just one second?

10       **(Defense counsel confer)**

11       **THE COURT:**  I don't want to have these -- you're

12   not --

13       **MS. EDWARDS:**  We will ask to take them back --

14       **THE COURT:**  Okay, so --

15       **MS. EDWARDS:**  -- at the end of the hearing.  We would

16   like them to remain (indiscernible).

17       **THE COURT:**  Fine.

18       **MS. EDWARDS:**  I just wanted you to have the chance.

19       **THE COURT:**  Got it.

20   BY MS. EDWARDS:

21   Q    Agent Wickman, have you had the chance to examine these

22   passports?

23   A    I have.

24   Q    Did you notice anything unusual about them?

25   A    Yes.  In the United States passport, the place of birth is

1   listed as Tennessee in the United States.  The Venezuelan

2   passport lists the place of birth as being in Venezuela.

3   Q    In addition to the two places of birth listed in the

4   passports, have you learned anything else noteworthy regarding

5   Mr. Gonzalez's Venezuelan passport?

6   A    Yes.  So when Mr. Gonzalez arrives in the United States

7   from abroad, he presents his United States passport.  When

8   Mr. Gonzalez departs the United States for Venezuela, he

9   presents and uses his Venezuelan passport.

10           As we reviewed his travel records, we can see that

11  Mr. Gonzalez actually has had two Venezuelan passports for at

12  least the last several years.  So we have one in our possession

13  that was in his possession at the date of his arrest, but there

14  is another Venezuelan passport that he has used as recently as

15  January of this year that we do not have.  We do not know its

16  whereabouts.

17  Q    How do you know that it wasn't just that one Venezuelan

18  passport expired and he renewed it, and got a new passport

19  number?

20  A    Mr. Gonzalez has used both of his Venezuelan passports to

21  travel in 2016, 2017, and also in 2018.  So he's used both

22  Venezuelan passports concurrently --

23  Q    Over that three years.

24  A    -- over that three-year time period.

25  Q    Has he used both Venezuelan passports this year?

1    A    Yes, he has.

2    Q    You said that Mr. Gonzalez would use his U.S. passport

3    coming in and Venezuelan passport going out.  Why would someone

4    alternate which passport they were presenting?

5    A    Possibly to avoid additional --

6              **MR. SHOHAT:**  Objection.  This is speculation.

7              **THE COURT:**  Do you -- is -- has your investigation

8    come up with some reason why that happens, or are you just

9    saying this could be something that happened?

10             **THE WITNESS:**  In general.  In general, people that

11   enter the United States --

12             **THE COURT:**  Well --

13             **THE WITNESS:**  -- on U.S. passports are given less --

14             **THE COURT:**  Hold on.  You can't just keep answering

15   when I'm stopping you.

16             I'm just not clear on whether you know that he did

17   whatever you're about to say, the -- I mean I don't think

18   you've --

19             **MS. EDWARDS:**  Your Honor, could I add some more

20   foundation?

21             **THE COURT:**  -- laid out the foundation for this

22   knowledge.

23   **BY MS. EDWARDS:**

24   Q    Agent Wickman, in your investigations of individuals

25   suspected of violating the Foreign Corrupt Practices Act, is it

1  part of your investigations beyond this as your practice to

2  examine border crossings of subjects of investigation?

3  A    Yes, it is.

4  Q    And in your work as part of Homeland Security

5  Investigations -- or Homeland Security, do you look at what

6  passport someone is using when they go in and out of the

7  country?

8  A    Yes.

9  Q    Based on your training and experience as an officer in the

10 Department of Homeland Security, are you familiar with reasons

11 individuals might selectively use a certain passport?

12 A    Yes.

13        **MS. EDWARDS:**  May he go ahead and answer the

14 question?

15        **MR. SHOHAT:**  Objection; still no predicate for how he

16 became familiar with those reasons.

17        **THE COURT:**  I think he just laid that predicate.  So

18 now, the question is, does using the U.S. passport coming in

19 and a Venezuela passport going out, somehow confuse you as to

20 the travel pattern?  That's the question.  So answer that

21 question.

22        **THE WITNESS:**  I don't believe it would confuse the

23 travel pattern.  It just might subject a traveler to a

24 different level of scrutiny and/or screening upon entry,

25 depending on if you're entering on a U.S. passport or entering

1    on a Venezuelan passport with a United States visa.

2            **THE COURT:** Okay, you can move off of that.

3    **BY MS. EDWARDS:**

4    Q    So we've talked about three passports so far, Agent

5    Wickman.  Are you aware of any additional passports the

6    Defendant might possess?

7    A    Yes.  It's our understanding that Mr. Gonzalez bears the

8    -- a Knights of Malta passport as well.

9    Q    Okay.  So let's stop there.  What are the Knights of

10   Malta?

11   A    Knights of Malta is a fraternal society or organization.

12   It's a Catholic society.  And they are a internationally

13   sovereign entity that issues their own passports, currency, and

14   postage stamps.

15   Q    And is the Defendant a Knight of Malta?

16   A    Yes, he is.

17   Q    How do you know that?

18   A    Various documents were found on his laptop, again pursuant

19   to the border search in January of this year, and also

20   Mr. Morales, who we spoke to, is also a Knight of Malta and has

21   indicated that Mr. Gonzalez is also in the Knights of Malta.

22           **THE COURT:** I've literally never heard of the Knights

23   of Malta.  Is this a place or --

24           **THE WITNESS:** They have an office in Italy in Rome.

25   But there is no sovereign piece of ground other than they have

1   -- they are recognized in other countries.  These passports are

2   recognized in 12 primarily European countries.  There's just

3   not -- it's -- they don't have a piece of ground to call their

4   own, but they are a sovereign international body that issues

5   currency, and postage stamps, and passports.

6   **BY MS. EDWARDS:**

7   Q    To be clear, are they recognized by the United States?

8   A    No, they are not.

9   Q    Okay.  But the countries that recognize them, you said are

10  primarily in Europe?

11  A    Primarily in Europe; Spain and Germany are examples.

12  Q    And have you spoken with the witnesses that you have

13  discussed today about specifically the Defendant and Knights of

14  Malta passports?

15  A    Yes.  Several witnesses that we've spoken to have

16  indicated that Mr. Gonzalez, you know, sought out and obtained

17  this Knights of Malta passport for perceived diplomatic

18  immunity privileges that could be conferred on a holder of a

19  Knights of Malta passport.

20         **MR. SHOHAT:**  Can we have the witnesses that identify

21  that --

22         **THE COURT:**  Yeah, I was about to --

23  **BY MS. EDWARDS:**

24  Q    So, who are -- who are the witnesses (indiscernible)?

25  A    Mr. Morales and Ms. Haddad.

1   Q    All right.  Agent Wickman, you said that Mr. Gonzalez was

2   arrested at Miami International Airport.  Did he have court

3   proceedings in Miami prior to being transported to Houston?

4   A    Yes, he had an initial appearance before a United States

5   magistrate judge.

6   Q    And in his initial appearance, did Mr. Gonzalez make any

7   statements under oath?

8   A    Yes, he did.

9   Q    Were you present at that hearing?

10  A    I was not.

11  Q    How do you know he made those statements?

12  A    I've listened to an audio recording of that proceeding and

13  also reviewed an informal transcript of the -- from the audio

14  of that proceeding.

15  Q    What was the subject matter of Mr. Gonzalez's testimony?

16  A    Mr. Gonzalez was asked to provide a financial disclosure.

17          **MR. SHOHAT:**  Excuse me.  Again, I want to interpose

18  an objection.

19          At the point -- it's my understanding that at the

20  point of the time that he answered those questions, he did not

21  have --

22          **THE COURT:**  Who did --

23          **MR. SHOHAT:**  -- I'm sorry -- he didn't --

24          **THE COURT:**  I can't hear you there.

25          **MR. SHOHAT:**  -- he did not have counsel at that point

1    of time when he answered those questions.  I'm not 100 percent

2    sure of that; I just don't want to waive that issue.  I believe

3    the transcript reflects that that was while the Court was

4    determining whether he qualified for a PD.

5              **THE COURT:**  What are you saying about that?

6              **MS. GARCIA:**  And no interpreter.

7              **MR. SHOHAT:**  Okay.  I'm saying he was not counseled

8    as to whether to answer questions at that particular time.  He

9    was uncounseled.

10             **THE COURT:**  Okay.  So you might have a Fifth

11   Amendment issue with it --

12             **MR. SHOHAT:**  Correct.

13             **THE COURT:**  -- later, where you might want to

14   suppress these statements --

15             **MR. SHOHAT:**  That's correct.

16             **THE COURT:**  -- but you don't think that I can't

17   consider them now?

18             **MR. SHOHAT:**  No, I do not, Judge; I think you can

19   consider them under these --

20             **THE COURT:**  Okay.

21             **MR. SHOHAT:**  -- but I just simply want to make sure

22   the record's preserved.

23             **THE COURT:**  So, that's fine; it's preserved.

24             **MR. SHOHAT:**  Okay.

25             **THE COURT:**  I mean that right.

1    **BY MS. EDWARDS:**

2    Q    To be clear, Agent Wickman, was the Defendant placed under

3    oath prior to making these statements?

4    A    Yes, he was.

5    Q    And was he explicitly warned by the magistrate judge in

6    Miami that he could be prosecuted for perjury if he lied?

7    A    Yes, he was.

8    Q    What did he say about his financial situation under oath?

9    A    Mr. Gonzalez stated that he had an annual income of

10   approximately $40,000, that he had between 5 and $7,000 in a

11   United States bank account, and that he had a home in Venezuela

12   valued at approximately $30,000.

13            **THE COURT:**  May I -- what was the question that that

14   was in response to exactly?

15            **THE WITNESS:**  I think he -- I think that the

16   magistrate judge asked, what is your annual income, and he

17   responded; do you have any cash in the United States, and he

18   answered that.

19            **MS. EDWARDS:**  Your Honor, may I show the agent that

20   informal transcript that he's testified he previously reviewed?

21            **THE COURT:**  Right.  Because I mean you can't -- I

22   can't contextualize your answer without knowing what the

23   question is, right?  So --

24            **MR. SHOHAT:**  We would have no objection to this

25   transcript being placed in evidence so Your Honor can review

1   it.

2           **THE COURT:**  Sure, I mean if we could all follow along

3   that would be great.

4           **MR. SHOHAT:**  May I approach, Your Honor?

5           **THE COURT:**  Yeah.  Thank you.  What page are you on?

6           **THE WITNESS:**  Page 2.

7           **MS. EDWARDS:**  Your Honor, we are working from --

8           **THE WITNESS:**  About halfway --

9           **MS. EDWARDS:**  -- an informal transcript --

10          **THE WITNESS:**  -- down.

11          **MS. EDWARDS:**  -- that was (indiscernible) is going to

12  be the exact same as the one we've just tendered.

13          **THE COURT:**  I don't think I'm where you are.  So

14  there's the, you know, "Have you received a copy of the

15  indictment?".

16          **MR. SHOHAT:**  Judge, I think it's page --

17          **THE COURT:**  It's where the tab is?

18          **MS. EDWARDS:**  Yes.

19          **THE COURT:**  Okay.

20          **MR. SHOHAT:**  There's a tab there, I think, Judge.

21          **THE COURT:**  Okay, so it was just, "In general, how

22  much do you estimate that you earn in a year or month?

23          "ANSWER:  $40,000 per year.

24          "QUESTION:  Do you own any real estate like a house

25          or an apartment?

1          "ANSWER:  No.

2          "QUESTION:  Do you pay monthly rent where you live?

3          "ANSWER:  No.

4          "QUESTION:  Do you --

5          "ANSWER:  Defendant answers, I -- excuse me -- I live

6          in Venezuela.

7          "QUESTION:  Do you have any assets at all in the

8          United States?

9          "ANSWER:  No.

10         "QUESTION:  So do you own any personal property in

11         Venezuela?

12         "ANSWER:  Yes.

13         "QUESTION:  What do you own?

14         "ANSWER:  A house.

15         "QUESTION:  Can you estimate what your house in

16         Venezuela is worth?

17         "ANSWER:  Unintelligible; and change, $30,000."

18         Okay.  So I've read that in.  So we can move probably

19    on from that.  If you want to ask the rest of the questions.

20    **BY MS. EDWARDS:**

21    Q    After that segment of the transcript, Agent Wickman, did

22    the magistrate judge ask Mr. Gonzalez whether he owned any

23    additional assets beyond the home in Venezuela and the one bank

24    account in the United States?

25    A    Yes.

1  Q    And what was the Defendant's answer?

2  A    No.

3  Q    And he was under oath at this time?

4  A    Yes, he was.

5  Q    And based on that --

6            THE COURT:  And that's the one that said, "Sir, I've

7            asked you, other than that single bank account and

8            your house, do you think you have any other assets

9            worth at least $5,000?

10           "ANSWER:  No."

11           And then, "Okay, I'm going to find you -- find that

12  you qualify for the assistant public defender".

13           Is that the question and answer that you're talking

14  about?

15           MS. EDWARDS:  That is correct, Your Honor.

16           THE COURT:  So is this an exhibit now?

17           MS. EDWARDS:  I think it just became -- Your Honor,

18  it's been --

19           MR. SHOHAT:  We can make it Exhibit 1, if you like,

20  to make it easier.

21           THE COURT:  So, Jason, do you have a sticker or

22  something?  Okay, let's -- please go ahead.

23  BY MS. EDWARDS:

24  Q    Agent Wickman, based on your investigation and the

25  evidence that you have gathered to date, what assets of the

1  Defendant's are you aware of?

2  A    At a minimum, one, and likely additional, based on

3  statements from other witnesses, account at a bank in

4  Switzerland containing in excess of $50 million.  There are

5  also banks that we believe that he controls in Panama.

6  Q    Banks or bank accounts?

7  A    Bank accounts -- I apologize.  Bank accounts in Panama at

8  banks in Panama, numerous real properties consisting of condos

9  in Miami, a condo in Houston, residential properties in

10  Atlanta, office space in Houston, numerous luxury vehicles;

11  again, the Ferrari, two Range Rovers --

12         MR. SHOHAT:  This is repetitive; it's already been

13  testified to.

14         THE COURT:  It is.  I heard all that.

15         MS. EDWARDS:  All right.  Then no further questions

16  at this time.

17         THE COURT:  All right.

18         MR. SHOHAT:  Judge, may we have a few minutes to

19  confer, like five minutes?

20         THE COURT:  Sure.  You know, and if you want five, I

21  could use five.  So --

22         MR. SHOHAT:  You got it.

23         THE COURT:  -- literally five.  So --

24         MR. SHOHAT:  Thank you.

25         THE COURT:  -- on the 11:30 dot there.

1          **THE MARSHAL:**  All rise.

2       **(Recess was taken from 11:26 to 11:32 a.m.)**

3          **THE COURT:**  Are you ready?

4       (No audible response)

5          Is everyone ready?

6          **MS. EDWARDS:**  Yes.

7          **MR. SHOHAT:**  Yes, I'm ready.

8          **THE COURT:**  Sir -- okay.  So where were we?  You

9    passed the witness.

10          **MS. EDWARDS:**  Yes, Your Honor.

11          **THE COURT:**  Cross?

12          **MS. SPEAKER:**  No.

13          **MR. SHOHAT:**  Cross, thank you, sir.

14          **THE COURT:**  Yes, sir.

15          **MR. SHOHAT:**  Is it still morning or is it afternoon?

16   Good morning, Agent Wickman; how are you?

17          **THE WITNESS:**  Good, thank you.

18          **MR. SHOHAT:**  You and I have never met before today,

19   have we?

20          **THE WITNESS:**  No.

21                       **CROSS EXAMINATION**

22   BY MR. SHOHAT:

23   Q    You said you are not the case agent on this case.

24   A    I am not.

25   Q    Who is the case agent on this case?

1   A    We currently have a co-case agent system so --

2   Q    Who are the co-case agents on the case?

3   A    Matt Wood and Steve Bodak.

4   Q    How do you spell Mr. Bodak's name?

5   A    B-O-D-A-K.

6   Q    Would it be accurate to say that when you testified that

7   you reviewed reports of interview and other documents that

8   helped you prepare for your testimony today, that you reviewed

9   documents in the possession of one or both of those case

10  agents, they are responsible for maintaining those documents --

11  A    Yes.

12  Q    -- as case agents in the case?

13  A    Yes.

14  Q    Have you prepared any written reports or statements of

15  your own in connection with any work you've done on this

16  investigation?

17  A    I have not.

18  Q    Other than speaking to the case agents to prepare for your

19  testimony, have you done any specific investigative tasks

20  yourself in connection with this investigation?

21  A    On I believe it was Friday, the 27th of July, in this

22  year, when we first received information that Mr. Gonzalez was

23  at least considering leaving the United States, I assisted

24  conducting some of the database queries looking to see some of

25  the travel history and to see if there was any current

1  reservation for an outbound departure for Mr. Gonzalez.  I

2  assisted with that on that day in July.  I believe that's the

3  only thing of substance that I actively assisted with --

4  Q    So --

5  A    -- in this investigation.

6  Q    So if I understand what you're telling us, you've been

7  called as the Government's witness at this detention hearing,

8  but other than that single act on July 27th, you did not engage

9  in any -- yourself to make it clear, in any investigative

10 activity in this case; is that correct?

11 A    That is correct.

12 Q    And since the time of Mr. Gonzalez's -- between -- strike

13 that.

14      Between July 27th and July 31st, the day I believe you

15 testified that Mr. Gonzalez was arrested; is that correct?

16 A    The 31st, yes.

17 Q    Between those two days, did you do anything else other

18 than what you've already described in connection with this

19 investigation?

20 A    No.

21 Q    Did you participate in his arrest?

22 A    No.

23 Q    So were you at the airport at the -- Miami International

24 Airport at the time of his arrest at the Miami International

25 Airport?

1    A    No.

2    Q    I'm correct that he was arrested at the Miami

3    International Airport, correct?

4    A    Yes.

5    Q    So you yourself have no personal knowledge of what

6    happened at the Miami International Airport at the time of his

7    arrest, correct?

8    A    That is correct.

9    Q    You yourself have no personal knowledge of, for example,

10   his wife being -- you testified that his wife was at the

11   airport.

12   A    Ex-wife, I believe.

13   Q    Ex-wife.

14   A    Yes.

15   Q    Where was she at the airport?

16   A    I believe she was outside in the vehicle at the curb, that

17   he had come in by himself into the terminal.

18   Q    Okay.  Was there anybody else in that vehicle?

19   A    I believe there was a daughter.

20   Q    And do you know the daughter's name?

21   A    I do not.

22   Q    Have you heard the name Isabel Gonzalez?

23   A    I have not.

24   Q    And where did you learn that Isabel Gonzalez was in the

25   vehicle, from whom did you learn that?

1   A    Other agents in my group.

2   Q    Do you know the name of the agent in the group that told

3   you that?

4   A    It would have been either Special Agent Wood or Bodak.

5   Q    One of the two --

6   A    Those are the two --

7   Q    -- co-case agents would have told you that Isabel Gonzalez

8   was in the vehicle at the Miami International Airport on July

9   31st at the time of Mr. Gonzalez's departure.

