United States Courts
Southern District of ...
F I L E D

**MAY 14 2019**

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** § | |
| § | |
| **v.** § | **CRIMINAL NO.** 19 CR 341 |
| § | |
| **JOSE M. GONZALEZ-TESTINO** § | |
| § | |

## INFORMATION

THE UNITED STATES ALLEGES:

### Introduction

At all relevant times, unless otherwise specified:

1.      Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.   PDVSA and its subsidiaries were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  Bariven, S.A. ("Bariven") was a wholly-owned subsidiary of PDVSA that at all relevant times was responsible for procuring goods and services on behalf of PDVSA.  Citgo Petroleum Corporation ("Citgo") was a Houston-based subsidiary of PDVSA that acted primarily as a refiner, transporter, and marketer of petroleum-based products, but also procured goods and services on behalf of PDVSA through its Special Projects group.

1

2.      PDVSA and its subsidiaries were "instrumentalities" of the Venezuelan government as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(2)(A).   PDVSA, Bariven, Citgo, and PDVSA's other affiliates and subsidiaries are hereinafter collectively referred to as "PDVSA."

3.      At all relevant times, defendant **JOSE MANUEL GONZALEZ-TESTINO** was a dual U.S. and Venezuelan citizen.   **GONZALEZ** was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).   During the relevant period, **GONZALEZ** and his co-conspirators controlled multiple companies based in the United States, Panama, and Europe that supplied equipment and services to PDVSA.

4.      Co-Conspirator 1, a Venezuelan citizen and resident of Miami, Florida, was one of **GONZALEZ**'s business partners between approximately 2012 and 2014.   Co-Conspirator 1 provided financing to **GONZALEZ** and his companies to enable **GONZALEZ** to supply equipment and services to PDVSA.   Co-Conspirator 1 was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.      Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, and Co-Conspirator 5 were each Venezuelan citizens who at relevant times worked with

2

**GONZALEZ** to win PDVSA contracts, pay bribes, and launder funds related to the scheme.

6.      Employee A was an individual who worked for **GONZALEZ**, including one of his U.S.-based companies.  Employee A's job responsibilities included handling PDVSA contracts for a logistics company controlled by **GONZALEZ**, as well as tracking purchase orders and bribe payments related to multiple other companies controlled by **GONZALEZ** and his co-conspirators. Employee A was an employee of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.      Company A, Company B, and Company C were each companies organized under the laws of Panama, controlled by **GONZALEZ** and his co-conspirators, and used by **GONZALEZ** and his co-conspirators to secure contracts with PDVSA.

### PDVSA Officials

8.      Alfonzo Eliezer Gravina Munoz ("Gravina"), who has been charged separately, was a dual U.S. and Venezuelan citizen and resident of Texas employed by PDVSA and by wholly owned subsidiaries and affiliates thereof from in or around 1998 until in or around March 2014.  During that time, Gravina held a number of positions related to the purchase of energy services equipment and services, including purchasing manager.  In this role, Gravina was a "foreign

official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A). Following his departure from PDVSA in 2014, Gravina began working for one of **GONZALEZ**'s companies. Gravina was thus a "domestic concern," and an employee and agent of a domestic concern, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

9.     Cesar David Rincon Godoy ("Rincon"), who has been charged separately, was a Venezuelan national who, from at least 2011 until June 2013, was employed by PDVSA. Rincon held a number of positions at PDVSA and Bariven, ultimately being named as a high-level Bariven executive in or about January 2012. In his capacity as a Bariven executive, among other duties, Rincon had the responsibility for assembling and revising Bariven's weekly payment proposals, which set forth the debt Bariven owed to its numerous vendors and proposed payments of various amounts to selected vendors.

10.     "Official A" was employed by Citgo in the Special Projects group between approximately 2015 and 2018. Official A's job responsibilities included vetting vendors for bidding panels and evaluating quotes for products.

11.     "Official B" was employed by Citgo between approximately 2010 and February 2018. Between approximately 2012 and 2015, Official B worked in the Special Projects group. Official B's job responsibilities included supervising employees and contracting processes in the Special Projects group.