10  A    I've only been told that Mr. Gonzalez was going to be

11  traveling with his ex-wife and daughter.

12  Q    Okay.

13  A    I never heard a name.

14  Q    Given your testimony that Mr. Gonzalez was going to be

15  traveling with his ex-wife and daughter, did any of your

16  investigative work or the -- when I say "you," I mean the royal

17  you, the investigation team, so that's -- you understand that's

18  what I'm referring to when I say that?

19  A    Yes.

20  Q    Did any of the investigative work uncover travel papers,

21  airline tickets or otherwise, in the name of the ex-wife or in

22  the name of the daughter?

23  A    I believe the ex-wife and daughter had reservations on the

24  same flight.

25  Q    They had reservations on the same flight.

1  A    It was either --

2  Q    Do you have documents that show they had reservations on

3  the same flight, do you have it in your possession or is it in

4  -- have you seen such a document?

5  A    I have not.  I believe it's in the -- there was a

6  reservation in our database that we can see.  I don't know that

7  it was a printed out document but I believe that those records

8  exist in the system.

9  Q    So if someone -- let me break that down if I can for just

10  a second.  You're -- what you're telling us today is you don't

11  know if anyone has -- and you have not seen a printed version

12  of the reservations for the travel of Maria Diaz, that's the

13  ex-wife's name.

14  A    I believe so.

15  Q    Or Isabel Gonzalez, you have not seen a printed out

16  version yourself and you don't know that there is a printed out

17  version.

18  A    That is correct.

19  Q    So what -- and what you are saying is that in your system

20  -- are you talking about your system or the airline system?

21  A    Not an airline system.  This would be a database that

22  Homeland Security has access to --

23  Q    I got you.

24  A    -- that you can see previous travel and you can also see

25  very current anticipated, booked travel.

1   Q    Booked travel, okay.  And -- but what you're saying and

2   what you're telling this Court is that in that system, the

3   Homeland Security system -- is there a name for that system?

4   A    Automated Targeting System is what I have --

5   Q    Okay.

6   A    -- access to.  There are others as well that --

7   Q    The ATS?

8   A    The ATS.

9   Q    Okay, in -- what you're telling this Court is that in the

10  Homeland Security ATS, you believe or have been told by one or

11  both case agents that there are travel records in that system

12  on that day for Maria Diaz and Isabel Gonzalez, the wife and

13  daughter of Jose Manuel Gonzalez; is that correct?

14  A    Yes.  Not by name but ex-wife and daughter, those --

15  that's what was conveyed to me, that Mr. Gonzalez was

16  scheduled, had reservations, with an ex-wife and daughter.

17  Q    When you say "not by name," you're -- the ATS system

18  wouldn't disclose the names of the travelers?  They were just -

19  -

20  A    The names --

21  Q    -- they were disclosed as his ex-wife and daughter?

22  A    The names would be in the system.  When it was related to

23  me, --

24  Q    Oh.

25  A    -- Corbin, Mr. Gonzalez was set to travel with his ex-wife

1    and daughter.

2    Q    I got you.  Now, Agent Wickman, it'll take me about 15 or

3    20 minutes before I fully remember the name every time I think

4    about it.  I'll get there.  Agent Wickman, at the beginning of

5    your testimony, Ms. Edwards asked you a question, and your

6    response to the question, basically what had you uncovered in

7    terms of illegal activity by Mr. Gonzalez was essentially the

8    nature of the question.  And your answer was, as I wrote it

9    down, that he paid bribes for government officials in exchange

10   for something of value; do you remember giving that answer?

11   A    Yes.

12   Q    Okay.  I want to talk for just a couple minutes about the

13   term "something of value," okay?  The -- your -- have you read

14   the complaint in this case, --

15   A    I have.

16   Q    -- are you familiar with it?  You have a copy of the

17   complaint on the bench there that I provided you with, so if

18   you need to refer, you can refer to it at any time.  In

19   paragraph 15 of the complaint, I think it's on page five, it

20   refers to specifically what the payments of -- the payments

21   were for; does it not?

22        **MR. SHOHAT:**  Give me a copy of the complaint.  I

23   don't know why it isn't in here.  In this -- no, I've got it.

24   Q    Let's take a look at paragraph 15 for just a second, all

25   right?

1  A    Yes.

2  Q    Paragraph 15, it says over on the top of page six,

3  specifically in exchange for bribes from Gonzalez, CW-1, that

4  would be Cesar Rincon, right?

5  A    Yes.

6  Q    Okay.  CW-1 took steps to direct contracts to Gonzalez's

7  company; see that, sir?

8  A    Yes.

9  Q    How many contracts did Mr. Gonzalez's bribe payments,

10  according to your investigation, cause Mr. Rincon to direct to

11  Mr. Gonzalez in your -- as a result of your investigation?

12  A    I don't have any knowledge of specific contracts.

13  Q    Okay.  And you can't tell us how many contracts resulted

14  from any bribe payments by Mr. Gonzalez, what you're saying

15  today, you cannot tell us that.

16  A    That's correct.

17        **THE COURT:**  Okay, what's the question?

18        **MR. SHOHAT:**  He cannot tell us how many contracts

19  were directed to Mr. Gonzalez as a result of bribe payments.

20        **THE COURT:**  Oh, you mean actually.

21        **MR. SHOHAT:**  Actually.  Okay.

22  **BY MR. SHOHAT:**

23  Q    Do you know of your own knowledge in light of the Judge's

24  use of the word "actually," do you know of your own knowledge,

25  Agent Wickman, whether or not there were contracts that were

1    paid for but not ultimately directed to Mr. Gonzalez?  You

2    understand what I'm saying?

3    A    I do not.

4    Q    Assume for the sake of this question that a bribe payment

5    is made to get a contract, but for whatever reason, some

6    business reason, the contract does not happen.

7    A    Okay.

8    Q    Do you understand that?  Are you aware of whether that

9    happened in this case, any payments made to Mr. Rincon -- has

10   Mr. Rincon said to you, for example, yes, he paid me $50,000 on

11   "X" date but we weren't -- for "X" contract, for "Y" contract,

12   but we weren't able to do the contract; are you aware of any of

13   that happening in this case?

14   A    No.  But the repeated payments would suggest that some

15   contracts were happening; otherwise, multiple payments --

16        **THE COURT:**  Well, can we just --

17   A    -- wouldn't be made.

18        **THE COURT:**  -- wait a minute, wait a minute?  Don't

19   make a legal argument.  I can do that.  I can understand what's

20   happening.  Just let him just ask you the questions, and the

21   things you know, you just tell him.  If he actually asks you

22   for a legal conclusion and that -- and nobody objects, then I

23   guess we can talk about it.  But that I don't think is what's

24   happening, so if we could just go forward on that basis.

25        **MR. SHOHAT:**  Yeah, I'm fine with that, Judge.

1  **BY MR. SHOHAT:**

2  Q    Agent Wickman, can you tell us the name, the company

3  involved, of any contract that Cesar Rincon says was directed

4  to Jose Manuel Gonzalez as a result of a bribe payment; can you

5  tell us that?

6  A    The only company names I'm aware of are the companies that

7  paid Cesar Rincon.  Whether that was the name of the company

8  that was awarded the PDVSA contract, I do not know.

9  Q    So the answer to my question is no, Mr. Shohat, other than

10 knowing the names of the companies that made the bribe

11 payments, I cannot tell you the name of any contract that was

12 directed to Mr. PDVSA (phonetic) -- to Mr. Gonzalez as a result

13 of a bribe payment; is that accurate?

14 A    Yes.

15 Q    Can you tell us today as you sit here in court as a result

16 of this investigation, can you tell us whether Jose Manuel

17 Gonzalez received any money personally as a result of any bribe

18 payment in return for a contract, whether he was paid on any

19 contract that he received as a result of a bribe payment; can

20 you tell us that?

21 A    No.

22 Q    Have you asked Cesar Rincon that question?

23 A    (No audible response)

24 Q    Has he been asked that question?

25 A    I don't know if he was asked that question.  I was not at

1    that interview.

2    Q    How many times has Cesar Rincon been interviewed?

3    A    I don't know the number.  I know it's at least one if not

4    additional.  I don't know the number.

5    Q    Was the first interview of Cesar Rincon sometime in

6    January or February of this year?

7    A    I don't believe it was until -- I'm not sure the exact

8    date.  I thought it was June of this year when -- after --

9    Q    Okay, I'm not asking --

10   A    I don't know --

11   Q    So your best --

12   A    -- the exact date.

13   Q    -- recollection today is that the first interview of Cesar

14   Rincon about this case was in June of this year, 2018, that's

15   your best recollection today.

16   A    I'd have to review other reports that I've read.  I've

17   read so many reports and so many interviews, I don't remember

18   what date that first interview occurred.

19   Q    When you prepared for this case by reviewing reports, did

20   you make notes to help you remember things for testimony in

21   this Court?

22   A    Yes.

23   Q    Where are those notes?

24   A    In my --

25            **MR. SHOHAT:**  Judge, I'd ask that his notes be

1  produced.

2            **THE COURT:**  Well, why don't --

3  **BY MR. SHOHAT:**

4  Q    Did you review your notes --

5            **THE COURT:**  Hey!

6  Q    -- in preparation --

7            **THE COURT:**  So one question, one answer, then --

8            **MR. SHOHAT:**  Let me lay a further --

9            **THE COURT:**  Just did you make notes?

10           **THE WITNESS:**  Yes.

11           **THE COURT:**  And those notes were based on your review

12  of what?

13           **THE WITNESS:**  Reports of investigation, travel

14  records, review of the audio transcript from the initial

15  appearance, discussions with other agents.

16           **THE COURT:**  And then he asked where are those notes?

17           **MR. SHOHAT:**  And he pointed to his --

18           **THE WITNESS:**  In my bag in the courtroom.

19           **THE COURT:**  Okay, now go ahead.

20           **MR. SHOHAT:**  Pursuant to Rule 26.2 --

21  **BY MR. SHOHAT:**

22  Q    Did you review those notes to prepare for your testimony

23  here today?

24  A    Yes.

25           **MR. SHOHAT:**  Pursuant to Rule 26.2, I'd ask for

 1  production of those notes.

 2          **THE COURT:**  Do you think that that qualifies as a

 3  statement under 26.2, a statement made by him and adopted by

 4  him?

 5          **MS. EDWARDS:**  I don't know that those statements are

 6  adopted by Agent Wickman, Your Honor.  I'm also not sure they'd

 7  be substantially verbatim of anything.  It seems like they'd be

 8  memory aids.

 9          **THE COURT:**  So, I mean, a statement is a written

10  statement that the witness makes and signs.  So he's saying

11  something, he's making a statement or substantially verbatim

12  contemporaneously recorded recital of the witness's oral

13  statement to a Grand Jury.  My read of that has always been it

14  is, you know, a witness giving some sort of testimony, writing

15  down what he did, when he did it, you know, a police report,

16  and so taking notes while you're looking at other things I

17  don't think qualifies as a statement.

18          **MR. SHOHAT:**  May I be heard on that?

19          **THE COURT:**  Because she apparently has something on

20  her phone that she wants you to look at.

21      **(Ms. Garcia/Mr. Shohat confer)**

22          **MR. SHOHAT:**  Yeah.  The -- under the Jencks Act, 18

23  US Code Section 35, under Rule -- is this 26.2, Monique?

24          **MS. GARCIA:**  Yes, yes.

25          **MR. SHOHAT:**  Under Rule 26.2, a statement is defined

1  as --

2          **THE COURT:**  I just read that.

3          **MR. SHOHAT:**  But not -- can I read part of it, Judge?

4          **THE COURT:**  Sure.  I mean, I just read the whole

5  thing but --

6          **MR. SHOHAT:**  F-1, "a written statement that the

7  witness makes and signs or otherwise adopts and approves."

8          **THE COURT:**  Yeah, but it's a -- it's -- I think that

9  there's a difference between notes that somebody makes about

10  somebody else's statement versus their statement about what

11  they did in the investigation.

12          **MR. SHOHAT:**  Your Honor, I agree that there is a

13  difference.  But it's a distinction without a difference for

14  purposes of Rule 26.2, and here's why.  Why happens here is

15  that the witness reviews a larger body of material and then

16  makes notes which are his selection of what's important.  It is

17  a statement, this is what's important to me that I need to

18  recall for purposes of my testimony.  And I believe that makes

19  it a statement under Rule 26.2.  That's one part.

20          The second part is independent of Rule 26.2, when a

21  witness refreshes his recollection for purposes of testimony

22  with a document, I believe that document is producible.

23          **THE COURT:**  If it were a trial and if the rules of

24  evidence directly applied.  Rule 26.2 does apply, but I don't

25  think that what you're talking about is a statement.  If you

1   talked to him a little while ago about things he did, things he

2   observed, and then did he write a statement about that.  That's

3   a statement, so he needs to produce that.  But his work product

4   as part of, you know, making notes and putting Post-It notes on

5   things I don't think qualifies as a statement.  I mean, I don't

6   see it.

7          **MR. SHOHAT:**  I -- Judge, I'll accept your ruling and

8   move on.  But I respectfully believe that when a witness

9   refreshes his recollection --

10         **THE COURT:**  Well, why don't you have one of those

11  guys run out and, you know, find a case, you know, --

12         **MS. EDWARDS:**  Your Honor?

13         **THE COURT:**  -- while we're doing this?

14         **MR. SHOHAT:**  We're Googling it, Judge.

15         **THE COURT:**  Google away, you can use --

16         **MS. EDWARDS:**  I would like to add if I could just

17  that I don't believe the witness has refreshed his recollection

18  during his testimony today with his notes.

19         **THE COURT:**  I'm not on that.

20         **MS. EDWARDS:**  Okay.

21         **THE COURT:**  I'm on, you know, 26.2 does apply right

22  now, okay?  It does apply.  If -- I have never understood what

23  you're talking about to be a statement.  And I'm not -- you

24  know, I'm not researching it right now.  I don't have Google or

25  anything in front of me.  I'm doing this based on my

1   understanding of the law.  So she's got a phone and I'm willing

2   -- if you give me a case that says I'm wrong, I'm happy to be

3   wrong.  I'm wrong all the time.

4          **MR. SHOHAT:**  We're working on it.  And so am I,

5   Judge.

6          **THE COURT:**  Great.

7          **MR. SHOHAT:**  This is something (indisc.)

8          **THE COURT:**  I'm not trying to argue with you.  I just

9   right now I think it's -- what you're talking about is not a

10  statement.  Now, you can ask him, did you write statements

11  about things you did, things you saw, --

12         **MR. SHOHAT:**  I think I've already asked him that

13  question.  I'm not going to replough that ground.  His answer

14  was no, and because the only really thing he did was one piece

15  of research on the ATS to determine travel plans.  Other than

16  that, he hasn't done anything.  But what I do believe is that

17  the one thing -- he's been offered as the Government's witness

18  in this case.  I don't believe -- I've been told they don't

19  have any other witness in the case -- in the detention hearing.

20  So he did create what is in essence his statement by creating

21  notes that are a selection of what he deemed important, and I

22  believe I have a right to see those.  That's my position.  I'll

23  accept your ruling and I'm ready to move on so --

24         **THE COURT:**  Okay.

25         **MR. SHOHAT:**  All right.

1          THE COURT:  And you --

2          MR. SHOHAT:  Are there --

3          THE COURT:  -- do you all have a position on this?

4          MS. EDWARDS:  We do not believe that Agent Wickman's

5    notes in preparation for the hearing --

6          THE COURT:  Because why?

7          MS. EDWARDS:  Because (indisc.) he hasn't formally

8    signed anything or adopted anything.  It is not his testimony.

9    The Jencks Act is about substantially verbatim statements,

10   typically like formal statements in Grand Jury, or if he had

11   any affidavits, we would have to produce those.  We do not

12   think that his notes to himself in preparation to testify today

13   are the --

14         MS. GARCIA:  I have a case.

15         MS. EDWARDS:  -- statement within the meaning of Rule

16   26.2.

17         MR. SHOHAT:  We believe that his notes are his

18   verbatim statement.

19         MS. GARCIA:  This is the case.

20         MS. EDWARDS:  They'd be selections of other people's

21   statements.

22         THE COURT:  So they're going to give us a case.

23         MS. GARCIA:  It's a case exactly on point.

24         MR. SHOHAT:  I don't know what it holds but I've

25   been --

1          **MS. GARCIA:**  I can read it, I can read the --

2          **MR. SHOHAT:**  Can Ms. Garcia read this to Your Honor?

3          **MS. GARCIA:**  Your Honor, it's --

4          **MR. SHOHAT:**  *U.S. versus Wicktor*.

5          **MS. GARCIA:**  Wicktor, W-I-C-K-T-O-R, 403 F.

6  Supplement 2d 964.

7          **MR. SHOHAT:**  What court?

8          **MS. GARCIA:**  It's United States District Court,

9  District of Arizona.  It's from 2005.  But it's directly on

10  point in that it's a preliminary hearing, it's the only witness

11  testifying.  And I'll read just the important part, Your Honor.

12  And 26.2 was the integral part of this hearing as well.  And it

13  says, during the preliminary hearing, Detective Susuras

14  testified that he participated in investigating the defendants

15  but he had not --

16          **MS. SPEAKER:**  Slow down.

17          **MS. GARCIA:**  -- yet prepared his own investigative

18  report.  Therefore, in preparing to testify, he reviewed and

19  relied on the reports of Detectives Kellogg, Kiefer, and Diaz.

20  Susuras testified that he had adopted and approved the three

21  detectives' reports as official reports in this case; 26.2(a)

22  is designed to further the fair and just administration of

23  criminal justice, and that citation is to a *Campbell versus*

24  *United States*, 373 U.S. 487, discussing the Jencks Act upon

25  which Rule 26.2(a) was fashioned.

1          **THE COURT:**  So in that case, that agent did the

2    investigation and he looked at those agent -- those other agent

3    -- no?

4          **MS. GARCIA:**  I believe --

5          **THE COURT:**  That's what you just read.

6          **MS. GARCIA:**  -- it says -- but that he participated

7    in the investigation like he had just testified that he had

8    done the --

9          **THE COURT:**  He -- so in that -- this is where it

10   comes in, right?  So an agent does an investigation, he does

11   things, he looks at things, he talks to people, but he didn't

12   write his own report, he's having to use other reports to say,

13   wait a minute, what did I do?  Oh, yeah, that's right -- you

14   keep doing that so go ahead.

15         **MS. GARCIA:**  Oh, I'm sorry, there's a part that was

16   actually the important part which --

17         **THE COURT:**  I thought you were just reading the

18   important part.

19         **MS. GARCIA:**  I'm sorry, I'm just --

20         **THE COURT:**  Okay.

21         **MS. GARCIA:**  -- going to --

22         **MR. SHOHAT:**  She was reading the background facts.