12.     "Official C" was employed by Citgo in the Special Projects group between approximately 2014 and 2018.  Official C's job responsibilities included vetting vendors for bidding panels and evaluating quotes for products.

13.     "Official D" was employed by Citgo in the Special Projects group between approximately 2014 and 2018.  Official D's job responsibilities included vetting vendors for bidding panels and evaluating quotes for products.

14.     "Official E" was employed as a senior executive of Citgo from June 2013 through approximately November 2017.   Official E's duties included overseeing all of Citgo's operations, including the Special Projects group.

15.     Rincon, Official A, Official B, Official C, Official D, and Official E were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A).

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

16.     Paragraphs 1 through 15 are realleged and incorporated by reference as though fully set forth herein.

17.     Beginning in or around 2012 and continuing through at least 2018, in the Southern District of Texas, and elsewhere, the defendant,

**JOSE MANUEL GONZALEZ-TESTINO**

did willfully and knowingly conspire, confederate, and agree with Co-Conspirators 1–5, and others known and unknown to the United States, to commit offenses against

5

the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use the foreign official's influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **GONZALEZ**, Co-Conspirator 1, and **GONZALEZ**'s U.S.-based companies, in obtaining and retaining business for and with, and directing business to, **GONZALEZ**, Co-Conspirator 1, and **GONZALEZ**'s U.S.-based companies, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

### Purpose of the Conspiracy

18.    The purpose of the conspiracy was for **GONZALEZ** and his co-conspirators to enrich themselves by obtaining and retaining lucrative contracts and

other business advantages with PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials.

**Manner and Means of the Conspiracy**

19.    The manner and means by which **GONZALEZ** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

20.    **GONZALEZ** often arranged for multiple companies that he and his co-conspirators owned or controlled, but that had different nominal owners on paper, to bid on the same PDVSA contracts in order to increase the probability of one of his companies winning those contracts while appearing that the contract had been awarded through a competitive bidding process

21.    **GONZALEZ**, his employees, and his co-conspirators discussed in person, over email, and through encrypted messaging services how they would obtain and retain contracts and other business advantages with PDVSA by providing things of value to PDVSA officials.

22.    **GONZALEZ** paid bribes to PDVSA officials in order to influence acts and decisions of the PDVSA officials in their official capacities, to induce the PDVSA officials to do and omit to do certain acts, to secure improper business advantages, and to induce the PDVSA officials to use their influence with the

7

Venezuelan government and agencies and instrumentalities thereof, including, but not limited to:

    a.    helping **GONZALEZ**'s companies win PDVSA contracts to supply equipment and services, including logistics services;

    b.    providing **GONZALEZ** inside information about the PDVSA bidding process;

    c.    helping to conceal the fact that **GONZALEZ** controlled multiple companies on certain bidding panels for PDVSA projects; and

    d.    assisting **GONZALEZ** in receiving priority over other vendors to receive payment for previously awarded PDVSA contracts.

23.    **GONZALEZ** and his co-conspirators paid bribes by giving PDVSA officials cash at in-person meetings; sending wire transfers from bank accounts controlled by **GONZALEZ** and his co-conspirators to bank accounts controlled by the PDVSA officials; and providing other things of value, including private jet travel, recreational travel including plane tickets and hotel accommodations, Super Bowl and other sports tickets, meals, entertainment, and luxury consumer goods including jewelry and watches.  Specifically, during Official E's tenure as a Citgo official, **GONZALEZ** provided Official E with original artwork, at least one flight on a private jet chartered by **GONZALEZ**, and, after Official E expressed displeasure with his corporate apartment, arranged the purchase of an apartment of

Official E's choosing in the Houston area, and lease of that apartment to Citgo for Official E's use.

24.    **GONZALEZ** and his co-conspirators maintained spreadsheets tracking the bribe amounts owed and paid to the PDVSA officials.  **GONZALEZ** and his co-conspirators paid some officials a percentage of contract amounts awarded to **GONZALEZ**, his co-conspirators, and their companies, and paid others a regular monthly amount; the actual amounts paid varied by individual official.

25.    **GONZALEZ** and his co-conspirators referred to various PDVSA officials by nicknames in these bribe tracking spreadsheets in order to conceal the officials' true identities.