23         **MS. GARCIA:**  -- the background facts.  And then it

24   says:  "Similar to Agent Conelly in *Sink*," another case from

25   the Fifth Circuit actually, "here Detective Susuras did not

1  prepare the investigative report at issue but rather approved

2  reports prepared by other detectives and testified based on

3  those reports.  The court concludes that the investigative

4  reports of Detectives Kellog, Kiefer, and Diaz," the ones I

5  just mentioned were the ones who did the substantive

6  investigation, "are Rule 26.2(a) statements as to testifying

7  Detective Susuras who adopted and approved those reports and

8  relied upon those reports as his own in preparing the criminal

9  complaint and testifying at the preliminary hearing."

10           **THE COURT:**  It's because he did the investigation --

11           **MR. SHOHAT:**  No, Judge, I don't --

12           **THE COURT:**  -- versus --

13           **MR. SHOHAT:**  -- think it is.  We now expand our

14  request not only for his notes, but for the investigative

15  reports that he reviewed to prepare for this hearing.

16           **MS. EDWARDS:**  Your Honor, --

17           **MR. SHOHAT:**  I would ask that they be produced

18  under --

19           **MS. GARCIA:**  Can I also cite the Fifth Circuit case

20  that this case relies on?

21           **THE COURT:**  So hang on.  The context of -- first of

22  all, do you all object to this?

23           **MS. EDWARDS:**  Yes.

24           **THE COURT:**  Okay.  And --

25           **MS. GARCIA:**  Just read this, just read this part.

1          **THE COURT:**  -- did you all exchange anything before

2    this hearing today?  Did you talk about --

3          **MS. EDWARDS:**  Mr. Shohat emailed me and asked for

4    Jencks material and I responded that I do not have any for

5    Agent Wickman, which is the Government's position.

6          **MR. SHOHAT:**  Judge, I'd like to read into the record

7    the Fifth Circuit decision in *United States versus Sink*, 586

8    Federal 2nd 1041, Fifth Circuit, 1978.  In *Sink*, Agent Stebins,

9    S-T-E-B-I-N-S, prepared a report of his investigation into

10   defendant's criminal activity and testified at trial regarding

11   his investigation.

12             "The court found the report to be Jencks Act

13             statement as to the author, Agent Stebins.

14             Significantly, the court further found that the

15             arresting agent, Conelly, who also testified at

16             trial, had endorsed Stebins's investigative report.

17             The court found that the investigative report

18             prepared by Stebins was a Jencks Act statement as to

19             Agent Conelly who had not participated in the

20             preparation of the report but had verified its

21             accuracy."

22   We have the --

23         **THE COURT:**  Because he did the investigation.

24   Denied.  He did the investigation.  That is how that works.

25         **MR. SHOHAT:**  Judge, that's your ruling, I'm --

1          **THE COURT:**  Okay, it is.

2          **MR. SHOHAT:**  Okay.

3                    **CROSS EXAMINATION (CONTINUED)**

4    **BY MR. SHOHAT:**

5    Q    Now, Agent Wickman, we've talked about contracts that the

6    allegations say Mr. Rincon was bribed for, for which he was

7    bribed, right?  That's what we've been talking about the last

8    few minutes before we got off on this subject of producibility

9    of your notes and --

10   A    Yes.

11   Q    Okay.  Now let's move on to the other things.  You said he

12   was also paid to perform government official in exchange for

13   some things of value.  Other than contracts, I think you

14   testified to two things of value that I heard, and you correct

15   me if I'm wrong.  And you can refer to paragraph 15 of the

16   complaint.  One thing of value that you testified was that five

17   payments were made in order to get paid by PDVSA, for

18   Mr. Gonzalez's companies to get payment from PDVSA; is that

19   correct?

20   A    Yes.

21   Q    And the other thing you testified to is, if I heard you

22   correctly, is that bribe payments were made in order to get

23   paid in dollars rather than in the sinking bolivar.

24   A    Yes.

25   Q    Fair statement?

1   A    Yes.

2   Q    Okay.  Other than those two things, was any bribe payment

3   made for any other thing of value from Cesar Rincon?

4   A    I believe I listed three distinct --

5   Q    Contracts --

6   A    -- benefits.  Contracts, getting paid for those contracts,

7   and getting paid in U.S. Dollars.

8   Q    Okay.  Now, how much money was paid by Mr. Gonzalez,

9   according to your investigation, to get paid by PDVSA?  How --

10  you testified approximately $630,000 total bribe payments were

11  made, right?

12  A    Yes.

13  Q    What has your investigation revealed of that amount,

14  $630,000, was expressly intended to facilitate his getting paid

15  by PDVSA?

16  A    I don't have an answer to that?

17  Q    Okay.  What of the $630,000 that was paid was paid in

18  exchange for Mr. Rincon assisting Mr. Gonzalez to get paid in

19  dollars rather than bolivars; what portion of the $630,000 --

20         MS. EDWARDS:  Your Honor, I object.  He's assuming a

21  fact not in evidence.  Mr. Shohat's questions are all assuming

22  that there was a one-to-one ratio, that every payment had a

23  specific --

24         MR. SHOHAT:  Judge, she --

25         THE COURT:  I think --

1          **MR. SHOHAT:**  That's not an objection.

2          **THE COURT:**  Wait.  Your question is fine, just ask

3    your question.

4          **MR. SHOHAT:**  All right.

5    **BY MR. SHOHAT:**

6    Q    What portion of the $630,000 was paid in exchange for

7    getting paid in dollars as opposed to bolivars; can you tell us

8    that?

9    A    No.

10   Q    How much money did Mr. Gonzalez receive as a result of

11   bribe payments in dollars rather than bolivars as a result of

12   your investigation; how much did he get?

13   A    I don't know the number.

14   Q    How much money did Mr. Gonzalez or any of his entities

15   receive as a result of bribe payments that resulted in him

16   getting to the front of the line and getting paid by PDVSA; can

17   you tell us that?

18   A    No.

19   Q    Do you know if in the course of your review of the files

20   in this case that you testified you reviewed to prepare for

21   your testimony, do you know if there's been any accounting or

22   financial determination that identifies even one payment

23   specifically to Mr. Gonzalez as a result of a bribe payment

24   that put him at the head of a line to get paid; can you

25   identify a payment to Mr. Gonzalez?

1    A    I cannot.

2    Q    Can you identify a payment to Mr. Gonzalez that resulted

3    from a bribe payment, a single payment, that he got paid in

4    dollars where he would have otherwise gotten paid in bolivars;

5    can you identify that?

6    A    I cannot.

7    Q    Okay, I'd like to go to the end of paragraph 15.  I'm

8    going to read a sentence into the record and then I'm going to

9    ask you some questions about it, okay?  It's the last two

10   sentences I think, maybe it's one.  It says, and I quote:  "In

11   addition, CW-1 helped Gonzalez prepare a presentation to be

12   given to the PDVSA board of directors, and CW-1 assisted

13   Gonzalez in receiving priority to meet with the board."  Did I

14   read that sentence correctly?

15   A    Yes.

16   Q    Did Mr. Rincon provide you with a copy of the presentation

17   that he helped Mr. Gonzalez prepare for the board of directors

18   of PDVSA?

19   A    I --

20   Q    Does the investigation have a copy?

21   A    I -- honestly I don't know.  I'm assuming that that

22   presentation -- I have not seen it.

23   Q    All right.  Well, Mr. Rincon's cooperating, he's been

24   debriefed, and you're -- as you sit here today, you're not

25   aware of the presentation, correct?  You don't have a copy of

1   the presentation.

2   A     I have not seen a copy of the presentation.

3   Q     What was the presentation about?

4   A     I don't know.

5   Q     How much did Mr. Gonzalez pay in bribe payments to

6   Mr. Gonzalez for this presentation to the board of directors --

7          **MS. GARCIA:**  Rincon.

8   Q     -- do you know that answer?

9   A     I do not.

10         **MS. GARCIA:**  Paid to Rincon.

11  Q     Paid to Rincon for the board of directors, okay.  The next

12  statement in this paragraph, the last one:  "CW-1 also took

13  steps to influence the PDVSA board of directors' decision to

14  award a contract for turbine generators to one of Gonzalez's

15  companies."  Did I read that correctly?

16  A     Yes.

17  Q     Which of Gonzalez's companies was awarded the turbine

18  generator contract?

19  A     I don't know.

20  Q     Did Mr. Rincon, the manager of Bariven, present you with a

21  copy of the contract that was awarded as a result of a bribe

22  payment for turbine generators to one of Gonzalez's companies?

23  A     I have not seen that.

24  Q     How much was the contract for that resulted in a bribe

25  payment to award a contract for turbine generators, how big was

1  that contract, what was --

2  A     I --

3  Q     -- the size of it?

4  A     I don't know.

5  Q     Has Mr. Rincon, who has been debriefed at least since June

6  of this year by agents that you're working with, has Mr. Rincon

7  been asked to identify the contract that he was bribed for,

8  reflected in the last sentence of paragraph 15?

9  A     I don't know.

10 Q     How much money has Mr. Gonzalez received or any of his

11 entities as a result of the contract for turbine generators to

12 one of his companies referred to in the last sentence of

13 paragraph 15 of the complaint?

14 A     I don't know.

15 Q     Do you know from your preparation for this hearing whether

16 or not the contract for turbine generators was a completed

17 contract?

18 A     I don't know.

19 Q     Do you know as a result of your investigation and

20 conversations with Mr. Rincon what the purpose was of the

21 turbine generators, what were they going to be used for by

22 PDVSA?

23 A     I don't know.

24 Q     You testified, Agent Wickman, that Cesar Rincon is the

25 manager -- at relevant times, we'll do it that way.  I don't

1    know if he is today.  I'm not putting that to you.  But that at

2    the relevant times in this complaint, which would be 2013,

3    right?  Essentially.

4    A    Yes.

5    Q    Okay.

6    A    Late 2012, 2013.

7    Q    End of '12, 2013.  Do you know of your own knowledge

8    whether Cesar -- not of your own knowledge, as of your learned

9    knowledge, your acquired knowledge, do you know whether Cesar

10   Rincon is the manager of all of Paravan (sic)?

11   A    Bariven?

12   Q    Yes.

13   A    A general manager of Bariven.  I don't know their

14   corporate structure to know whether there are other parallel

15   general managers in the structure.  I don't know.

16   Q    Do you know whether or not Bariven is broken down into

17   divisions?

18   A    I don't know.

19   Q    Do you know -- strike that.

20        Would you turn to page -- paragraph 18, page seven of the

21   complaint, sir?  Page -- in paragraph 18, the payments that are

22   the alleged bribe payments in this case are set out in order,

23   in date order; are they not?

24   A    Yes, they are.

25   Q    And this paragraph lists approximately 11 such payments;

1   is that correct?

2   A    Yes.

3   Q    And these are the payments that form the basis for this

4   criminal case; is that correct?

5   A    Yes.

6   Q    There are no other payments listed in the complaint that

7   apply to this criminal case against Mr. Gonzalez; is that

8   correct?

9   A    That's correct.

10  Q    There are no payments in this complaint to Citgo; is that

11  correct?  This complaint does not involve payments to Citgo,

12  they involve payments to an account controlled by a relative of

13  a manager of Bariven; is that correct?

14  A    That's correct.

15  Q    Citgo is not involved in this complaint; is that correct?

16  A    That's correct.

17  Q    Now, if I'm looking at this complaint correctly, Agent

18  Wickman, the first payment that is covered is dated November

19  27th, 2012; is that correct?

20  A    Yes.

21  Q    The last payment is June 3rd, 2013.

22  A    Yes.

23  Q    June 3rd, 2013, is more than five years back from today,

24  correct?  It's more than five years ago, --

25  A    Yes.

1  Q    -- correct?  There has been no indictment in this case; is

2  that correct?

3  A    That's correct.

4  Q    You referred to an MLAT request in your testimony;

5  remember that?

6  A    Yes.

7  Q    When was that MLAT request initiated?

8  A    I don't know the exact date.

9  Q    In what month was that MLAT request initiated and what

10 year?

11 A    I don't know that exact date.

12 Q    Do you know -- you don't know the month, okay.  If I told

13 you that it's been represented to me by Ms. Edwards, --

14       **MR. SHOHAT:**  Correct me if I'm wrong, Ms. Edwards.

15 Q    -- that the initiation date was late March of 2018, --

16       **MR. SHOHAT:**  Did I get that right?

17       **MS. EDWARDS:**  I believe it was April 3rd.

18 **BY MR. SHOHAT:**

19 Q    -- April 3rd, 2018, would you have any reason to

20 disbelieve that that is an accurate date for the initiation of

21 the MLAT request?

22 A    No.

23 Q    Okay.  How many of these payments -- go through them and

24 count them for me, how many of these payments listed in this

25 complaint predate April 3rd, 2013?

1   A    Nine of the 11.

2   Q    Okay.  No, that's not accurate.

3   A    No?

4   Q    I'll tell you --

5   A    Predate -- I'm sorry, I'm sorry, April 3rd --

6   Q    -- it's the first -- one, two -- it's the first five

7   payments.

8   A    I thought you meant May 3rd -- April 3rd.

9   Q    I'm sorry, I apologize.  First five payments --

10  A    Okay.

11  Q    -- predate April 3rd, 2018, correct?

12  A    Yes, that is correct, five.

13       **(Pause)**

14  Q    The payment on November 27th, the first payment that's

15  listed, November 27th, 2012, for $50,000 to (indisc.) is

16  Ameritraders, right?

17  A    That is correct.

18  Q    So this says that the payor, the originator of that

19  payment, was Ameritraders essentially, right?

20  A    Yes.

21  Q    What was that payment for, according to your

22  investigation?

23  A    It was a bribe paid from Mr. Gonzalez to Cesar Rincon.

24  Q    For what purpose?

25  A    For Cesar Rincon's assistance in getting a contract

1  rewarded to Mr. Gonzalez's company or companies for getting --

2  assisting with getting those contracts paid and for getting

3  paid in U.S. dollars.

4  Q    Is it your testimony, Agent Wickman, having been an

5  experienced -- how long have you been investigating FCPA cases?

6  A    About three years.

7  Q    About three years.  Are all bribe payments or payments to

8  foreign officials covered by the Foreign Practices Act, as far

9  as you know?

10  A    Well, according to the FCPA, there's specific conditions

11  that have to be met.  You have to have a domestic concern

12  paying a -- which is a defined term, paying a foreign

13  government official, again another defined term.  As long as

14  those conditions are met, then it could fit the violation.

15  Q    Doesn't the Foreign Practices Act require --

16        MS. EDWARDS:  Objection, Your Honor, he's asking the

17  agent to testify to legal conclusions.

18        THE COURT:  That's true.  I think that you can ask

19  him about what purposes he knows about and --

20        MR. SHOHAT:  All right.

21        THE COURT:  -- and then we can have legal argument

22  later about whether those fit under the statute.

23        MR. SHOHAT:  I think I've already covered that point.

24  Would it be possible to get some water somewhere, somehow?

25        THE COURT:  Sure.

1          **MR. SHOHAT:**  Is there water available in this

2   facility?

3          **THE CLERK:**  I'll get you some, sir.

4          **MR. SHOHAT:**  Thank you, I appreciate it.

5          **THE COURT:**  Yeah, thank you.  There's a lot of water

6   in this facility.

7          **MR. ARDOIN:**  There's a lot of hot air sometimes, too.

8          **THE COURT:**  Mr. Ardoin.

9          **MR. SHOHAT:**  Give me just a couple minutes, Judge,

10  please.

11  **BY MR. SHOHAT:**

12  Q    You testified, Agent Wickman, that Cesar Rincon and Jose

13  Manuel -- that Cesar Rincon has told the investigation that he

14  knows Jose Mangolaz (phonetic) -- Manual Gonzalez back from a

15  time when both of them worked at PDVSA together; did I get that

16  correctly?

17  A    Yes.

18  Q    What was Mr. Rincon's position at PDVSA?  You've testified

19  he worked for Bariven as general manager.  What was his

20  position at PDVSA at the time that he met Mr. Gonzalez; do you

21  know that?

22  A    I do not.

23  Q    What was Mr. Gonzalez's position at PDVSA at the time that

24  he met Mr. Rincon; do you know that?

25  A    I do not.

1   Q    What was -- during the time that Mr. Rincon worked for

2   Bariven, the relevant times in this case, late 2012 to mid-2013

3   more or less, what was his specific role at Bariven in

4   connection with the awarding of contracts for Bariven?

5   A    From my understanding, he did not have --

6        **THE COURT:**  Who are you asking about?  I'm sorry.

7        **MR. SHOHAT:**  Cesar Rincon.

8        **THE COURT:**  Okay, thank you.

9   A    He was a part of the decision-making process of awarding

10  contracts.  I don't know whether the sole responsibility, the

11  sole authority to award contracts rested on Cesar Rincon.  But

12  he was certainly a part of that process and could influence

13  where contracts would be issued.

14  Q    Are you aware of whether Bariven's awarding of contracts

15  required acquiescence's of PDVSA -- probably not the greatest

16  word -- as opposed to just Bariven the subsidiary; are you

17  aware of that --

18  A    I do not --

19  Q    -- they could award the contracts independently of PDVSA

20  itself?

21  A    I'm not aware of how that interaction and process worked.

22       **(Pause)**

23  Q    You've testified that an MLAT request has gone out.  We

24  know that the MLAT request went out early April of this year.

25  And you've testified I think if I heard you correctly, there

1    are no returned documents yet pursuant to the MLAT request; is

2    that what you testified to, as far as you know?

3    A    As far as I know.

4    Q    Okay, so we're six months in to that MLAT request.  Do you

5    know whether or not your government is anticipating a response

6    soon or when that response might happen; do you have any idea?

7    A    All I know in my experience with MLAT's is they take many,

8    many months, even up to a year or in excess of a year, to

9    receive documents from that.

10   Q    So the answer right now is you don't have any personal

11   knowledge of what the progress is of that MLAT.

12   A    Correct.

13              **MR. SHOHAT:**  Thank you.

14   Q    The records that you have from -- you testified you have

15   records from the sending bank in Switzerland that showed the

16   accounts there were held in corporate names --

17              **MS. EDWARDS:**  Objection, misstates the testimony.

18   A    No.

19              **MR. SHOHAT:**  Okay, let me see if I have -- get it

20   accurate because I don't want to misstate --

21   **BY MR. SHOHAT:**

22   Q    You have records which presumably are wire transfer

23   records from the receiving banks, BB and T here or --

24   A    In --

25   Q    In Miami.

1   A      Yes.

2   Q      And Bank of America --

3   A      Bank of Houston.

4   Q      Bank of Houston here.  You have records from the receiving

5   banks showing that the originating companies in Switzerland are

6   companies A, B, and C that you identified, correct?

7   A      The bank accounts in the names of those companies, because

8   they're Swiss bank accounts, were A, B, and C, yes.

9   Q      As of today, am I correct, not having the MLAT response,

10  which I'm going to assume from experience requests the kind of

11  information I'm about to ask you about, that as of today, this

12  detention hearing, you do not have any bank documentation of

13  any kind which ties Jose Manuel Gonzalez to the three

14  originating accounts in Switzerland; is that correct as of

15  today?