26.    To conceal the nature, source, and ownership of the bribe payments, **GONZALEZ**, his employees, and his co-conspirators:

    a.    created false justifications, including false invoices sent to **GONZALEZ**'s companies for equipment not provided and for services never rendered;

    b.    sent and directed bribe payments from bank accounts held in the names of companies other than the companies being awarded PDVSA contracts and receiving payments from PDVSA;

    c.    requested the PDVSA officials identify bank accounts into which the PDVSA officials could receive bribe payments that were in

the names of companies, intermediaries, relatives, friends, and close personal associates of the PDVSA officials;

d.     helped an associate of Official A, open a bank account in Switzerland, and wired money to that account; and

e.     used intermediaries, including a relative of Official A, to pass information regarding bribe payments owed and accounts into which bribe payments could be made.

27.     During the time set forth in the Information, the Defendant used encrypted messaging services to communicate with his co-conspirators; routinely deleted BlackBerry messages on his personal devices and other documents; monitored electronic communications of his co-conspirators, employees, and others without their knowledge;  and discussed with Gravina the latter's cooperation with the government's investigation.

## Overt Acts

In furtherance of the conspiracy and to achieve the objects thereof, at least one of the conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

### *Payments to Rincon*

28.     In or about 2012, **GONZALEZ** met with Rincon at the Eurobuilding Hotel in Caracas to discuss the assistance that Rincon would provide to **GONZALEZ's** companies in exchange for bribe payments.

29.     Later in 2012, **GONZALEZ** subsequently requested Rincon's bank account information, so that he could direct bribe payments to Rincon's preferred bank accounts.

30.     On or about the dates below, in exchange for Rincon's assistance with PDVSA contracts, **GONZALEZ** and his co-conspirators caused the following bribe payments to be sent from Swiss bank accounts, held in the name of Company A, B, or C, into an account in the Southern District of Texas, held in the name of a company owned by one of Rincon's relatives (the "Texas Account") or an account in Florida held in the name of a different company owned by one of Rincon's relatives (the "Florida Account"):

| Overt Act | Date | Rincon Beneficiary Bank Account | GONZALEZ Company Bank Account | Amount |
|---|---|---|---|---|
| 30(a) | 11/27/2012 | Texas Account | Company A | $50,000.00 |
| 30(b) | 1/15/2013 | Texas Account | Company B | $50,000.00 |
| 30(c) | 3/5/2013 | Florida Account | Company A | $50,000.00 |
| 30(d) | 3/7/2013 | Florida Account | Company A | $50,000.00 |
| 30(e) | 3/21/2013 | Florida Account | Company A | $50,000.00 |
| 30(f) | 4/8/2013 | Florida Account | Company A | $75,000.00 |
| 30(g) | 4/17/2013 | Florida Account | Company A | $75,000.00 |
| 30(h) | 4/24/2013 | Florida Account | Company B | $50,000.00 |
| 30(i) | 5/2/2013 | Florida Account | Company C | $29,000.00 |
| 30(j) | 5/14/2013 | Florida Account | Company C | $100,000.00 |
| 30(k) | 6/3/2013 | Florida Account | Company A | $50,000.00 |

### *Payments to Other PDVSA Officials*

31.    On or about April 4, 2013, **GONZALEZ** caused a $50,000 bribe payment to be sent from a Swiss account under his control to a bank account in the Southern District of Texas in Gravina's name.

32.    On or about April 23, 2013, **GONZALEZ** caused a $50,000 bribe payment to be sent from a Swiss account under his control to a bank account in the Southern District of Texas in Gravina's name.

33.   On April 13, 2017, a relative of Official A sent an email to **GONZALEZ** with an attachment titled, as translated into English, "Report on open processes."   The attachment was a twenty-page document listing each contract that was open for bidding and the procurement officer in the Citgo Special Projects group that was responsible for each contract.

34.   In or about May 2017, **GONZALEZ** and his co-conspirators arranged for an associate of Official A to travel to Switzerland to open a bank account in the associate's name to which **GONZALEZ** could wire bribe payments for Official A.

35.   On or about August 1, 2017, **GONZALEZ** and his co-conspirators caused a $57,472.11 bribe payment for Official A's benefit to be sent to the Swiss account referenced in paragraph 34.