16  A      No.

17  Q      No, it's not correct or yes, it is correct?

18  A      That is correct, we do not have from the Swiss banks.

19  Q      You referred to a co-conspirator in this case who has been

20  interviewed by the name of Gonzalo Morales, correct?

21  A      Yes.

22  Q      Has Mr. Morales entered into any kind of plea arrangement

23  or cooperation arrangement or a formal cooperation arrangement

24  with the Government in which he's going to receive benefits as

25  a result of his cooperation, that you're aware of?

1    A    I don't believe he has.

2    Q    You don't believe it.  Do you know the terms under which

3    he's cooperating?  Has he got a cooperation agreement, even

4    oral?

5    A    (No audible response)

6    Q    You don't know.

7    A    I don't know.

8    Q    Okay.  How about Joanna Hadaad (phonetic), does she have a

9    plea agreement or a cooperation agreement?

10   A    Not to my knowledge.

11   Q    Have she -- have either --

12        **THE COURT:**  So could I just -- let's keep it on the

13   probable cause because a lot of these things that I think you

14   might want to use later to cross examine, they have to give

15   these things to you.

16        **MR. SHOHAT:**  I get it.

17        **THE COURT:**  You'll find it out.  I mean, --

18        **MR. SHOHAT:**  Frankly, I'm only asking the question

19   because -- to see if it's relevant for your consideration of

20   their credibility --

21        **THE COURT:**  I'm assuming all these people are in

22   trouble and they're going to cooperate and, you know, people

23   are burning documents and all of it.  So I understand what's

24   happening.

25   //

1   **BY MR. SHOHAT:**

2   Q    How long has Mr. Gonzalez, if you know, maintained an

3   office at 848 Brickell in Miami, Florida?

4   A    I don't know the duration.  I don't know when he began and

5   I don't know whether he -- you know, as of the end of July when

6   he was arrested, I don't know if he still maintained that

7   office space.  I don't know the duration of that.

8   Q    Do you know does he lease or own that space?

9   A    I don't know.

10  Q    Have you -- has your investigation sought to acquire a

11  lease?

12  A    I'm not aware of --

13  Q    Has your investigation determined for whom Mr. Gonzalez

14  works to be paid a salary, earned income, of $40,000 a year;

15  have you determined for whom he works?

16  A    I have not, no.

17  Q    Have you ever heard of a company of -- in the name of

18  Insistema, CA, I-N-S-I-S-T-E-M-A, CA; have you ever heard of

19  that company?

20  A    I don't believe so.

21       **(Pause)**

22  Q    You referred to an individual by the name of Roberto

23  Rincon as one of the sources of information in this case,

24  correct?

25  A    Yes.

1   Q    Would you open the complaint, please, to --

2        **(Mr. Shohat/Ms. Speaker confer)**

3   Q    Would you open the complaint to paragraph 19 on page

4   seven; you see that, sir?

5   A    Yes.

6   Q    Bottom of -- very bottom of page seven.  Now, at the

7   bottom of page 19 -- bottom of page seven, paragraph 19, it

8   basically says, and I quote:  "In addition, Cesar -- Roberto

9   Rincon," he's CW-2, right?

10  A    (No audible response)

11  Q    Roberto Rincon is CW-2.

12  A    I don't know if I've been told that but just my reading on

13  paragraph 19, it sounds consistent with Mr. Rincon's role in

14  the larger investigation.

15  Q    Are you telling us, Agent Wickman, that in preparation for

16  your testimony here today, you were not told that the

17  individual described in paragraph 19 as CW-2 was Roberto

18  Rincon; you don't recall being told that?

19  A    I do not.

20  Q    Now, given your testimony, he believes to be -- you

21  believe him to be CW-2, it says:  "Corroborates CW-1," that

22  would be Cesar Rincon's "statements that Gonzalez and

23  coconspirator one controlled company A, B, and C.  CW-2 is the

24  owner of a number of U.S.-based energy companies," and it goes

25  on and says he's cooperating; you see that, sir?

1   A    I do.

2   Q    Now, nothing in the complaint refers to CW-2 as saying one

3   word about bribe payments by Jose Manuel Gonzalez; is that

4   accurate?  Only that he controlled the three companies; is that

5   a fair statement?  In the complaint.

6   A    Can I have a minute to read --

7   Q    Go ahead.

8   A    -- paragraph 19 in its entirety?

9   Q    Will you take my representation that the only reference in

10  the complaint to CW-2 is paragraph 19; will you accept that

11  representation?

12  A    Yes.

13  Q    Okay, take a look at paragraph 19 and tell us whether I am

14  correct that nothing out of the mouth of Cesar Rincon refers to

15  any bribe payments by Mr. Gonzalez, it only says he

16  corroborated that Gonzalez controlled the three companies,

17  companies A --

18          **MS. SPEAKER:**  You mean Roberto.

19          **MR. SHOHAT:**  Roberto Rincon, I apologize, thank you.

20  **BY MR. SHOHAT:**

21  Q    That Roberto Rincon corroborated Cesar Rincon's statements

22  that Mr. Gonzalez controlled companies A, B, and C; is that

23  correct?

24  A    Can you restate the question?  I want --

25  Q    Yes.

1  A    -- to make sure I'm answering the question as it's asked.

2  Q    No, no, no, you're doing the right thing.  That's exactly

3  the right thing to do.  Am I correct that nothing in the

4  complaint, including paragraph 19, contains any statement by

5  Robert Rincon about any bribe payments by Mr. Gonzalez?

6  A    That's correct.

7  Q    This complaint was -- this was the complaint that was used

8  to arrest and hold Mr. Gonzalez on July 31st to support the

9  arrest warrant for Mr. Gonzalez on July 31st, 2018; is that

10  correct?

11  A    Yes.

12  Q    Has Roberto Rincon been interviewed since July 31st, 2018,

13  if you know?

14  A    I'm not aware of that.

15  Q    Would it be a fair statement -- you testified that Robert

16  Rincon provided you with this document, which is Government

17  Exhibit 1; do you have a copy of it up there, sir?

18  A    I don't have a copy here but I've seen it.

19  Q    This, he provided you with that document.

20  A    Yes.

21  Q    Given your testimony that nothing in the complaint refers

22  to any bribe payments by Mr. Gonzalez, and given your testimony

23  that you're not of any -- aware of any briefings by Mr. Rincon

24  since July 31st, 2018, the date of Mr. Gonzalez's arrest, would

25  I not be correct that this document which you say was provided

1   by Roberto Rincon was provided prior to Mr. Gonzalez's arrest?

2   A    I don't know that to be the case.  I honestly don't know

3   if we have interviewed Mr. Roberto Rincon since the arrest of

4   Mr. Gonzalez, so I don't know when that document was provided.

5   Q    Agent Wickman, tell Judge Bray which company on Government

6   Exhibit 1, I'll place it in front of you again, tell him which

7   company or companies in Government Exhibit 1 were involved in

8   bribe payments to Cesar Rincon.

9   A    In the third column --

10            **THE COURT:**  To Cesar, five payments to Cesar.

11            **THE WITNESS:**  To Cesar.

12            **MR. SHOHAT:**  To Cesar Rincon.  Go ahead.

13  A    Companies A, B, and C in the complaint.

14  Q    Okay.

15  A    Company A is Ameritraders, which is in the third column.

16            **THE COURT:**  Wait, wait, wait, you have to let him

17  answer.

18            **MR. SHOHAT:**  Yeah, yeah, yeah.

19            **THE COURT:**  Hold on.  I just --

20            **MR. SHOHAT:**  I meant to exempt them but go ahead.

21            **THE COURT:**  Okay.

22  A    Ameritraders, Inc. is listed in the third column under the

23  United States flag, it's the -- presumably the list of United

24  States companies.

25  Q    Fair enough.

1  A    Further down is RH International Consulting, Inc.  And I

2  think I missed Henry PDA International Holdings LLC.  Those

3  three names are included on this --

4  Q    Fair enough.

5  A    -- document.

6           THE COURT:  And they are again?  Say again because

7  we're just --

8           THE WITNESS:  Company A is Ameritraders in the

9  complaint.

10          THE COURT:  Yeah, yeah, they constitute what, these

11 three companies you just named are companies that?

12          THE WITNESS:  I apologize.  If you go to the first

13 column, these are the Panamanian companies.  Ameritraders --

14          THE COURT:  No, I didn't mean for you to open up a

15 whole big thing.  You just named --

16          MR. SHOHAT:  Well, I can answer your question easily.

17 I can help you.

18          THE COURT:  Just somebody say what those three

19 companies --

20          MR. SHOHAT:  Those are the originating bank accounts

21 in Switzerland that paid the money --

22          THE COURT:  Okay.

23          MR. SHOHAT:  -- into the accounts of the relative of

24 Cesar Rincon, a company called Inversion --

25          THE COURT:  Got it.

1          **MR. SHOHAT:**  -- the two banks.

2          **THE COURT:**  All right.

3          **MR. SHOHAT:**  That's what the Government is alleging,

4    okay?

5    **BY MR. SHOHAT:**

6    Q    Other than companies -- how many companies are listed on

7    that?

8    A    Approximately 15.

9    Q    Other than the three companies, A, B, and C, which

10   companies listed on that document provided by Mr. Roberto

11   Rincon are involved in bribe payments, if any, to Cesar Rincon,

12   as far as you know?

13   A    I don't have any knowledge --

14   Q    Which company listed on Government Exhibit 1 were involved

15   in bribe payments to Citgo as far as you know?

16   A    I don't know.

17   Q    Now, you testified that Mr. Rincon provided this document

18   to you; is that correct?

19   A    Yes.

20   Q    And that he obtained the document from someone at PDVSA.

21   A    Yes.

22   Q    He told you he obtained the document from someone at

23   PDVSA.

24   A    Yes.

25   Q    Have you ever seen this document in any other place?

1  A    I haven't.

2  Q    Do you know what the first line of this document (speaks

3  Spanish) Jose Manuel Gonzalez, and then the second line,

4  (speaks Spanish), do you know what those mean in English?

5  A    I do not.

6  Q    That Spanish.

7  A    I do not.

8  Q    Would you take my word for it that the first line --

9       **MR. SHOHAT:**  Please correct me if I'm wrong.

10 Q    -- basically says the empire of Joseph Manuel Gonzalez?

11 A    I would accept your translation of that.

12 Q    But you're not aware -- let me -- are you aware that this

13 document appeared numerous times in blogs in Venezuela over the

14 months, in Venezuelan blogs?

15 A    I'm not aware of that.

16      **(Pause)**

17 Q    Has the investigation that you're representing here today

18 researched other than companies A, B, and C, has the

19 investigation researched the actual providence or ownership of

20 all the companies or some of the companies on here, other than

21 what you've been told about and you testified to about

22 (indisc.) other than that company.  We know you've testified

23 that you've been told things about that company, but has the

24 investigation actually researched the ownership of these --

25 control of these entities?

1   A     I don't have direct knowledge of that.

2   Q     Okay.  You want to finish, you have more to say?

3   A     I would assume so if at least --

4          **THE COURT:**  Don't assume.

5          **THE WITNESS:**  Okay.

6          **THE COURT:**  Keep going.

7          **THE WITNESS:**  At least for the United States --

8          **MR. SHOHAT:**  Okay.

9          **THE WITNESS:**  -- entities.  I do not have direct

10  knowledge of --

11         **MR. SHOHAT:**  Do --

12         **THE COURT:**  But this document is not going to -- this

13  case does not rise and fall on this document, okay?  So, I

14  mean, I don't know --

15         **MR. SHOHAT:**  Got it.  I'll move on, Judge.

16         **THE COURT:**  And I'm not trying to rush you, but we --

17         **MR. SHOHAT:**  I get the message, Judge.

18         **THE COURT:**  -- I'm giving you really wide latitude.

19         **MR. SHOHAT:**  Okay, yes, sir, I know you have, and

20  time is running and I want to try to --

21         **THE COURT:**  There's other people that need -- and, I

22  mean, at some point we're going to have to take a break and let

23  some other people go.

24         **MR. SHOHAT:**  Judge, if you'd like to do that at any

25  time, it's perfectly --

1          **THE COURT:**  I mean, how long are we going to do this;

2  are we going to go into tomorrow here or what --

3          **MR. SHOHAT:**  Well, --

4          **THE COURT:**  -- I mean, seriously what are we doing?

5  I want to know.

6          **MR. SHOHAT:**  Judge, I don't know the answer.  She

7  covered a lot of territory with this witness.  I don't have

8  that much more with the witness.  But I am going through my

9  notes because I'm doing it on the fly.

10          **THE COURT:**  That's fine.  Why don't you give me a

11  guesstimate so I can --

12          **MR. SHOHAT:**  A half hour.

13          **THE COURT:**  Would anybody object to me letting some

14  people get out of here --

15          **MR. SHOHAT:**  No, no, no.

16          **THE COURT:**  -- who have --

17          **MR. PEARSON:**  Absolutely not, Your Honor, we're at

18  the Court's --

19          **MR. SHOHAT:**  One hundred percent, and I can review my

20  notes and --

21          **MR. PEARSON:**  Excuse me!  We're at the Court's

22  disposal.

23          **THE COURT:**  Okay, so why don't we do that?  There --

24          **MS. GARCIA:**  Geez.

25          **THE COURT:**  -- are a lot of people in this courtroom.

1   I'm not sure -- so why don't you sort of gather yourself and

2   your next set of questions and you can just sort of stay where

3   you are and go take a break or something.  And let's bring back

4   -- so, okay, off the record in this case.

5           **(Recess taken from 12:31 p.m. to 12:44 p.m.)**

6           **THE COURT:**  Are we on the record?

7           **THE CLERK:**  We are recording but I'm not (indisc.)

8           **THE COURT:**  I'm not trying to rush you.  I was in a

9   rush because I wanted to make sure that I wasn't holding up

10  people.  And I know one of those lawyers was out of town and

11  needed to get on a plane at some point so that --

12          **MR. SHOHAT:**  I do, too.

13          **THE COURT:**  Okay.  And I have civil hearings at 3:00

14  so --

15          **MR. SHOHAT:**  We hope to be finished with this witness

16  maybe in less than a half hour, I believe that's true.

17          **THE COURT:**  Do you have other witnesses?

18          **MR. SHOHAT:**  No.  I have witnesses but they're very

19  brief.

20          **THE COURT:**  Okay.

21          **MR. SHOHAT:**  And I can proffer them if you like and

22  then she can ask questions if she likes, we can do it that way.

23          **THE COURT:**  Witnesses as to detention issues or

24  witnesses --

25          **MR. SHOHAT:**  Yes, they're witnesses that we're asking

1　that he be released in the custody of his brother.  I have his

2　brother.

3　　　　　THE COURT:  No, okay, I just wanted to make --

4　they're not probable cause-related witnesses.

5　　　　　MR. SHOHAT:  No, no, no, they're not on that issue.

6　　　　　THE COURT:  Normally a proffer is fine if -- I mean,

7　it's normally -- from the defense it's fine.

8　　　　　MS. EDWARDS:  We may (indisc.)

9　　　　　MR. SHOHAT:  (Indisc.) available.  One of them is in

10　London, we need to contact her by phone because she's waiting.

11　　　　　THE COURT:  Okay.

12　　　　　MR. SHOHAT:  She's my client's ex-wife.

13　　　　　THE COURT:  All right, let's go.

14　　　　　MS. SPEAKER:  But it's a Miami number and it's --

15　　　　　MR. SHOHAT:  We have a 305 number and she answers.

16　　　　　THE COURT:  All right.

17　　　　　MR. SHOHAT:  Have a seat, agent.

18　　　　　THE WITNESS:  (Indisc.)

19　　　　　MR. SHOHAT:  You're still sworn.

20　　　　　THE WITNESS:  Excellent.

21　　　　　THE COURT:  You're still sworn.

22　　　　　THE WITNESS:  Love it.

23　　　　**(Witness retakes the stand)**

24　//

25　//

1           **CROSS EXAMINATION (CONTINUED)**

2    **BY MR. SHOHAT:**

3    Q    Agent Wickman, please take a look at Exhibit 2.  Exhibit 2

4    is a letter dated August 4th, 2016, to Gonet and CIE in

5    Switzerland; you see that, sir?

6    A    Yes.

7    Q    Who provided you -- this letter you said came off of

8    Mr. Gonzalez's laptop.

9    A    Yes.

10   Q    In what program was it in in his laptop, if you know?

11   A    I don't know.

12   Q    Do you know if he had a program in his laptop that listed

13   companies that he owned, that he had control of specifically?

14   A    I do not.

15   Q    Do you know if he had a program in his laptop that listed

16   companies that he represented in the course of his employment

17   as distinguished from companies that he owned or controlled; do

18   you know that?

19   A    I do not.

20   Q    Taking a look at Exhibit 2, Exhibit 2 as you indicated

21   indicates that the company Azolarafan (phonetic), and that's

22   all I'm going to refer to here, that the company Azolarafan is

23   within a group family accounts of its shareholders' group and

24   has assets in excess of 50 million U.S. dollars in our books,

25   correct?

1   A    Yes.

2   Q    Okay.  Your testimony was, if I understood your testimony,

3   that this letter represented that Mister -- that this letter

4   represented that there was $50 million in the bank or the

5   financial entity to whom the letter is addressed; is that your

6   testimony?

7   A    Yes.

8   Q    That's not what it says at all, is it?  In fact, it

9   doesn't refer at all to the amount of money in the financial

10  institution; isn't that true?  It refers instead to the value

11  of the company on the books of the senders of the letter; isn't

12  that what it refers to?

13       **(Pause)**

14  A    Can you restate your question?

15  Q    This letter, contrary to what you told Judge Gray on

16  direct examination, this letter does not refer to an amount of

17  money in any bank account in Switzerland or anywhere in the

18  world; instead, it is a statement by the signers of the letter

19  of to the value of the company on the books of the company,

20  isn't that what it says?

21  A    Within the group of family accounts.

22  Q    Yeah, of its shareholder group, assets in -- of $50

23  million is on our books, correct?

24  A    That's what the words say.

25  Q    Okay, it -- let me repeat the question.

1              THE COURT:  Sir, I'm reading it.  I have you.

2              MR. SHOHAT:  Okay.

3              THE COURT:  I can --

4              MR. SHOHAT:  Fair enough.

5              THE COURT:  -- understand what this says.

6              MR. SHOHAT:  Fair enough.

7    BY MR. SHOHAT:

8    Q    And by the way, Mr. Gonzalez is not -- did not sign this

9    letter; is that correct?

10   A    No.

11   Q    It's not correct or it is correct?

12   A    He did not sign these.  The signatures do not appear to be

13   his, --

14   Q    And --

15   A    -- they're not his names.

16   Q    -- there are two people listed that we won't get into

17   their names, they're not important, but they refer to

18   themselves as authorized signatories, correct?

19   A    Correct.

20   Q    Do you have any evidence in your possession that

21   Mr. Gonzalez was an authorized signatory in any way for the

22   Azolafaran (phonetic) company anywhere in the world, that he

23   was an authorized signatory?