36.   In or about 2014, **GONZALEZ** caused a $400,000 payment to be made to Official B in exchange for Official B's assistance to in winning a contract from PDVSA.

37.   On or about September 7, 2017, **GONZALEZ** and his co-conspirators caused a $22,600 bribe payment for Official C to be made to a Houston bank account in the name of a relative of Official C.

38.     On or about July 28, 2017, **GONZALEZ** and his co-conspirators caused a $30,575 bribe payment for Official D to be sent to a Houston bank account held in the name of a relative of Official D.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (FCPA – 15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

39.     Paragraphs 1–15 and 18–38 are realleged and incorporated by reference as though fully set forth herein.

40.     On or about July 28, 2017, in the Southern District of Texas and elsewhere, the defendant,

**JOSE M. GONZALEZ-TESTINO,**

being a domestic concern and an officer, director, employee, and agent of a domestic concern, and a stockholder thereof acting on behalf of a domestic concern, and by aiding and abetting a domestic concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and

15

instrumentalities, in order to assist **GONZALEZ** and his U.S.-based companies in obtaining and retaining business for and with PDVSA, and directing business to, **GONZALEZ**, his co-conspirators, and his companies, to wit: causing a $30,575 wire transfer from a Curacao bank account under his control to an account controlled by Official D's nephew located in the Southern District of Texas.

All in violation of 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2.

## COUNT THREE
## (Failure to File Foreign Bank Account Report – 31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. § 2)

41.     Paragraphs 1–15 and 18–38 are realleged and incorporated by reference as though fully set forth herein.

42.     At all relevant times, United States citizens who had a financial interest in or signature authority over certain foreign bank accounts, whether or not the accounts were set up in the names of nominees who act for their principals, had reporting obligations to the United States.

43.     The Bank Secrecy Act and its implementing regulations required U.S. citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeded $10,000 at any point during the year.  This report, known formally as a Report of Foreign Bank and Financial Accounts (FinCEN Report 114), was commonly known as a foreign bank account report or "FBAR."  At all times relevant to this information, the FBAR for any calendar year was required to be filed on or before June 30 of the following calendar year.

44.     U.S. citizens were also required to report, on Schedule B of Form 1040, information to the Internal Revenue Service ("IRS") regarding foreign bank

accounts in which the taxpayer had a financial interest or had signature authority over.

45.    For each year in or about and between 2015 through at least 2017, defendant **GONZALEZ** was a U.S. citizen who had a financial interest in or signature authority over foreign accounts that required an FBAR report. Specifically, **GONZALEZ** had a financial interest in or signature authority over foreign bank accounts held in the names of companies he controlled, including Companies A, B, and C, as well as other foreign bank accounts held in **GONZALEZ**'s name.  No FBAR reports were made by **GONZALEZ** for these accounts.

46.    Furthermore, in each of **GONZALEZ**'s tax filings with the IRS for 2015 through 2017, **GONZALEZ** failed to report that he had a financial interest in or signature authority over any foreign bank accounts.  He also falsely stated to his accountant that he did not have control or authority over any foreign bank accounts.

47.    On or about the filing due date of June 30, 2018, in the Southern District of Texas and elsewhere, the defendant,

**JOSE M. GONZALEZ-TESTINO**,

willfully and knowingly failed to file with the Department of the Treasury an FBAR disclosing that he had a financial interest in, and signature and other authority over,

a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000 during the year 2017.

All in violation of 31 U.S.C. §§ 5314 and 5322(a).

## NOTICE OF CRIMINAL FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

48.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendant,

**JOSE M. GONZALEZ-TESTINO,**

that in the event of conviction of either of the offenses charged in Counts 1 and 2 of this Information, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## PROPERTY IN SUBSTITUTION

49.    In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendant in substitution up to the total value of the property subject to forfeiture. The United States will seek the imposition of a money judgment against the defendant.


RYAN K. PATRICK
UNITED STATES ATTORNEY

ROBERT ZINK
ACTING CHIEF
FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: _____

BY: _____

JOHN P. PEARSON
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEYS

SARAH E. EDWARDS
SONALI D. PATEL
TRIAL ATTORNEYS