24   A    No.

25              (Pause)

1  Q    Okay, you testified that in January of this year, upon

2  entry into the United States, as a result of what you described

3  as a border search, Mr. Gonzalez's cellphone and his laptop

4  were seized and imaged, correct?

5  A    I believe it was a laptop and three cellphones.

6  Q    So a laptop and three cellphones were seized and imaged.

7  Were any of the cellphones email-enabled?

8  A    I don't know.

9  Q    Was the laptop email-enabled, did it have emails on it as

10 far as you know?

11 A    I don't know the full contents of the laptop.

12 Q    So you can't tell us today -- in light of that answer, you

13 cannot tell us today, Agent Wickman, whether or not the

14 business emails that you were told were destroyed by Joanna

15 Hadaad were on his laptop, you don't know that, that was seized

16 and imaged; is that correct?

17 A    That's correct.

18      **(Pause)**

19 Q    You told us that you were given a spreadsheet by Joanna

20 Hadaad with nicknames on it that listed PDVSA bribes; is that

21 what you said?

22 A    I believe the spreadsheet was to compile the contracts

23 which had been awarded by PDVSA, would list the contracts and

24 it would list bribe percentages, and then that percentage

25 equating -- or calculating a bribe payment which was to be paid

1   to certain individuals.  And I believe they were Citgo

2   individuals.

3   Q    Okay.  Where's the spreadsheet?

4   A    I don't know.

5   Q    You don't know.  Is it by any chance in your backpack?

6   A    I do not have that spreadsheet.

7   Q    You don't have it here in court?

8   A    No.

9        **(Pause)**

10  Q    Do you know the date ranges of the emails which Joanna

11  Hadaad said were destroyed?

12  A    I do not.

13  Q    Do you know the contents, can you describe generally the

14  contents of those emails, according to Joanna Hadaad, what was

15  in those emails?

16  A    Not specifically other than -- no.

17  Q    Referring to your testimony about the Knights of Malta

18  passport, do you know of your own knowledge or have you been

19  told by any of your witnesses whether Mr. Gonzalez used the

20  Knights of Malta passport for travel?

21  A    I do not.

22  Q    Are you aware of your -- as a result of your investigation

23  whether a Knights of Malta passport can be used for travel?

24  A    My understanding is that it can be used in -- it's only

25  recognized in certain countries, not in the United States.  But

1    it can be used in I believe it's a list of 12.  The source that

2    I researched listed 12 mostly European countries where that

3    passport is recognized.

4    Q    Are you aware whether or not -- maybe I just asked this

5    question, I'm not sure -- whether or not Mr. Gonzalez has ever

6    used the passport for travel, the Knights of Malta?

7            **MS. EDWARDS:**  (Indisc.)

8            **THE COURT:**  Right.  It seems like a novelty more than

9    anything else.  I'm not going to base any decision on some

10   weird passport.  There are three others, though, so --

11           **(Mr. Shohat/Ms. Speaker confer)**

12   Q    Of the companies that you're aware of that you say Jose

13   Manuel Gonzalez has control of, how much money has your

14   investigation revealed is in any bank account anywhere in the

15   world controlled by Mr. Gonzalez?

16   A    I don't know.

17           **THE COURT:**  Wait, what's -- say the question again.

18   I'm sorry, I didn't --

19   Q    Of the companies that you have asserted here today,

20   including those on Exhibit 1, and any other companies, how much

21   money is in any bank account over which Mr. Gonzalez has

22   signatory authority or otherwise control anywhere in the world?

23   And your answer was?

24   A    Don't know.

25           **MR. SHOHAT:**  Judge, that's all I have at this time.

1          **THE COURT:**  Okay, any other witnesses for the

2    Government?

3          **MS. EDWARDS:**  No, Your Honor, although I would

4    briefly request redirect.

5          **THE COURT:**  Sure.

6                         **REDIRECT EXAMINATION**

7    **BY MS. EDWARDS:**

8    Q    Agent Wickman, has your investigation revealed that in

9    this case and the relationship between Mr. Gonzalez and Cesar

10   Rincon, each bribe payment was for a specific act?

11   A    No.

12   Q    Okay, how did the bribe payments work?

13         **MR. SHOHAT:**  Objection, predicate.

14         **THE COURT:**  You are --

15         **MS. EDWARDS:**  Sorry, if it was not a one-to-one

16   relationship, is that a better way to ask it?

17         **THE COURT:**  I mean, --

18         **MR. SHOHAT:**  No, I don't mind your question, but --

19         **THE COURT:**  Wait, wait, wait, crosstalk, let's not do

20   that.  So --

21         **MR. SHOHAT:**  Yeah.

22         **THE COURT:**  -- I hear what he's saying.  You just

23   asked a pretty broad question.  Why don't you just --

24         **MS. EDWARDS:**  Sorry.

25         **THE COURT:**  -- get a couple lead-ins here?

1  **BY MS. EDWARDS:**

2  Q    Agent Wickman, could you describe the relationship between

3  the acts taken by Cesar Rincon and the payments made by

4  Mr. Gonzalez?

5         **MR. SHOHAT:**  Objection, vague and predicate for this

6  witness (indisc.)

7         **THE COURT:**  So I hear you and so what she's trying to

8  figure out is was each one of the payments that is in the

9  complaint for a specific action that this foreign person was

10  supposed to take, or were they payments in general for a

11  variety of acts?

12         **MR. SHOHAT:**  Objection, leading.

13         **THE COURT:**  I know.  But it's just that we're going

14  to get there eventually so -- and you -- honestly, you opened

15  the door so wide --

16         **MR. SHOHAT:**  I don't --

17         **THE COURT:**  -- you could drive an --

18         **MR. SHOHAT:**  I don't disagree with that.

19         **THE COURT:**  -- entire, you know, barn of horses

20  through it.

21         **MR. SHOHAT:**  I agree with you.

22         **THE COURT:**  So let's not object then.  We know we're

23  getting there.  It -- and it's -- so do you understand the

24  question?

25         **THE WITNESS:**  I do.

 1          **THE COURT:**  Was there a one-to-one relationship

 2   between payment and act, yes or no?

 3          **THE WITNESS:**  No.

 4          **THE COURT:**  I get it.

 5   **BY MS. EDWARDS:**

 6   Q    Agent Wickman, does the complaint charge Mr. Gonzalez with

 7   conspiring to violate the Foreign Practices Act?

 8          **THE COURT:**  Yes, 371.

 9          **MS. EDWARDS:**  Thank you, Your Honor.

10   A    Yes.

11   Q    Okay.  And did you testify previously that Mr. Morales,

12   his alleged coconspirator, stated that he and Mr. Gonzalez

13   agreed to pay bribes in furtherance of their business?

14   A    Yes.

15   Q    Is a conspiracy complete at the time of agreement?

16   A    Yes.

17          **THE COURT:**  Legal question.  I heard all the

18   testimony.  I understand what --

19          **MS. EDWARDS:**  Okay.

20          **THE COURT:**  -- you're getting at.  Do you have

21   another topic?

22   **BY MS. EDWARDS:**

23   Q    Agent Wickman, prior to the information from Joanna Hadaad

24   on July 26th, 2018, did Homeland Security have immediate plans

25   to arrest Mr. Gonzalez?

1  A     No.

2  Q     Was your investigation ongoing?

3  A     Yes.

4  Q     Is your investigation still ongoing?

5  A     Yes.

6  Q     Was it -- the information regarding the Defendant's plan

7  to flee that precipitated his arrest?

8  A     Yes.

9        **MS. EDWARDS:**  Thank you, no further questions.

10       **THE COURT:**  I hate to say it, but you're -- are you

11 done?

12     (No audible response)

13       **THE COURT:**  All right, so with that any other

14 witnesses?

15       **MS. EDWARDS:**  The Government does not have other

16 witnesses, Your Honor.

17       **THE COURT:**  All right.  Does the Government rest?

18       **MS. EDWARDS:**  Yes.

19       **THE COURT:**  All right, the -- so you can step down.

20 Don't leave though, just in case -- I don't know --

21     **(Witness steps down)**

22       **MR. SHOHAT:**  For record purposes, I'm going to make a

23 proffer so (indisc.)

24       **THE COURT:**  I'm not trying to -- I don't want there

25 to be any indication that I'm going to shut you down on what

1   you need to do for your client so --

2           **MR. SHOHAT:**  I get it.

3           **THE COURT:**  -- if you need to call somebody in

4   London, call them.

5           **MR. SHOHAT:**  Okay.

6           **THE COURT:**  I mean --

7           **MR. SHOHAT:**  Can we get somebody on the phone in

8   London, can we do that?

9           **THE COURT:**  I mean, I just -- I understand that

10  you --

11          **MS. SPEAKER:**  Three, oh, five number --

12          **THE COURT:**  -- there might be some --

13          **MS. SPEAKER:**  The sticky on your screen in front of

14  you --

15          **THE COURT:**  -- note that I'm trying to rush you, and

16  I'm not trying to do that.

17          **MR. SHOHAT:**  No, it's --

18          **THE CLERK:**  Your Honor, honestly I don't know --

19          **MS. SPEAKER:**  It's a Miami phone number, it's not

20  (indisc.)

21          **MR. SHOHAT:**  It's a 305 number.

22          **THE CLERK:**  Oh, okay.

23          **THE COURT:**  Let's try.

24          **THE CLERK:**  If it's local, I mean, it's -- if it's --

25          **MR. SHOHAT:**  Judge, this is Maria Diaz, the ex-wife

1  of --

2          **THE COURT:**  All right, but is there any objection to

3  this?  I mean, he could go by proffer if he wanted to so --

4          **MR. SHOHAT:**  The easy --

5          **MS. EDWARDS:**  We don't have an objection.  He can

6  present it however he wishes.

7          **THE COURT:**  All right, and this person pertains -- go

8  ahead, I'm sorry.

9          **MR. SHOHAT:**  She's going to be a cosigner -- we're

10  offering her as a cosigner on the bond.  I want to have her

11  testify to that.

12          **THE COURT:**  Fine.

13          **MR. SHOHAT:**  And I want to have her testify about

14  this travel issue that's been raised (indisc.)

15          **THE COURT:**  Okay.

16          **THE CLERK:**  Does the witness need an interpreter?

17          **MR. SHOHAT:**  No.

18          **THE CLERK:**  Okay.

19          **THE COURT:**  Any objection to me swearing her over the

20  phone, or Jason swearing her?  I mean seriously.

21          **MR. PEARSON:**  No objection, Your Honor.

22          **THE COURT:**  Okay.  What's her name, Joanna Rincon, is

23  that --

24          **MS. SPEAKER:**  Maria (indisc.)

25          **THE COURT:**  I'm sorry.

1           **MR. ARDOIN:**  Maria --

2           **MS. SPEAKER:**  (Indisc.) Diaz.

3           **THE COURT:**  All right, where am I getting that name?

4           **MS. DIAZ:**  Hello.

5           **MR. SHOHAT:**  Maria?

6           **MS. DIAZ:**  Yes.

7           **MR. SHOHAT:**  Hi, this is Ed.  How are you?

8           **THE COURT:**  Wait, let Mr. Marchand --

9           **MS. DIAZ:**  Hi, fine.

10          **THE COURT:**  -- start this phone call.  Here, you do

11   it.

12          **MR. SHOHAT:**  Okay, you're going to be sworn in --

13          **THE COURT:**  Wait, sir!  Let Mr. Marchand speak to the

14   witness.

15          **MR. SHOHAT:**  Right.

16          **THE CLERK:**  Ms. Diaz?

17          **MS. DIAZ:**  Yes?

18          **THE CLERK:**  My name is Jason Marchand.  I am the Case

19   Manager to Judge Bray.  I'm going to issue an oath to you

20   because you're about to testify in this case; do you

21   understand, ma'am?

22          **MS. DIAZ:**  Not too much.  My English no good but I

23   know what I have to do.

24          **THE COURT:**  Hold on.

25          **MS. DIAZ:**  Hello?

1          **THE COURT:**  Ma'am, can you hear me?

2          **MS. DIAZ:**  Yes, I can hear you.

3          **THE COURT:**  All right.  This is Peter Bray in the

4  Southern District of Texas.  We're in live, open court and

5  we're about to have you testify.  Is that something that you --

6          **MS. DIAZ:**  Yeah.

7          **THE COURT:**  -- already knew that you were going to

8  do?

9          **MS. DIAZ:**  Yes, yes.

10          **THE COURT:**  All right.  Do you understand what I am

11  saying to you?

12          **MS. DIAZ:**  Yes, yes.

13          **THE COURT:**  Do you normally speak English or Spanish?

14          **MS. DIAZ:**  Spanish is better --

15          **MS. GARCIA:**  (Indisc.)

16          **MS. DIAZ:**  -- for me.

17          **THE COURT:**  Okay.  We either need to get an --

18          **MR. SPEAKER:**  Is there an interpreter?

19          **THE COURT:**  Well, we thought we said that she speaks

20  English.

21          **MR. SHOHAT:**  She does speak English.  She speaks

22  English to me every day.

23          **THE COURT:**  All right.  Ma'am, if we go slowly and

24  you don't understand something, can you ask that it be

25  repeated?

1          **MS. DIAZ:**  Yeah, it's okay.

2          **THE COURT:**  All right.

3              **MARIA DIAZ, DEFENDANT'S WITNESS, SWORN**

4          **THE COURT:**  All right.  So you need to get in front

5    of a microphone, sir, --

6          **MR. SHOHAT:**  Well, --

7          **THE COURT:**  -- so that she can hear.  You could --

8    that's fine.

9          **THE CLERK:**  You can sit at the table, sir.  There's a

10   microphone at your table.

11         **MR. SHOHAT:**  Okay.  Is it okay if I call her Maria,

12   Judge?

13         **THE COURT:**  You can do whatever you need to do to --

14         **MS. GARCIA:**  Is it on?

15         **THE COURT:**  -- get it out.

16         **MR. SHOHAT:**  Hello?  Maria, can you hear me?

17         **THE WITNESS:**  Yes, yes.

18         **MR. SHOHAT:**  Okay, this is Mr. Shohat.

19         **MS. SPEAKER:**  She needs to speak up.

20         **MS. DIAZ:**  Okay.

21                      **DIRECT EXAMINATION**

22   BY MR. SHOHAT:

23   Q    Marie, are you -- of what country are you a citizen, or

24   countries?

25   A    U.S. citizen and Venezuela citizen.

1   Q    Where do you reside?

2            **MS. SPEAKER:**  Live.

3   Q    Where do you live?

4   A    In Miami, U.S.

5   Q    What is your address in Miami?

6   A    Okay, it's 2669 South Rachel (phonetic) Drive, Apartment

7   1901 North, Coconut Grove, Florida, 33133.

8   Q    Do you own that apartment?

9   A    No.

10  Q    Who owns that apartment?

11  A    My sister-in-law.

12  Q    Okay, that would be --

13  A    Brother-in-law, I'm sorry.

14  Q    Your brother-in-law.  That would be Mr. Gonzalez's

15  brother?

16  A    In-law, yes.

17  Q    Okay, would that be Walter Alex Gonzalez Testino?

18  A    Yes.

19  Q    Okay.

20  A    Yes.

21  Q    How long have you lived in that apartment?

22  A    I don't remember exactly but some months.

23  Q    Before that, where did you live?

24  A    I'm sorry?

25  Q    Where did you live before you lived in that apartment?

1   A    On 200 Biscayne Boulevard Way.

2   Q    Is that The Epic?

3   A    (Indisc.) -- apartment.  Yes, Epic.

4   Q    It's the Epic, okay.  Mrs. Gonzalez, have I asked you the

5   question of whether you would be willing to sign and be

6   personally responsible on a bail bond if it was set by the

7   Court here?

8   A    Yes.

9   Q    Are you willing to sign on Jose's bail bond?

10  A    Yes, I do.

11  Q    What is your relationship to Jose Gonzalez?

12  A    His wife.

13  Q    Okay, are you living -- currently living together with

14  Jose Gonzalez or were you living with him as of the time of his

15  arrest?

16  A    Yes, I do.

17  Q    Okay.

18  A    Well, he -- oh, okay.

19  Q    Did you understand my question, Mrs. Diaz?

20  A    (Indisc.)

21  Q    Were you living with Jose Gonzalez at the time of your

22  arrest -- of his arrest in July?

23  A    No, he live in Venezuela.  I live in Miami with my

24  daughter.  He visits us sometimes but we are together when I

25  live in the airport.

1  Q    Okay.  Mrs. Gonzalez, is the daughter you're referring to

2  by the name of Isabel?

3  A    Yes.

4  Q    Is that Jose Gonzalez's daughter as well?

5  A    Yes.

6  Q    Is this a daughter by your marriage with Mr. Gonzalez?

7  A    Yes.

8  Q    How old is Isabel?

9  A    Eighteen years old.

10 Q    Where is Isabel now?

11 A    London.

12 Q    Where are you now?

13 A    London.

14 Q    Are you in London with Isabel?

15 A    Yes, I do.

16 Q    Okay.  Mrs. Gonzalez, do you own any real estate anywhere

17 in the world in your name?

18 A    In Venezuela, yes.

19 Q    And what do you own in Venezuela?

20 A    A house.

21 Q    Okay.  Mrs. Gonzalez, I want to refer you back to the date

22 on which your husband was arrested; do you understand that?

23 I'm going to ask you some questions --

24 A    Oh, no, --

25 Q    -- about the day he was arrested.

1  A    -- I didn't understand the last question.

2  Q    I'm going to ask you some questions now about the date on

3  which he was arrested; do you understand that?

4  A    Okay.

5  Q    That date was July 31st of this year.

6  A    Yes.

7  Q    Did you bring Mr. Gonzalez to the Miami International

8  Airport on that day?

9  A    Yes.

10  Q    Did you drive in your car on that day?

11  A    No, it -- no, not my car, another car.

12  Q    Another car.  But you drove to the airport by car; is that

13  correct?

14  A    Yes, by car, yes, driving, driving.

15  Q    Was your daughter, Isabel, with you when you drove --

16  A    No.

17  Q    -- Mr. Gonzalez to the -- wait until I finish my question,

18  please.  Was your daughter, Isabel, with you when you drove to

19  the airport that day?

20  A    No.

21  Q    Where was Isabel on July 31st, 2018?

22  A    In Europe.

23  Q    What was she doing in Europe?

24  A    She is in summer travel with friends.

25  Q    Do you and Mr. Gonzalez have any other daughters?

1  A    No.

2  Q    Do you have any sons?

3  A    I have my son and my daughter all with Jose.

4  Q    But not with Jose.  Were any of your children with you

5  when you drove Jose Gonzalez to the airport on July 31st, 2018?

6  A    No.

7  Q    When you drove Jose to the airport on July 31st, 2018,

8  what did you do?

9  A    I wait for him.  He goes to make a check-in and I always

10 wait for him (indisc.)

11 Q    Why?

12 A    Because sometimes there are delays or maybe we have enough

13 time to have something, and I always wait outside.  He come

14 back and if we have enough time, we go on around, we talk, he

15 take the briefcase and he goes to the gate.

16 Q    Did you have plans to travel with Mr. Gonzalez on July

17 31st, 2018?

18 A    No.

19 Q    Did you have a ticket, had you purchased a ticket to

20 travel on July 31st, 2018?

21 A    No.

22 Q    Did you make or did anyone in your name if you know make a

23 flight reservation for you to travel on July 31st, 2018?

24 A    No.

25 Q    Was it uncommon for Jose Manuel Gonzalez, your husband, to

1   travel internationally or to Caracas; was that a common thing

2   or an uncommon thing?

3   A     Could you repeat it, please?  I'm sorry.

4   Q     Was it normal for Jose to travel?

5   A     Yes, normal.

6   Q     Why would -- according to your knowledge, why was Jose

7   going to Caracas on July 31st, 2018?  What, if anything, did

8   you know about that trip?

9   A     Nothing, nothing.

10  Q     He didn't discuss the reasons for that trip with you.

11  A     No, he always fly frequently to Caracas to work and going

12  back all the year, all the time.

13          **MR. SHOHAT:**  I have no further questions.

14          **MS. SPEAKER:**  What about (indisc.)

15          **MR. SHOHAT:**  Hold on, hold on.

16          **MS. SPEAKER:**  Right there.

17      **(Ms. Speaker/Mr. Shohat confer)**

18          **MR. SHOHAT:**  I have no further questions.

19          **THE COURT:**  Cross?

20          **MS. EDWARDS:**  Thank you, Your Honor.  Will she be

21  able to -- Ms. Diaz, are you able to hear me?

22          **THE WITNESS:**  Yes, I can hear you.

23          **MS. EDWARDS:**  Hi.  My name is Sarah Edwards.  I'm a

24  lawyer for the Government in this case.  I'm going to ask you a

25  few questions now, and I would just ask like you were doing

1    with Ed, if you don't understand something that I say, please

2    let me know, okay?

3             **THE WITNESS:**  Okay.

4             **MS. EDWARDS:**  Okay.

5                          **CROSS EXAMINATION**

6    **BY MS. EDWARDS:**

7    Q    I think you just described for Mr. Shohat your current

8    residence, an apartment in Coconut Grove that is owned by your

9    brother-in-law, Walter Alejandro; is that correct?

10   A    Yes.

11   Q    Do you know where the funds that Mr. Walter Alejandro used

12   to purchase the apartment came from?

13   A    No.

14   Q    You said that you lived in The Epic, a building in Miami,

15   before the apartment in Coconut Grove; is that correct?

16   A    Yes, it's correct.

17   Q    Are you aware that that apartment was owned by a corporate

18   entity named Elbamed under your husband's control?

19   A    I can't understand that to say.  I'm sorry.

20            **THE COURT:**  Who owned --

21   Q    Do you know who owned the apartment at The Epic?

22   A    Well, it's a company, that's it.

23            **THE COURT:**  Who owns the company?

24   Q    Do you know who owns the company?

25   A    No.

1   Q    Are you familiar -- sorry, you don't know who owns the

2   company whose apartment you lived in?

3   A    I don't know why do you ask me that if I think -- can I

4   consult this with my lawyer?

5   Q    Certainly.

6           MR. SHOHAT:  I'm not your lawyer.

7   Q    I'll just leave it.  Ms. Diaz, I will just leave it.

8           THE COURT:  Just a minute.  What's the name of the

9   company?

10          THE WITNESS:  Hello?

11          MS. EDWARDS:  Elbamed.

12          THE COURT:  Ma'am, this is the judge.  Have you --

13          THE WITNESS:  Yes.

14          THE COURT:  -- ever heard the name Elbamed?

15          THE WITNESS:  If I hear that name.

16          THE COURT:  Have you heard that company name?

17          THE WITNESS:  Yes, yes, I did.

18          THE COURT:  Do you know who owns that company, yes or

19  no?

20          THE WITNESS:  No, no, no.

21          THE COURT:  Move on.

22  BY MS. EDWARDS:

23  Q    Have you ever worked for any -- have you ever worked with

24  Jose Manuel?

25          MR. SHOHAT:  I'm going to object.  It's outside the

1 | scope of the testimony.

2 |        **THE COURT:** I think she's getting at whether or not

3 | she's involved in this and whether she would make a good

4 | surety.

5 |        **MR. SHOHAT:** Fair enough.

6 |        **THE COURT:** I think it's fair --

7 |        **MR. SHOHAT:** I think it's --

8 |        **THE COURT:** -- in this context.

9 |        **MR. SHOHAT:** You're right, it's fair.

10 |        **THE COURT:** You put her up.

11 |        **MR. SHOHAT:** It's fair.

12 | **BY MS. EDWARDS:**

13 | Q    Ma'am, have you ever worked with Jose Manuel Gonzalez?

14 | A    I think I have to consult every this answer with a lawyer.

15 | Maybe I have to find a lawyer.

16 |        **THE COURT:** Ma'am, this is the judge again.

17 |        **THE WITNESS:** Yes, yes.

18 |        **THE COURT:** Are you wanting to stop testifying based

19 | on your right to remain silent and consult a lawyer; yes or no?

20 |        **THE WITNESS:** Could you repeat that question again?

21 |        **THE COURT:** Are you asking to stop testifying because

22 | you feel like you just want to remain silent in -- and get a

23 | lawyer; yes or no?

24 |        **THE WITNESS:** Yes, I would like to find a lawyer.

25 |        **THE COURT:** Okay, then I'm going to -- sir, --

1          **MS. SPEAKER:**  Ed, the judge wants you.

2          **THE COURT:**  I'm -- ma'am, stand by.

3          **MR. SHOHAT:**  That's fine.

4          **MS. SPEAKER:**  (Speaks Spanish)

5          **THE COURT:**  I'm uncomfortable --

6          **MR. SHOHAT:**  That's fine.

7          **THE COURT:**  -- with -- okay.

8          **MR. SHOHAT:**  It's fine, yeah, no, no, no, I get it.

9          **THE COURT:**  Okay.  Is she excused?

10         **MR. SHOHAT:**  Yeah.

11         **THE COURT:**  Ma'am, you're excused.  We're going to

12   hang up the phone.  Thank you so much for your time.

13         **MR. SHOHAT:**  Say goodbye.

14         **THE CLERK:**  I already hung up.

15         **MR. SHOHAT:**  Maria, you can hang up.

16         **THE COURT:**  She --

17         **THE CLERK:**  I --

18         **THE COURT:**  -- we hung up.

19         **MR. SHOHAT:**  Oh, okay.

20         **THE COURT:**  You're fine.

21         **MR. SHOHAT:**  Okay.

22         **THE COURT:**  Okay, I will tell you what I think about

23   that later.  Do you have any other witnesses?

24         **MR. SHOHAT:**  Yeah, I have Alex Gonzalez, the brother.

25         **THE COURT:**  Okay.

1          **MR. SHOHAT:**  Alex, come take the stand.  This is

2    going to end up in the same (indisc.)

3          **THE CLERK:**  Sir, face me, raise your right hand.

4    **WALTER ALEXANDER GONZALEZ TESTINO, DEFENDANT'S WITNESS, SWORN**

5          **THE COURT:**  Is anybody aware, before we start, of

6    there being similar issues?

7          **MR. SHOHAT:**  No, I'm not aware of any similar issues,

8    Judge.  But if --

9          **THE COURT:**  Are you?

10         **MS. EDWARDS:**  I --

11         **THE COURT:**  I don't want -- I mean, this is not the

12   way.  If there is a similar issue, I think it's fair that you

13   let that be known before we start.

14         **MS. EDWARDS:**  I do not, depending on what testimony

15   is elicited, I don't plan to ask him about any work with the

16   Defendant.  I do expect we'll ask additional questions about

17   the funds used to purchase this apartment in Coconut Grove.

18         **THE WITNESS:**  Yes.

19         **THE COURT:**  Okay.

20                        **DIRECT EXAMINATION**

21   BY MR. SHOHAT:

22   Q    Would you state your name, please?

23   A    Walter Alexander Gonzalez Testino.

24   Q    Are you related to the Defendant, Jose Manuel Gonzalez

25   Testino?

1   A   Yes, my brother.

2   Q   How are you related to him?

3   A   It's my brother.

4   Q   Of what country or countries are you a citizen?

5   A   Venezuela and United States.

6   Q   Where were you born?

7   A   Tennessee, Cookeville.

8   Q   Cookeville?

9   A   Cookeville, Tennessee.

10  Q   Cookeville, Tennessee.  Where was your brother Jose born?

11  A   Cookeville, Tennessee.

12  Q   Is he older or younger than you?

13  A   Older.

14  Q   How old are you, sir?

15  A   I'm sorry?

16  Q   How old are you, sir?

17  A   How older?

18  Q   How old are you?

19  A   No, no, he is older.

20  Q   No, I'm asking you now, what is your age?

21  A   Forty-six.

22  Q   And he's 48, right?

23  A   Forty-nine.

24  Q   Forty-nine, he just turned 49 --

25  A   Yes.

1   Q    -- two days ago, right?

2   A    Yes.

3   Q    Okay.  Now, where do you live?

4   A    In 200 in Miami, 200 Biscayne Boulevard Way, Apartment

5   2903.

6   Q    Is that a condominium building known as The Epic?

7   A    Yes.

8   Q    It also has a hotel.

9   A    Yes.

10  Q    In it.  Okay, and who owns the apartment that you're

11  living in?

12  A    My uncle.

13  Q    What is your uncle's name?

14  A    Phillipe Gonzalez.

15  Q    Okay, and how big is that apartment?

16  A    Two rooms.

17  Q    What are the -- do you know the square -- when you say --

18  two bedrooms?

19  A    Two bedrooms, yes.

20  Q    Do you know the square footage of the apartment?

21  A    No.  I have no idea.

22  Q    Is it a large apartment?

23  A    Yes.

24  Q    How many entrances does the apartment have?

25  A    To the apartment?

1  Q    How many --

2  A    There's one.

3  Q    Just one, a front door and that's only (indisc.)

4  A    The front door, yes.

5  Q    And is that the only way in and out of the apartment?

6  A    Yes.

7  Q    Okay.  Are you -- do you own any other property?

8  A    Yes.

9  Q    What other property do you own?

10 A    2669 South Rachel Drive, Miami, Florida 33133.

11 Q    And what is that?

12 A    Coconut Grove.

13 Q    What is that, a house, an apartment?

14 A    That's an apartment.

15 Q    Okay.  How large an apartment is that?

16 A    Big.

17 Q    What is the approximate market value?  If you went to sell

18 that apartment today, how much would you value that apartment?

19 A    I would say 4.5 million.

20 Q    Okay.  Who's living in the apartment now?

21 A    The apartment is rented but we have two rooms where my

22 sister-in-law live.

23 Q    Okay, so you have a lease on the apartment, you're getting

24 rent paid on the apartment.

25 A    Yes.

1    Q    How much rent do you get a month on that apartment, do you

2    receive; do you know?

3    A    Thirty thousand dollars.

4    Q    Thirty thousand dollars a month.  And how long is the

5    lease on the apartment; is it a year, six months?

6    A    A year.

7    Q    It's a year lease.  Where did the money come from to buy

8    that apartment?

9    A    My father.

10   Q    What is your father's name?

11   A    Jose Manuel Gonzalez.

12   Q    And what a shock.  What -- where is your father now?

13   A    In Venezuela.

14   Q    What was the business that produced that kind of wealth

15   that he was able to buy that apartment?

16   A    Okay, for the business, my knowledge, okay, my father is

17   an electrical engineer.  He got his decree in Cookeville,

18   Tennessee, 1972.

19   Q    And you were born while he was in school there.

20   A    Yes, and my brother also.

21   Q    Okay.

22   A    And when he went back to Venezuela, he work with

23   multinational company GTE.  He worked with (speaks Spanish)

24   Caracas, he work in -- for the government back those days.  He

25   was a professor in the University (speaks Spanish) professor of

1  physics and mathematics for a lot of years.  And he has his

2  home businesses.  I don't know the name of the companies but --

3  Q    (Indisc.)

4  A    -- businesses in construction, engineering,

5  telecommunications, energy, and I don't know what else.  But I

6  don't know exactly what he does.

7  Q    Okay.  Do you -- to your knowledge, did the money that

8  went in to buy the apartment that you've described come from

9  any source which is illegal in any way --

10  A    No.

11  Q    -- to your knowledge?  If Mr. Gonzalez is released on

12  bail, your brother, are you willing to take him into your

13  custody?

14  A    Yes.

15  Q    Are you willing to reasonably assure this Court that you

16  will produce him in this Court as required?

17  A    How's that again?  I'm sorry.

18  Q    Are you willing to reasonably assure, are you willing to

19  assure this Court to the extent that you are capable of doing

20  so, that you will produce, that you will have your brother in

21  court --

22  A    Yes.

23  Q    -- as required?  If necessary, are you willing to accept

24  the services of a private security company that would monitor

25  24 hours a day, seven days a week, the movements of your

1   brother and appropriately record any movements in violation of

2   the bond immediately to the U.S. authorities; are you willing

3   to accept such assistance --

4   A    Yes.

5   Q    -- in complying with the bond?

6            THE COURT:  Who's going to pay for that?

7            MR. SHOHAT:  The family is going to pay --

8            THE WITNESS:  My father.

9            MR. SHOHAT:  -- (indisc.) the father has offered to

10  pay for that.

11           **(Pause)**

12           THE COURT:  How much would that cost?

13           MR. SHOHAT:  We've interviewed.  We have a couple

14  letters that we can offer the Court.

15           THE COURT:  Just give me a -- I'm just curious.

16           MR. SHOHAT:  It costs about a hundred dollars an hour

17  per security guard.

18           THE COURT:  Okay, and how many security guards would

19  you propose?

20           MR. SHOHAT:  We would propose two.  And what they

21  do --

22           THE COURT:  Twenty-four hours a day, so $5,000 a day.

23           MR. SHOHAT:  Whatever the number is.

24           THE COURT:  Okay.

25           MR. SHOHAT:  And what they do, Judge, the way this

1  company works, is they put video cameras on the doors, and

2  here's the one door.  They monitor the video cameras --

3           **THE COURT:**  No, I -- whatever you're talking about, I

4  assume that they would, you know, watch him, whatever you're

5  talking about.  And I'm just -- I was just curious how that was

6  going to go.  That's so --

7           **MR. SHOHAT:**  Yeah, I can give you a better --

8           **THE COURT:**  -- $35,000 a week times, you know, 52

9  weeks a year is what you're proposing that he -- these are the

10 funds that he --

11          **MR. SHOHAT:**  Well, --

12          **THE COURT:**  -- can have access to through his father.

13          **MR. SHOHAT:**  We've talked to several companies that

14 do this work and we have learned in that process that the

15 initial fees get reduced as the history of the individual under

16 the supervision becomes clearer and that --

17          **THE COURT:**  Okay.

18          **MR. SHOHAT:**  -- there are no issues.  And they do

19 reduce their prices.

20          **THE COURT:**  You've answered my question, thank you,

21 sir.

22          **MR. SHOHAT:**  I'm going to give you the letter later.

23          **THE COURT:**  I don't need the letter.  You -- I

24 believe you.

25          **MR. SHOHAT:**  Okay.

1          **THE COURT:**  Okay?

2          **MR. SHOHAT:**  Yeah.  That's all the questions I have.

3          **THE COURT:**  Okay, cross?

4          **MS. EDWARDS:**  Your Honor, may we approach for a

5    second?  I wasn't aware that this witness was going to start

6    talking about his father.  I just want to make sure that what I

7    want to ask is okay.

8          **THE COURT:**  Here, come over here.

9          **MS. SPEAKER:**  You want to go?  I'm sure (indisc.)

10         **THE COURT:**  And can we get a -- can you hear?

11         **MS. SPEAKER:**  Just need to speak up.

12         **MR. SHOHAT:**  Well, let me come over here.

13         **THE COURT:**  Why don't you come right here?  Can you

14   train around there?  I suppose I should have made you come this

15   way, I'm sorry.  I just don't want -- do you have the (indisc.)

16   do I have it?

17         **THE CLERK:**  I don't see it.

18         **THE COURT:**  What, this thing?  How do you make the --

19         **MS. SPEAKER:**  White noise?

20         **THE COURT:**  Yeah.  Never mind.

21       **(Bench conference held off the record from 1:23 p.m. to**

22   **1:24 p.m.)**

23         **THE COURT:**  You couldn't hear that?

24         **MS. SPEAKER:**  Just you, Judge.

25         **MS. SPEAKER:**  No.

1      **THE COURT:**  The parties just told me what they're

2  going to ask next.  So to the extent that you couldn't get it

3  down, whatever's being asked next was what was just off to the

4  side here.

5                        **CROSS EXAMINATION**

6  **BY MS. EDWARDS:**

7  Q    Sir, you said that your father owns the apartment in

8  Coconut Grove.

9  A    No, I own the apartment.  My father gave me as a gift the

10 apartment.

11 Q    Okay, you own the apartment, your father provided the

12 money to purchase is; is that correct?

13 A    Yes.

14 Q    And you've stated that your father had worked for

15 Electricidad de Caracas and was a professor, but you were not

16 sure exactly what he does, correct?

17 A    Yes.  In the past, he did that.  I don't know what he does

18 as of today because I never talk business or politics or

19 religion with my father.

20 Q    Are you aware of your father working with your brother?

21 A    I think so.

22 Q    Are you aware of your father working at all with PDVSA, or

23 P-D-V-S-A?

24 A    Not sure.

25 Q    But you do believe that your father works with your

1  brother.

2  A    Not sure.  I mean, I don't know.

3          **THE COURT:**  Sir, just a minute ago you said yes.  Now

4  you're not sure.  Now -- and then it's no.  You have --

5          **THE WITNESS:**  And --

6          **THE COURT:**  Wait.  We put you under oath and you

7  have --

8          **THE WITNESS:**  Sure.

9          **THE COURT:**  -- to be clear about your answers.  If

10  you don't know, say "I don't know."  So ask the question again.

11          **THE WITNESS:**  Okay.

12          **THE COURT:**  This is a very serious matter.  This

13  isn't --

14          **THE WITNESS:**  Yes, yes, I know, I know.

15          **THE COURT:**  -- some kind of kangaroo court.  If you

16  don't know the answer, say I don't know.

17          **THE WITNESS:**  Okay.

18  **BY MS. EDWARDS:**

19  Q    Are you aware of your father working with your brother,

20  Jose Manuel?

21  A    I don't know.

22          **THE COURT:**  Fine.

23          **MS. EDWARDS:**  No further questions.

24          **MR. SHOHAT:**  I want to ask one other --

25  //

1                        **REDIRECT EXAMINATION**

2    **BY MR. SHOHAT:**

3    Q    Do you have any criminal history, any criminal background,

4    have you ever been arrested or -- you?

5    A    No.

6              **MR. SHOHAT:**  Okay, that's all I have.

7              **THE COURT:**  Okay, can this witness be excused?

8              **MR. SHOHAT:**  Yes.

9         **(Witness is excused)**

10             **THE COURT:**  Do you have any other witnesses?

11             **MR. SHOHAT:**  No, but I have other evidence.

12             **THE COURT:**  Do you have a proffer --

13             **MR. SHOHAT:**  Yes.

14             **THE COURT:**  -- of that evidence?

15             **MR. SHOHAT:**  Yes.

16             **THE COURT:**  Okay, make your proffer.

17             **MR. SHOHAT:**  Okay.

18        **(Ms. Speaker/Mr. Shohat confer)**

19             **MR. SHOHAT:**  Judge, the first thing I'd like to talk

20   about is the issue of his family's travel.  And I'd like to

21   offer at this time Defendant's Exhibit 1.  Do we have a copy

22   for the Government?  Give the copy.

23             **MS. GARCIA:**  We have one for the Court.

24             **THE COURT:**  And one for the Court.

25             **MS. SPEAKER:**  Just any exhibit list.  I have the

1 (indisc.)

2  **MR. SHOHAT:**  I don't have an exhibit list.  We'll

3 prepare one.

4  **MS. SPEAKER:**  I made --

5  **MS. EDWARDS:**  We're going to make a joint transcript

6 your Exhibit 1, so if you would mind, this would be defense

7 Exhibit 2.

8  **MR. SHOHAT:**  Okay, we'll change the number.  This is

9 Defendant's Exhibit 2, Judge.  Defendant's Exhibit 2 is a

10 composite exhibit of the flight itinerary for the daughter,

11 Isabel Gonzalez.  And it includes -- does it include her

12 passport, Duchess?

13  **MS. WEINER:**  Yes, sir.

14  **MR. SHOHAT:**  It includes her passports, copies of her

15 passports towards the end.  In combination, this document shows

16 that on July -- this combination of documents, Exhibit 2, shows

17 that on July 31st, 2018, Isabel Gonzalez was traveling in

18 Europe.  She returned to the United States in August of 2013.

19  **THE COURT:**  Can I just ask what is -- there seems --

20 we keep revisiting this notion that the daughter was at the

21 airport; is that what we're getting at?

22  **MR. SHOHAT:**  Yeah, because --

23  **THE COURT:**  Whether she --

24  **MR. SHOHAT:**  -- the Government is trying to create

25 the inference that the whole family was fleeing the United

1  States as a result of --

2          **THE COURT:**  Okay, so this exhibit says that whoever

3  was in the car wasn't the daughter.

4          **MR. SHOHAT:**  That's correct.

5          **THE COURT:**  Got it.

6          **MR. SHOHAT:**  It was not the daughter and --

7          **THE COURT:**  Is there any debate about that?  I mean,

8  not to cut you off, but I -- do you think it was --

9          **MR. SHOHAT:**  The testimony was that it was the

10  daughter.

11          **THE COURT:**  All right, but --

12          **MS. EDWARDS:**  That has been our understanding.  But

13  we are not going to argue this point.  We will concede for

14  purposes of this hearing that Isabel Gonzalez was not present

15  (indisc.)

16          **THE COURT:**  All right, so Isabel Gonzalez was, on the

17  date that your client showed up at the airport, in another

18  country; is that what you're saying?

19          **MR. SHOHAT:**  She was in Europe.

20          **THE COURT:**  She -- okay.

21          **MR. SHOHAT:**  Traveling in Europe.

22          **THE COURT:**  So yes is what you --

23          **MR. SHOHAT:**  And those tickets show it.

24          **MS. SPEAKER:**  We've established through Maria that

25  she --

1          **THE COURT:**  Yes is easy on this, right?

2          **MR. SHOHAT:**  Yes.

3          **THE COURT:**  Okay, so, yes, so that's established for

4    the purposes of this hearing, okay.

5          **MR. SHOHAT:**  Okay, I want to make -- there's been

6    talk about his private airplane, a Hawker.

7          **THE COURT:**  Okay.

8          **MR. SHOHAT:**  That is not his private airplane.  It is

9    owned by a cousin through a corporate entity.  The reference by

10   Agent Wickman to two other airplanes is because the Defendant

11   traveled through a charter company, he did charter planes,

12   particularly to Venezuela, and that charter company had the

13   Hawker.

14         **THE COURT:**  Wait, wait, wait, when you proffer, you

15   have to tell me who -- where are you getting that information?

16         **MR. SHOHAT:**  From -- I'm getting this information

17   from the brother and third parties.

18         **THE COURT:**  The brother, the one that just testified?

19         **MR. SHOHAT:**  Yes.  But I'm not putting all this in

20   through him, I'm just making a proffer here.  She can question

21   him if she likes but I'm getting this -- and I'm getting some

22   of it from my client, okay, as to what the situation is with

23   the Hawker.  The Hawker was owned by the charter company;

24   charter company is in Broward County, Florida, and they -- it

25   wasn't owned but it was like leased to the charter company.

1  And the Hawker was sometimes used and two other or three other

2  aircrafts.

3            THE COURT:  But you concede he had access to --

4            MR. SHOHAT:  He had access --

5            THE COURT:  -- this private --

6            MR. SHOHAT:  -- but chartering the flights, which he

7  can be ordered not --

8            THE COURT:  okay, okay.

9            MR. SHOHAT:  Doesn't have access to it now.

10           THE COURT:  So just so we can go forward and not get

11  contentious, just sometimes I have questions, and before I'm

12  done with it you might know already the answer, but if you

13  could just let me finish it, then the --

14           MR. SHOHAT:  Yes, sir.

15           THE COURT:  -- record shows what my question was and

16  then what your answer was.  So you concede that he had access

17  to a Hawker airplane --

18           MR. SHOHAT:  I concede that he chartered private

19  aircraft and one of the private aircraft that he chartered was

20  the Hawker.

21           THE COURT:  Got it.

22           MR. SHOHAT:  Okay, --

23           THE COURT:  But there --

24           MR. SHOHAT:  -- that he -- and that he frequently

25  traveled using these private aircraft.  I would also include on

1   my proffer now the list of family members that Mr. Gonzalez has

2   who reside in Miami --

3               **THE COURT:**  Okay.

4               **MR. SHOHAT:**  -- or south Florida.

5               **THE COURT:**  You can tell me how many they are --

6               **MR. SHOHAT:**  Eleven of them.

7               **THE COURT:**  -- and what their relationship are -- is.

8               **MR. SHOHAT:**  His mother, Marta Testino; his

9   stepfather, Carlos Lezalma (phonetic); Walter Alejandro

10  Gonzalez.  These are all -- well, a U.S. citizen, Carolina

11  Lezama, his sister, that's L-E-Z-A-M-A, Lezama, his sister;

12  Maria Diaz -- Maria Alejandro Gonzalez, his wife; Isabel, his

13  daughter, although Isabel right now is attending college in

14  London.  She enrolled in school in London and his mother is

15  over there -- her mother is over there helping her get set up

16  and everything, that's why she's there.

17              **THE COURT:**  Okay.

18              **MR. SHOHAT:**  Luciana Sperando, S-P-E-R-A-N-D-O,

19  sister-in-law; Diana Gonzalez, his niece, a U.S. citizen;

20  Carlos Testino, his uncle, you've heard some testimony about,

21  this is his mother's brother, also a U.S. Testino -- U.S.

22  citizen; he has another Carlos Testino who's a cousin who is a

23  U.S. citizen; and Elizabeth Gonzalez, his aunt, his father's

24  sister, we don't know if she's a U.S. citizen.  But we believe

25  that if required, a number of these people can sign and will

1  sign on the bail.  We don't have a final answer as to that

2  right now but --

3       **THE COURT:**  Okay.

4       **MR. SHOHAT:**  -- if Your Honor was to impose bail with

5  multiple signatories, we could accomplish that we are quite

6  confident.

7     **(Mr. Shohat/Ms. Speaker confer)**

8       **MR. SHOHAT:**  Okay, regarding his passport and the

9  issue that was arisen -- that arose with a Venezuelan passport

10  that said he was born in Venezuela, all right, we have here and

11  we'll offer as Defendant's exhibit -- what number are we on,

12  three?

13       **MS. SPEAKER:**  Three.  Do I need to make a four?  I

14  was --

15       **MR. SHOHAT:**  This three?

16       **MS. SPEAKER:**  Yeah.

17       **THE COURT:**  Are there two different birthplaces in

18  two different passports?

19       **MR. SHOHAT:**  Yes, but it's a mistake and we're going

20  to show you.

21       **THE COURT:**  Did he use a passport that had a

22  birthplace that wasn't his?

23       **MR. SHOHAT:**  I think he used -- yes, he used the -- I

24  don't think he realized it necessarily --

25       **THE COURT:**  Well, you don't -- wait a minute, wait,

1  wait, wait, wait, that --

2  **MR. SHOHAT:** I don't know the answer to that.

3  **THE COURT:** Okay, so he --

4  **MR. SHOHAT:** But he did --

5  **THE COURT:** Wait. I want to understand what you're

6  doing. You're going to tell me that here's his passport and

7  then explain to me that you think it was a mistake.

8  **MR. SHOHAT:** Right. I'm going to show you old

9  Venezuelan passports, expired, that have it correctly done.

10  **MS. EDWARDS:** I haven't seen those. May I get a

11  copy?

12  **MR. SHOHAT:** Yeah. Give her a copy. And the only --

13  we can think of is that this somehow was done in -- because the

14  old passports which begat the new passports all have Cookeville

15  (speaks Spanish) as his place of birth. Here's Exhibit 3 and

16  here's Exhibit 4. They both show the correct --

17  **THE COURT:** All right, but it is an established fact,

18  for the purposes of this hearing, comma isn't it, that he was

19  actively using a passport, one of three, that had a birthplace

20  that was not his, and that at some time prior to that, he had

21  passports where the birthplace was his, and so it somehow or

22  another got changed. Your contention would be that it's a

23  mistake; their contention would be that it's probably some

24  indicia of fraud. And I don't know which it is.

25  **MR. SHOHAT:** Okay.

1          **THE COURT:**  Right?  I mean I don't know.

2          **MR. SHOHAT:**  I think you've accurately said it.  The

3     only thing I want to mention when you say "actively used the

4     passport," he used it on occasion to go to Venezuela because

5     U.S. citizens need a visa.  And so rather than obtain a visa,

6     because he is a Venezuelan citizen, he would use that

7     Venezuelan passport.  That passport, by the way, is in

8     Venezuela right now and we will surrender it along with the

9     Knights of Malta passport as a condition of any -- we have

10    access to it, we will surrender it.  They're in his home --

11         **THE COURT:**  All right, --

12         **MR. SHOHAT:**  -- in Venezuela.

13         **THE COURT:**  -- I got it, I got it.  I mean, if I

14    order that, then you will.

15         **MS. SPEAKER:**  The Venezuela birth certificate?

16         **MS. EDWARDS:**  Your Honor (indisc.)

17         **THE COURT:**  I'm sorry?  I can't hear you.

18         **MS. EDWARDS:**  I'm sorry, are you -- I'm trying to

19    keep a list for the Clerk.  Are you accepting Exhibits 3 and 4?

20         **THE COURT:**  I mean, for the purposes of this hearing,

21    it's some old passport, right?  That's all this is.

22         **MS. EDWARDS:**  Yes.

23         **THE COURT:**  When did this passport expire, Exhibit 3?

24    **(Mr. Shohat/Ms. Speaker confer)**

25         **MS. SPEAKER:**  The judge is asking a --

1           **MR. SHOHAT:**  Oh, I'm sorry.

2           **THE COURT:**  This is an -- a copy of an expired

3   passport.

4           **MR. SHOHAT:**  Exhibit --

5           **THE COURT:**  So to the -- it exists, do you have any

6   objection to --

7           **MS. EDWARDS:**  No.

8           **THE COURT:**  -- it -- just fine.  And then Exhibit 4

9   is another expired passport; is that right?

10          **MR. SHOHAT:**  (No audible response)

11          **MS. SPEAKER:**  Ed.

12          **THE COURT:**  Sir?

13          **MR. SHOHAT:**  Yes, yes, sir.

14          **THE COURT:**  Okay.

15          **MR. SHOHAT:**  That's my understanding.

16          **THE COURT:**  So --

17          **MS. EDWARDS:**  We do not object to Exhibit 4 either.

18          **THE COURT:**  -- I don't know what it tells me but it's

19  in.

20      **(Defendant's Exhibits Numbers 3 and 4 were received in**

21  **evidence)**

22          **MR. PEARSON:**  Your Honor, I apologize for intruding.

23  Just for scheduling purposes, Mr. Johnson and I have

24  sentencing in front of Judge (indisc.) at 2:00 o'clock

25  (indisc.)

1          **THE COURT:** All right, well, --

2          **MR. SPEAKER:** That's -- Ms. Edwards is fine, Judge,

3 (indisc.)

4          **THE COURT:** -- I hear you and it's fine. If you need

5 to leave, you need to leave. I just -- this is, you know,

6 we're going on three hours and, you know, you need -- if you

7 have a presentation to make, --

8          **MR. SHOHAT:** It's going to -- I'm going to get to

9 these exhibits real quick --

10          **THE COURT:** -- make it.

11          **MR. SHOHAT:** -- and then I'll make it. Give me

12 another exhibit sticker, please.

13          **MS. EDWARDS:** Your Honor, I apologize. I did think

14 this would be a little shorter, and so if we go past about

15 2:30, I'm just going to have to call and change my flight. I

16 can do --

17          **THE COURT:** No, it's fine. I just -- I am not upset

18 that it's taking so long. But I am saying, you know, whoever's

19 over at that table, I mean, stack those things up and let's

20 talk about them.

21          **MR. SHOHAT:** All right, Exhibit 5, Judge, is going to

22 be a list of Venezuelan defendants in this district who have

23 been indicted and arrested pursuant to the investigation, the

24 broader investigation of Fraud Corrupt Practices Act, and in

25 many cases money laundering, who have been released on bail.

1          **THE COURT:** That's not relevant. I -- that is out,

2  that's not relevant.

3          **MR. SHOHAT:** Okay, so just let me complete the

4  proffer if you will. It's very --

5          **THE COURT:** Other people have gotten out on bail.

6          **MR. SHOHAT:** Correct.

7          **THE COURT:** I agree with you.

8          **MR. SHOHAT:** Who are Venezuelan citizens and in many

9  cases with much more money and much more issues, and we were

10  going to proffer some of those.

11          **THE COURT:** And I wasn't in those hearings.

12          **MR. SHOHAT:** Okay.

13          **THE COURT:** It's denied, it's out.

14     **(Ms. Garcia/Ms. Weiner confer)**

15          **MR. SHOHAT:** You indicated that you don't want to see

16  the letter on the private security issue.

17          **THE COURT:** I trust that everything you said about

18  that is absolutely true.

19          **MR. SHOHAT:** Okay. Then I have a brief proffer.

20     **(Mr. Shohat/Ms. Speaker confer)**

21          **MR. SHOHAT:** Your Honor, I just want to conclude our

22  presentation with the following.

23     **(Ms. Speaker/Mr. Shohat confer)**

24          **MR. SHOHAT:** Can I have just one minute?

25          **THE COURT:** Uh-huh.

1     **(Mr. Shohat/Defendant confer from 1:39 p.m. to 1:40 p.m.)**

2           **MR. SHOHAT:**  Your Honor, just to start off with,

3     Mr. Gonzalez was born on September 19th, 1969, in

4     Charlottesville, Tennessee.  He is a United States citizen.

5           **MS. SPEAKER:**  Cookesville (phonetic).

6           **MR. SHOHAT:**  In Cookesville, Tennessee.

7           **THE COURT:**  I got you.

8           **MR. SHOHAT:**  He is a United States citizen.  He has

9     lived in the United States until 1999 when he began to travel

10    back and forth from Venezuela and Miami as he began to do

11    business in that arena.  He attended the University of

12    Metropolitana in Caracas where he became a systems engineer and

13    got his MDA.  He has dual United States/Venezuelan citizenship.

14    He has extensive ties in the United States.  In fact, as a

15    result of his employment with a company called Insistema, which

16    is an oil, gas, and mining company that procures materials and

17    equipment for the oil, gas, and mining industry.  And he is an

18    advisory to Insistema, has been an advisor for Insistema for

19    something like 11 or 12 years.  He runs the Insistema business

20    in Miami and in the United States, which is located at that

21    Brickell office address.  He has maintained a Brickell office

22    address.  To put it another way, he cannot survive in his

23    professional business without being able to come to the United

24    States.  If he leaves the United States -- that's what his

25    business was, was the U.S. end of Insistema.  That's basically

1   what his business is.  And that's how he learned -- how he

2   earns what livelihood he does earn as a consultant or advisor

3   to that company.  There is no question about that.

4           He had prior to that been a very successful business

5   man in a number of businesses and did as a result of those

6   relationships, which have zero to do as I understand it and am

7   proffering with anything in these cases, he has a number of

8   corporate entities that he is involved with.  But as the

9   evidence in this case showed, there's zero evidence that any of

10  those corporate entities has done anything illegal in

11  connection with anything in this case.

12          His mother -- I've already given you the list of

13  family members that reside -- basically and fundamentally,

14  Mr. Gonzalez's family is in Miami and south Florida.  That's

15  where his family is.  He -- admittedly he has a father who

16  lives in Venezuela.  But when you heard his brother say we

17  don't talk politics and we don't talk religion, you might infer

18  from that that the father who lives in Maduros (phonetic),

19  Venezuela is not exactly someone that they're on the same page

20  except that he supports his son, he wants his son to be

21  successful in this case, and he's willing and has financed

22  what's happened so far in this case.  And he will finance the

23  bail for Mr. Gonzalez.

24          And we believe that, Judge, in a case which does not

25  involve drugs, does not involve violence, does not invoke any

1 of the presumptions in the <u>Bail Reform Act</u> against bail, we

2 believe the analytical matrix for Your Honor, which I know

3 you're completely familiar with, is, is the Defendant a serious

4 risk of flight, and if he is a serious risk of flight, are

5 there conditions which will reasonably assure his appearance in

6 court.

7 Now, as far as the argument that the Government says

8 there is evidence that he's destroyed -- there is testimony

9 available to the Government that he has destroyed evidence.

10 Look, Judge, we're at a pretrial detention hearing.  And,

11 frankly, we're not in a position to fully address that evidence

12 having heard the details of it for the first time; although

13 I'll give Ms. Edwards credit, she did tell me earlier this week

14 that that was going to be a centerpiece of her argument for

15 detention in this case.  But what we have not heard in this

16 case is any evidence that Mr. Gonzalez, if admitted to bail,

17 would continue in any such obstructive conduct.  There has been

18 no evidence.  One would have to engage in an assumption that

19 such obstructive conduct, if it existed, would continue.

20 **THE COURT:**  Every judicial decision on bond is a

21 prediction.

22 **MR. SHOHAT:**  Correct.

23 **THE COURT:**  Okay, so I get it.

24 **MR. SHOHAT:**  But there -- but in my --

25 **THE COURT:**  And this is -- so the testimony is what

1  it is.  And so if you have some proffer that suggests that that

2  testimony is not true, you should proffer it.

3          **MR. SHOHAT:**  I'm not able at this juncture to address

4  that testimony directly.  I --

5          **THE COURT:**  Okay.

6          **MR. SHOHAT:**  -- heard it for the first time today.  I

7  can only tell you this, Judge, --

8          **THE COURT:**  That's where we are then.

9          **MR. SHOHAT:**  -- we have spoken to people connected

10 with some of those people that were in the proffer.  But I'm

11 not in a position to really proffer other than to say it isn't

12 what we heard.  But I can't challenge it.  I can't --

13         **THE COURT:**  So it's unchallenged.

14         **MR. SHOHAT:**  I cannot challenge --

15         **THE COURT:**  All right, --

16         **MR. SHOHAT:**  -- it factually, --

17         **THE COURT:**  -- next topic, sir.

18         **MR. SHOHAT:**  -- Judge.  But I can tell you that from

19 the standpoint of your decision, it's like saying that a

20 defendant charged with obstruction of justice or a defendant

21 charged with witness tampering cannot get bail.

22         **THE COURT:**  That's not what it is.  I'm -- there's no

23 presumption, it's all just evidence.

24         **MR. SHOHAT:**  Yes, and so that's why I'm saying there

25 needs to be articulable evidence before you that assists your

1   prediction in some way.  Mr. Gonzalez is an individual who will

2   be entering this justice system for the first time, although he

3   had a withholding tax issue some years ago on which he got

4   probation and his business.  And other than that -- and by the

5   way, complied with all the conditions of bail in that matter.

6   And he'll be entering the system for the first time.  I'm going

7   to ask the Court to consider the case of *U.S. versus Demler*

8   (phonetic), Southern District Hio (sic), November 27, --

9           **THE COURT:**  Tell me what it says.

10          **MR. SHOHAT:**  What Demler says is that the fact that

11  the government proffers evidence at a detention hearing, that a

12  -- unrebutted evidence of a detention hearing, that the

13  defendant had obstructed justice and tampered with witnesses

14  does not predict whether he will do so if admitted to bail

15  without more to predict that he would do so --

16          **THE COURT:**  And that's what I just told you.  I agree

17  that each thing is just a factor.

18          **MR. SHOHAT:**  Right, so --

19          **THE COURT:**  I am not making any presumptions.

20          **MR. SHOHAT:**  Got it.  So I'm relying on *U.S. versus*

21  *Demler* and would offer a copy --

22          **THE COURT:**  That's fine.

23          **MR. SHOHAT:**  -- of that case to the Court on this

24  issue.

25          **THE COURT:**  Okay.

1          **MR. SHOHAT:**  On this issue.  Mr. Gonzalez, Judge, is

2    an individual who frankly -- I want to proffer to the Court

3    also, you were told that he traveled about 20 times this year

4    and about 150 times over the last several years.  All that's

5    accurate.  His business calls for him to travel.  And if

6    released, Mr. Gonzalez will endeavor to reengage in that

7    business as a advisor to Insistema, but only in the United

8    States without travel and only between Houston and Miami, which

9    is essentially where his business is, Houston and the Southern

10   District of Florida or south Florida.  He will not travel.

11   He'll be subject to any bail restrictions that the Court might

12   impose in that regard.

13          **THE COURT:**  I get it.  So to the extent that I impose

14   conditions, you're convinced that he will follow them is what

15   you're basically --

16          **MR. SHOHAT:**  Our position is that --

17          **THE COURT:**  -- saying.

18          **MR. SHOHAT:**  -- the evidence indicates that there are

19   reasonable -- the first issue is, is he a serious risk of

20   flight.  We contend he is not a serious risk of flight given

21   his history.  He -- our proffer is he was traveling on March --

22   on July 31st for business in Venezuela and not because he

23   thought this was coming.  And by the way, Judge, early this

24   year, Mr. Gonzalez met in a meeting, the details of which I'm

25   not going to describe any further, but they don't involve any

1  cooperation in this case in any way, he met in D. C. and

2  Ms. Edwards and another DOJ prosecutor were there.  And from

3  that point forward, he knew from that that they were looking --

4  that he was being looked at.  Remember also his laptop and

5  cellphones were seized.  Notwithstanding that --

6            THE COURT:  What date was that meeting?

7            MS. EDWARDS:  January 10th, 2018, Your Honor.

8            THE COURT:  Hold on a minute.  Met with the

9  Government on January 18th --

10           MR. SHOHAT:  Tenth, January 10th, 2018.

11           THE COURT:  -- 10th, '18.

12           MR. SHOHAT:  And the two prosecutors --

13           THE COURT:  Got it.

14           MR. SHOHAT:  -- involved in this prosecution were

15  present.

16           THE COURT:  All right, I just wanted to know the

17  date.

18           MR. SHOHAT:  You got it.  And he came, has come and

19  gone approximately 15 times continuing his business in this

20  country.

21           THE COURT:  What's the -- was the subject matter of

22  this case discussed during that meeting?

23           MR. SHOHAT:  No.  It was not related to this case

24  directly.  What it -- but the two prosecutors in this case

25  showing up were an -- the meeting, it was not anticipated by

1  Mr. Gonzalez, who was represented by a lawyer at that meeting,

2  not me, --

3          **THE COURT:**  Well what was it about?

4          **MR. SHOHAT:**  Can we approach the sidebar on this?

5          **THE COURT:**  Sure.  I mean, you brought it up and it

6  sort of corroborates a whole lot of what the Government's

7  saying so we might as well talk about it.

8          **MR. SHOHAT:**  Which I would ask that this part of the

9  record be sealed under the (indisc.)

10          **THE COURT:**  Sealed from here, go.

11          **MR. SHOHAT:**  Okay.

12          **MS. SPEAKER:**  I can hear you, though.

13      **(Sealed bench conference held from 1:51 p.m. to 1:54 p.m.,**

14  **omitted)**

15          **MR. PEARSON:**  Your Honor, I apologize.  I am

16  (indisc.)

17          **THE COURT:**  That's fine, you can go.

18          **MR. PEARSON:**  -- the Court's permission.

19          **MR. SHOHAT:**  The point, Judge, is you have a period

20  from January to May before there's any indication that the

21  Defendant was involved in the destruction of any evidence.

22  During that period, after being aware that he's on the

23  Government's radar screen, after being aware of that, he's

24  still conducting full business in the United States.  And, for

25  purposes of this proceeding, Your Honor can fashion conditions

1  which will prevent any destruction of evidence.  You can order

2  him not to have contact --

3          **THE COURT:**  No, I know the conditions I can impose, I

4  really do.  I absolutely understand.  I've been doing this for

5  a long time.

6          **MR. SHOHAT:**  I know you have.

7          **THE COURT:**  And I know what the conditions are, I

8  know what the Bail Reform Act says.  And I'm not trying to cut

9  you off, but you are -- you really are -- have communicated to

10  me that notion.  If you have other things you want to

11  communicate to me, --

12          **MR. SHOHAT:**  Could I have just a minute?

13          **THE COURT:**  -- do that.  Yes.

14          **MR. SHOHAT:**  The only other thing -- well, --

15      **(Mr. Shohat/Ms. Speaker confer)**

16          **MR. SHOHAT:**  The Government currently possesses no

17  evidence that actually ties Jose Manuel Gonzalez Testino to any

18  payment in this case.  They have evidence that ties three

19  corporations that he has involvement in to payments but they

20  don't have evidence that ties him to any of those payments.

21  And the agent admitted that today, they doe (sic) not have that

22  evidence.  Now, --

23          **THE COURT:**  No, he said there was no documentary

24  evidence but there are --

25          **MR. SHOHAT:**  Other than what witnesses have said.

1    **THE COURT:**  Witnesses.  And at a preliminary hearing

2  stage, that's evidence.

3    **MR. SHOHAT:**  I agree, I misspoke.

4    **THE COURT:**  I mean, my clients used to tell me, well,

5  they have no evidence.  And I would say, well, other than the

6  20 people who said you did it.

7    **MR. SHOHAT:**  Well, other than two witnesses who they

8  have identified, I don't think they have any documentary

9  evidence to corroborate that Mr. Gonzalez was involved in those

10  payments.

11    And the only other thing I would point out to the

12  Court is we now have two Pretrial Services report, which the

13  Court is aware of, that do recommend bail; albeit those reports

14  did not take into consideration the Government's proffer about

15  the destruction of evidence.  I get it.

16    **THE COURT:**  Well, and you know the problem with these

17  Pretrial Services reports, with all due respect to the Pretrial

18  Services officer who's right here, is that they don't take into

19  account the offense and the offense conduct and all of it at

20  all.  I mean, that -- they just don't.  So are you --

21    **MR. SHOHAT:**  I'm done.

22    **THE COURT:**  -- done?  Do you have -- so you've made

23  your argument, I believe, and --

24    **MR. SHOHAT:**  Yes.

25    **THE COURT:**  -- your proffer in a --

1          **MR. SHOHAT:**  Yes, sir.

2          **THE COURT:**  -- simultaneous way.

3          **MR. SHOHAT:**  Yes, sir, that's correct.

4          **THE COURT:**  Are you satisfied that you said what you

5    need to say?

6          **MR. SHOHAT:**  Yes, sir.

7          **THE COURT:**  Do you have anything that you need to say

8    on -- Government, on either the issue of probable cause or

9    detention?

10          **MS. EDWARDS:**  I would like to address the Court

11    briefly, Your Honor, --

12          **THE COURT:**  Sure.

13          **MS. EDWARDS:**  -- in argument, but I will keep it

14    brief.

15          **THE COURT:**  Go ahead.

16          **MS. EDWARDS:**  Just to begin where Mr. Shohat left

17    off, obviously the first thing that Your Honor will consider is

18    the nature of the offense, which of course itself is

19    international, and the weight of the evidence.  At this point

20    the Government has offered Mr. Gonzalez's coconspirator who

21    participated in bribery with him and the testimony through the

22    agent of the person who was bribed, both of whom say that

23    Mr. Gonzalez controlled these entities and the bribes.  We are

24    still waiting for (indisc.) bank records but we think the fact

25    that we have American bank records that corroborates that is

1  significant.

2          Turning to detention, we do not think there is any

3  combinations of conditions that could assure this Defendant

4  either appear at his next court hearing or stop destroying and

5  instructing others to destroy evidence.  He has been doing so

6  since the border search in January when he was first alerted to

7  the investigation.  He has instructed multiple people multiple

8  times to destroy evidence.  And significantly, although he did

9  keep up a pattern of travel from January through July of this

10 year, he told two people prior to getting on the plane on --

11 well, prior to arriving at the airport on July 31st that his

12 plan was to leave, that he knew the investigation was getting

13 closer to him.

14         Your Honor, I think the only thing I will add at this

15 point is as for this proposal about armed security guards, we

16 do not think it is appropriate to allow wealthy defendants to

17 create a prison of their own choosing in their own apartment by

18 hiring armed guards.  There is case law, I believe it's from

19 the Northern District of Texas, on this point, but if you'll

20 allow me, I'll give you the citation.  If --

21         **THE COURT:**  I --

22         **MS. EDWARDS:**  -- you don't need it, that's fine.

23         **THE COURT:**  I understand the notion that the

24 Defendant is proposing, and I understand your objection to it.

25 The fact that another court has made a ruling on it in some

1  other context is not something that really matters right now.

2  I mean, there's a lot more going on in this case than armed

3  security guards.

4          **MS. EDWARDS:**  That's true.

5          **THE COURT:**  Okay.

6          **MS. EDWARDS:**  Simply put, Your Honor, I think that

7  the Defendant has the incentive and the means to flee, and he's

8  already told people he tried to do it once.  We were lucky that

9  we were able to apprehend him that time.  He has a passport to

10  a country from which we don't extradite, he has access to

11  charter planes, including one that we have provided evidence

12  that he owns, albeit not in his own name, so he has both the

13  means and the incentive to flee.  His guidelines based on the

14  offense charged in the complaint, the offenses charged in the

15  complaint, expose him to upwards of ten years of imprisonment.

16  He has everything he would need to continue to flee, to

17  continue to obstruct justice, and we think he needs to be

18  detained.  Thank you.

19          **THE COURT:**  All right.  Is there anything else from

20  anybody before --

21          **MR. SHOHAT:**  The only thing I was going to say, if

22  you don't mind, is we also have a number of instances in which

23  this kind of private security bail was offered and accepted --

24          **MS. SPEAKER:**  FIFA case.

25          **MR. SHOHAT:**  -- by various courts all over --

1          **THE COURT:**  I understand that that is a -- we can do

2    almost anything we want in terms of conditions, you know, I

3    mean, within the law.  But -- so is there anything else from

4    anybody before --

5          **MR. SHOHAT:**  No, not at this time, Judge.

6          **THE COURT:**  On probable cause, I think there is

7    probable cause.  The defense has put forth a number of

8    arguments that I think at trial, I don't know what a jury's

9    going to think, but at the probable cause stage, the question

10   is whether there is, you know, sufficient evidence to move past

11   -- it's not even, you know -- well, actually if I were to rule

12   right now on whether there's some reason to believe, I think

13   the evidence is actually strong.  You don't have to finish the

14   job on conspiracy; all you need to do is agree.  And I think

15   everybody in this room agrees on that.  And there are at least

16   two if not more cooperating witnesses who say that bribery was

17   the object, that bribery payments were made, that they were

18   made in an effort to get contracts, to get the contracts paid

19   in a particular currency.  And under this, all that a person

20   has to do is, you know, direct that, you know, corruptly in

21   furtherance of some offer or payment or any gift or a thing of

22   value, and it doesn't have to be very valuable, to a foreign

23   official which, you know, the PDVSA is a foreign company, you

24   know, government-controlled company.  Nobody disputes that, do

25   they?

1      (No audible response)

2           And so the people who are employees of that company

3  qualify -- is there a note?

4           **MS. SPEAKER:**  Oh, no, no.

5           **THE COURT:**  I mean, while I'm on the topic, if you

6  have something to say, go ahead -- is that --

7           **MR. SHOHAT:**  No, no.

8           **MS. SPEAKER:**  No.

9       **(Mr. Shohat/Ms. Speaker confer)**

10          **THE COURT:**  Okay.  The point is that these payments

11  were made at least in an effort to influence the foreign

12  officials to enter into contracts, to get access to the board,

13  to at least induce an unlawful act.  And so for those reasons,

14  as well as all the reasons that were set forth in the evidence

15  on the record, I think there is probable cause.

16          The question of bond, I think there's a risk of

17  flight, and I think it's a substantial risk of flight.  And I

18  think that's been proven by at least a preponderance, if not

19  clear and convincing, evidence.  The statute under 3142(g)

20  requires me to look at a number of factors, and those -- some

21  of the factors that weigh in favor of my decision are that I

22  think there is strong evidence at this point against the

23  Defendant.

24          He does have a prior criminal history.  That's not a

25  very heavy factor but it is there and it is something related

1   to a financial crime.

2         He has significant ties outside of the United States,

3   specifically financial ties.  He does have some family ties.  I

4   credit the testimony regarding his attempt to leave the country

5   at a time when he knew that -- and this off -- this sealed

6   discussion here convinces me he definitely knew the Government

7   was looking at him.  He told people that the Government is

8   looking at me, they're getting closer, whatever the words were,

9   and on that basis said, I'm leaving.  On that basis, told two

10  different people to destroy evidence.  One of them actually

11  did.  One of them didn't and told the Government about it.

12  Destruction of evidence is a very, very serious matter, in

13  particular in a document-driven case.

14        The Defendant also has traveled significantly

15  recently.  And to the extent that it's got to do with work, I

16  just found probable cause to believe that his work involves a

17  criminal conspiracy.

18        The -- this notion of hiring a security company,

19  while interesting, actually more concerns me.  We just

20  established that he has access to funds amounting to $5,000 a

21  day.  He has every ability to travel.  He has the willingness

22  to travel, the ability to travel, and the reason to travel:  to

23  flee.

24        I also find that he was not truthful to the court in

25  Miami.  We have Morales and Hadaad saying, and it's undisputed

1    -- by the way, the destruction of evidence at this hearing is

2    undisputed.  The discussion about -- forget the plane.  But

3    there is absolutely no contest to the testimony of the agent

4    about Morales and Hadaad reporting that he had houses in Spain

5    and Switzerland.  And he told the court in Miami in response to

6    a very open-ended question that he did not have such assets.

7            I cannot credit the wife.  She just on the phone here

8    stopped testifying because she wanted to maintain her right to

9    remain silent.  I think that's very concerning.  But really

10   that's not the basic part.  I understand that he has a place to

11   go.  I understand he has people who would sign on the bond.

12   It's these other things that are much more concerning.

13           I don't want to repeat things I've already said.  So

14   I find that there's a substantial risk of flight and that there

15   is no condition or combination of conditions that would

16   reasonably assure the appearance of the Defendant in court.

17   And so he will be detained pending trial.  And all of these

18   exhibits, I'll let you take them back and assemble your exhibit

19   list so that if and when you appeal this decision, you have all

20   of that on the record.

21           And I'll just tell you, this was a very long hearing.

22   I listened to all of it intently and heard every word that

23   every person had to say.  And I've looked at these exhibits --

24   oh, and by the way, the -- I forgot to say, I'm also concerned

25   about the number of passports that -- and I understand that

1  there is some -- we don't know why there's a different date of

2  birth in there.

3          **MR. SHOHAT:**  It's not a different date of birth, it's

4  place of birth.

5          **THE COURT:**  Or place, I'm sorry, place, place.  We

6  don't know why that is so I'm not assuming some nefarious

7  motive there.  You said it might have been a mistake.  Okay, --

8          **MR. SHOHAT:**  Well, if he told them --

9          **THE COURT:**  Well, just --

10          **MR. SHOHAT:**  -- previously Cookeville, Tennessee --

11          **THE COURT:**  Sir!  I get it.  What I'm saying is, he's

12  got several passports.  He's using different passports to get

13  in and out.  Maybe that doesn't mean anything.  But the point

14  is he has three of them.  And he's -- again, the foreign travel

15  is -- would by itself not necessarily be a problem if it

16  weren't for the fact that he is traveling in -- you know, he's

17  doing foreign travel in order to facilitate this crime.  And it

18  shows his ability to travel.  And he told people he was going

19  to flee.  And that's uncontested, all of that is uncontested.

20  So that's my ruling.  Is there anything else we need to do

21  today?

22          **MR. SHOHAT:**  Well, thank you for your time, Your

23  Honor.

24          **THE COURT:**  You're welcome.  Is there anything else?

25          **MS. EDWARDS:**  Not from the Government, Your Honor.

1          **THE COURT:** All right, you're excused.  Go about

2  your --

3          **MR. SPEAKER:** All rise.

4          **THE COURT:** -- business.  I'm just going to clean up

5  here.

6      **(This proceeding was adjourned at 2:10 p.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          <u>September 30, 2018</u>
        Signed                              Dated


            *TONI HUDSON, TRANSCRIBER*